UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 24-20463 CR Altman

UNITED STATES OF AMERICA,
vs.                        Plaintiff
GUSTAVO ALFONSO CASTANO RESTREPO

                Defendant.
_____/

**MOTION TO STRIKE
NOTICE OF INTENT TO SEEK THE DEATH PENALTY [DE 46]**

Defendant, GUSTAVO ALFONSO CASTANO RESTREPO, through undersigned counsel, and pursuant to the points and authorities set forth *infra*, hereby moves this Court to strike the Government's "Notice of Intent to Seek the Death Penalty" [DE 46], and in support states as follows:

I.      **INTRODUCTION/PROCEDURAL HISTORY**

> *"Death is a unique punishment in the United States. In a society that so strongly affirms the sanctity of life…"*
> *Furman v. Georgia*, 408 U.S. 238, 286 (1972) [1]

On October 21, 2024, Mr. Restrepo was charged by Indictment with Kidnapping Resulting in Death, allegedly occurring eight years earlier, in violation of 18 U.S.C. 1201(a)(1) and 2, an offense punishable by death. [DE 3].

---

[1]      Along similar lines, see, *United States v. Gomez-Olmeda*, 296 F. Supp. 2d 71, 90 (D.P.R. 2003) (citations omitted):

> Capital punishment is qualitatively different from any other form of criminal penalty we may impose. With it, we deny the convict any possibility of rehabilitation and order instead his execution, the most irrevocable of sanctions. Its severity demands a heightened need for reliability in the determination that death is the appropriate punishment in a specific case.

On December 20, 2024, the Court scheduled a status conference by paperless Order [DE 31]: "[c]onsistent with [its] usual practice in such cases, **and to better manage the complexities associated with this case** … set a Status Conference **to discuss scheduling** on January 6, 2025." (emphasis added)

On January 6, 2025, the prosecution formally advised the Court and defense counsel that the Attorney General had instructed the prosecution **not** to seek the death penalty in this case. In specific and detrimental reliance in this case, the matter proceeded in all respects as a non-capital case, and the "scheduling" involved a non-capital trial setting of June 2, 2025, which was then continued to September 8, 2025.

Notwithstanding, the government delayed filing a *Notice of Intent to Seek the Death Penalty* until August 11, 2025, twenty-seven days before the trial. Twenty-seven days is not "a reasonable time before trial", as required by 18 USC § 3593. The government's efforts to reverse formal no-seek announcements have been rejected by every court that has confronted it to date.

After the status conference the case proceeded in all respects as a non-capital case. Defense counsel did not request appointment of "Learned Counsel" (see 18 U.S.C. § 3005), a mitigation specialist, nor any otherwise appropriate experts and/or support staff routinely assigned to capital cases. No mitigation investigation was commenced.

Following the President's Executive Order "*Restoring the Death Penalty*", on February 5, 2025, Attorney General Pamela Bondi issued a "*Memorandum Re: Reviving the Federal Death Penalty and Lifting of Moratorium on Federal Executions,*" implementing the Executive Order. The AG Memo suspended the current version of DOJ death protocols and directed a review of all formal decisions not to seek the death penalty that were charged during the previous administration between January 20, 2021, and January 19, 2025. (*Id.*)

Sometime in the late spring of 2025, the prosecutor told the defense that the decision not to seek the death penalty was being reviewed. No reason for the review was provided then or now, and the only objective change in the circumstances in this case was political.

One rock-solid principle of death penalty defense is that a client facing the death penalty must have at least two defense counsel, with at least one "learned in the law applicable to capital cases" 18 U.S.C. § 3005. To that end, the defense, having been informed of the government's apparent political decision to seek the death penalty and fulfill the vagaries emanating from Washington, D.C., successfully sought this Court's appointment of learned counsel to assist in the representation of Mr. Restrepo. *See* DE 42 (Motion to Appoint Learned Counsel) and DE 43 (Order appointing Stu Adelstein as Learned Counsel) (filed May 30, 2025).

With the appointment of learned counsel being sought, the undersigned attorney again requested that the prosecutor delay the proceedings before the DOJ committee in Washington until learned counsel could perform the work for which he was appointed and prepare mitigation. [*See* Exhibit One.]  Although it had taken eight years to charge Mr. Restrepo, time was of the essence for the prosecution (at least in regard to the DOJ committee receiving a presentation from defense counsel), for reasons that were never explained, and counsel's request was denied. Time was not of the essence for the prosecution once the decision to seek the death penalty was made.

The prosecutor informed undersigned counsel that the date for him to appear before the committee in Washington, D.C., had been set for Tuesday, June 3, 2025. The undersigned informed Mr. Williams that the date, days after counsel had finished a month-long trial before this Court in May, 2025, did not allow "a reasonable opportunity"[2] for a thorough investigation of mitigating

---

[2]     See Justice Manual § 9-10.080 (discussing the need to provide "counsel for the defendant a reasonable opportunity to present information for the consideration of the United States Attorney or Assistant Attorney General which may bear on the decision whether to seek the death penalty.")

circumstances.  Mr. Williams was asked multiple times to reschedule the date, as counsel had scant time to prepare for the presentation to the committee, having just finished a lengthy trial. Mr. Williams advised that the Committee refused to reschedule the meeting. [*See* Exhibit One].

On June 3, 2025, undersigned counsel met via Microsoft Teams with the Capital Case Committee and was compelled by the government's unyielding scheduling demands to provide preliminary and underdeveloped mitigation evidence he had recently obtained from family members of his client over the weekend. The preparation was rushed and was not nearly as comprehensive as counsel would have presented had he been afforded the "reasonable opportunity" required. This evidence did not contain many of the normal types of mitigation employed in other cases, including the investigation of mitigation by a mitigation specialist and the potential use of other experts for mitigation evidence.

Over a month later, on July 11, 2025, a Superseding Indictment was returned, which now contained "Special Findings" concerning the death penalty. DE 44.[3] After yet another month delay, a *Notice of Intent to Seek the Death Penalty* [DE 46] was filed on August 11, 2025, less than thirty days before the scheduled trial date of September 8, 2025.  Notably, the notice of intent was not filed in June 2025, nor in July 2025, even after the superseding indictment was unsealed. The untimely notice placed the defense in the position of not being able to agree to a continuance of the trial, lest the delay be used by the prosecution to now cure its untimely notice of intent to seek the death penalty.

---

[3] While Mr. Williams told both of Mr. Restrepo's defense attorneys in a phone call in June 2025 that he ***did not*** expect the committee to authorize the seeking of the death penalty (while also apparently obtaining the superseding indictment unsealed in July with the special findings necessary for the imposition of the death penalty), no attack on Mr. Williams' character or veracity is being made, unlike his filings against the undersigned attorney. *See* DE 48.

There are several independent reasons for this Court to strike the government's untimely notice of intent to seek death. First, as discussed, the notice is not timely, and is not even close to being timely.  Second, there are no changed circumstances, other than political, that led to the prosecution reversing the prior in-court waiver of the death penalty on January 6, 2025. There has been no new evidence uncovered, and no change of circumstances as to how the crimes charged were committed. The special findings listed in the superseding indictment were well known to the prosecution at the time of the original indictment in November 2024, and at the time of the in-court waiver of the death penalty in January 2025. The only change in circumstances was political.

## II.     ADDITIONAL FACTORS UNRELATED TO TIMELINESS SUPPORT AN ORDER STRIKING THE NOTICE OF INTENT

In the thirty-year history of the federal death penalty, no administration has ever attempted to reverse a prior administration's formal decision not to seek the death penalty. **Until now**. The judicial reaction to this unprecedented effort has been unanimous and decisive, falling into two general categories. First, every court which has been called upon to strike a no-seek reversal has done so. Second, every court which has had occasion to address the no-seek reevaluation **prior** to a Notice of Intent being filed has been sharply critical of the concept, signaling that it would not tolerate such action.

### A.     Cases where Courts have ruled on no-seek reversals

Without exception, each of the District Courts to have directly confronted the issue have struck the Notice of Intent to Seek the Death Penalty:

*United States v. Spurlock* **(D NV) 3:23-cr-00022-MMD-CLB**

On May 9, 2025 the Court entered an Order [DE 419] that "Defendant's motion to strike the United States' notice of intent to seek the death penalty [DE 374] is granted." The Court also relied upon numerous independent grounds equally applicable here, including the following:

    1.  **Judicial Estoppel**

"The Court also finds - as a standalone basis for the use of discretion to strike the Death Notice - that the principals of judicial estoppel preclude the government from reversing its formal, timely-filed July No-Seek notice, especially where no case-related developments occurred following the July Notice to bear on the reversal decision." DE 419, at 29.

    2.  **Lack of "Good cause" under 18 U.S.C. § 3593**

"[T]he FDPA must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so." DE 419, at 37, "and [the Court] finds that the government has violated the FDPA by attempting to reverse its formal no-seek decision without leave to amend, and without showing good cause to amend - even assuming, without deciding, that the FDPA allows amendment of a no-seek notice to seek death for good cause." *Id*., at 40.

*United States v. Constanza, et al* **(D MD) 1:22-cr-00409-SAG**

On June 18, 2025, the Court granted [DE 130] the defendants' Motion to Strike:

The question before this Court is whether the government's belated notices of its intent to seek the death penalty comport with Defendants' constitutional and statutory rights. The answer is emphatically no. *Id*., at 3

In addition to timeliness issues, the Court, like *Spurlock*, "agree[d] that general principles of judicial estoppel and the more specific guidelines found in Section 3593(a) also preclude the government from reversing its position here." DE 130:21.

### *United States v. Dangleben* (D VI) 3:23-cr-00072-RAM-GAT

On August 18, 2025, Chief Judge Molloy entered an Order [DE 213] granting the Defendant's *Motion to Strike Notice of Intent to Seek the Death Penalty*, "finding the opinions rendered in *United States v. Spurlock ...* and *United States v. Constanza-Galdomez* … well-founded and the reasoning therein persuasive …"

### *United States v. Cole and Smith* (D VI) 1:23-cr-00016-WAL-EAH

On the same date, in an unrelated case, Judge Lewis filed a *Notice of Intended Ruling and Order* [DE 230], advising that:

> … the Court intends to strike the Government's Notices of Intent to Seek the Death Penalty … A Memorandum Opinion setting forth the bases for this decision, and an accompanying Order, will follow as soon as practicable.

The *Cole* and *Smith* pleadings relied heavily on *Spurlock* and *Constanza.*

**B.    Cases where Courts addressed no-seek reversals but were not yet required to strike a Notice of Intent because it was premature**

In the following cases, Courts were sharply critical of the concept, signaling that they would not tolerate such action, but were not required to strike a Notice of Intent because no such Notice had yet been filed.

### *United States v. Martinez* (CD CA) 19-cr-00117-ODW

In *Martinez*, the defense forecast - pre-election - the possibility that a new administration might make an unprecedented attempt to reverse the current administration's no seek decisions. The Court made its position clear:

> THE COURT … I don't see this as being fair … I don't see that as fair at all ... I'm not going to permit something that unfair to take place in this court ... Okay. I'm going to say this for the last time. You can't tell people that this form of punishment is off the table so that they can now sleep again and then change your mind and go, "It's back on again." No.
> Transcript of Proceedings, August 12, 2024, at 13

***United States v. Suarez, et. al.*** **(ND CA) 5:24-cr-00226-BLF**

The defendants moved preemptively to prohibit the government from reevaluating its no-seek decision. Despite holding that the matter was not yet ripe because no Notice of Intent had been filed, the Court made no secret of its great displeasure with the government's proposed course:

- I am concerned, … that the United States -- that Attorney General has caused the United States to mislead the court, and this new endeavor of the Attorney General to revisit cases that are as old as four years old causes the no-seek notice to be a joke, and I'm very concerned about that. July 15, 2025, p. 5
- The United States seems to believe it can willy nilly withdraw the no-seek notice. That's very concerning to me. p. 5
- My view, the government has made a decision, and that's why I say the government mislead the court because it filed a notice of not seeking the death penalty. p. 7
- And you make this point in your reply brief, I think very thoroughly, that a no-seek order is meaningless because under the government's view it could be withdrawn at any time. And so all cases are death eligible cases until the last screaming moment before trial when timeliness would overwhelm any argument to the contrary by the government. I'm very concerned about that. p. 8
- So I actually think it may be that I ultimately determine that withdrawing a no-seek is not allowed because it was an irrevocable determination and a final determination ... p. 9
- I do think that the reliance this court placed on the no-seek notice is significant in this case. p. 16

Ultimately, the government declined to reverse its prior no-seek decision, so the Court was not required to strike a Notice of Intent.

***United States v. Hightower*** **(D MD) SAG-23-00186 2025 U.S. Dist. LEXIS 109340 (D. Md. June 10, 2025)**

In *Hightower*, the Court described the government's reconsideration of its decision not to seek the death penalty as a "highly unorthodox scenario" which "obviously placed Mr. Hightower under great strain," including "weeks of intense stress over whether the government would seek the death penalty." *Id.* at *6-8.

**C.     Additional cases not involving no-seek reevaluations**

*United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003)

Although not in the no-seek reevaluation context, the only Circuit Court to address whether a formal no-seek decision may be reversed said it could not. referring to "the government's **irrevocable** decision not to pursue the death penalty." (emphasis added).

*United States v. Black* and *United States v. Green* 918 F.3d 243, 265 (2d Cir. 2019)

Also not a no-seek reevaluation case, but affirming the District Court's dismissal of the Indictment based upon **prejudice from the government's "delayed death penalty decision."** The 2nd Circuit observed:

> … Black, Green, and Rodriguez were forced … to worry over whether the government would seek not just their liberty, but their lives. The magnitude of the anxiety and concern incurred by this decision is great, and this consideration weighs heavily in our determination that the delay here prejudiced Defendants-Appellees.

## III.    THE NOTICE IS UNTIMELY AND SHOULD BE STRUCK

The notice seeking the death penalty was filed on August 11, 2025, twenty-eight days before the trial scheduled for September 8, 2025. Twenty-eight days does not meet the "reasonable time" required by 18 USC § 3593(a).

Under 18 USC § 3593(a), the Government "shall sign and file with the court, and serve on the defendant, a notice…a reasonable time before the trial or before acceptance by the court of a plea of guilty." What constitutes a "reasonable time" is a fact-specific inquiry. Courts have consistently recognized that capital cases require extraordinary preparation, including investigation of mitigation evidence, consultation with experts, and strategic adjustments unique to capital defense. See, e.g., *United States v. Ferebe*, 332 F.3d 722, 727–28 (4th Cir. 2003).

Filing a notice of intent to seek death **less than one month before trial** does not provide adequate time for the defense to conduct mitigation investigation, retain and prepare experts, and prepare a guilt/innocence strategy that is also consistent with a penalty-phase strategy. *See* ABA

Guidelines, Guideline 10.10.1 Trial Preparation Overall, noting that defense counsel "*should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies."*

Courts have struck or precluded death notices with far longer lead times. *See Spurlock*, 2025 WL 1360499, at *26 (finding 54 days before trial was "grossly insufficient"); *Constanza-Galdomez*, 2025 WL 1712436, at *8 (finding notice filed 109 days before trial untimely); *Dangleben*, 3:23-cr-00072-RAM-GAT, DE 213 (striking death notice filed 137 days before trial); *Cole*, 1:23-cr-00016-WAL-EAH, DE 230 (striking death notice filed 52 days before trial). *See also United States v. Ferebe*, (notice 77 days before trial unreasonable); *United States v. McGriff*, 427 F. Supp. 2d 253 (E.D.N.Y. 2006) (notice 70 days before trial untimely).

**A Continuance Will Not Cure The Notice Issue**

In *United States v. Ferebe*, the Fourth Circuit evaluated a notice of intent to seek death filed roughly six weeks before the scheduled trial date. The Court set out four non-exhaustive factors: "(1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and . . . (4) the status of discovery in the proceedings." *Id.* at 737. Regarding the third factor, the *Ferebe* court concluded that the time between the filing of the notice and the trial should be measured *without considering any further continuance* spurred by the late-filed notice.

In *United States v. Wilk*, 452 F.3d 1208 (11th Cir. 2006), the Eleventh Circuit considered *Ferebe* and adopted a modified formulation of the relevant factors. Notably, there was no initial waiver of the death penalty in *Wilk*, followed by a reconsideration. This factor weighed heavily in the Court's decision, and distinguishes it from the issues in this case: "[F]rom the start, all parties

knew this was a likely death penalty case, and thus, Wilk's counsel, who had extensive capital crimes experience, began to prepare a death defense months before the Death Notice was filed on February 18, 2005." *Id*. at 1222.

The *Wilk* court held that, in considering the totality of the circumstances, a district court should evaluate at least "(1) what transpired in the case before the formal Death Notice was filed; (2) the period of time remaining for trial after the Death Notice was filed; (3) the status of discovery and motions in the proceedings; (4) the nature of the charges in the indictment; (5) the nature of the aggravating factors claimed to support the death penalty; and (6) the anticipated nature of the defense, if known." *Id.* at 1221.

The first factor settles much of the matter in this case. Unlike in *Wilk*, where the Court found that the defense knew from the outset that the case was a death penalty case, in this matter, the prosecutor announced a waiver of the death penalty on the record, less than sixty days from the indictment. This fact is controlling. *See Spurlock*,

> The mere existence of the no-seek notice also distinguishes this case from *Wilk*, where "from the start, all parties knew [it] was a likely death penalty case," and the defense had begun to prepare a death defense months before the notice was filed, including by hiring mitigation experts and engaging in discussions about death-qualifying.
> *Id.,* DE 419: 46.

The *Wilk* court found that a continuance would remedy the untimely notice. *Id.* at 1223-24. However, the non-binding dicta was case-specific to the facts, as the reasoning of the District Courts in *Spurlock* above, and *Ferebe*, detailed below, illustrates.

The decision in *Ferebe* stands in opposition to the prosecution's solution in this case, which is to obtain a continuance to cure the untimeliness of the notice of intent to seek the death penalty. This issue was also noted by the District Court Judge in *Spurlock* where the judge ruled that a continuance would not cure the untimely notice of intent to seek death:

The government maintains that a continuance would cure any unfair advantage. But regardless of the impact of an another continuance on Spurlock's rights under the Speedy Trial Act per se, there is no real question that an additional delay would cause some degree of additional prejudice against him – because of the added pursuit of capital punishment itself, the impact of a no-seek notice on defense preparation, and simply the fact a delay would extend Defendant's time in pretrial custody. *Id.,* DE 419: 31.

Nor is the prosecution's argument in their motion to continue that the defense was on notice of their intent to seek death sufficient. 18 USC § 3593(a) requires a filing of a formal notice to seek death and nothing less. Amorphous allegations about knowing what the prosecution might do are meaningless when the law requires a written notice. *See Spurlock*:

> To the extent the government implies the defense was effectively on notice of its intent to seek death *before* April 10, 2025, and that additional time preceding the notice should be incorporated into a reasonableness analysis as a result, that argument is unpersuasive. **The government cannot satisfy its burden to file a formal death notice complying with Section 3593(a) by equivocations or vague references to future filings.** A proper notice must formally lay out circumstances and aggravators believed to justify the imposition of capital punishment. *See* 18 U.S.C. § 3593(a). The government's statement to the defense that reversal was a "possibility" in February 2025 did not amount to notice because it provided no certainty as to the government's new position whatsoever. *Id.,* DE 419: 41 (emphasis added).

Other district courts have also held that a continuance does not resolve the untimeliness of a notice to seek death. In *United States v. Ponder*, 347 F. Supp. 2d 256, 267 (E.D.Va. 2004), the district court held that "[I]f a trial date is continued because the filing of the Death Notice is too close to the trial date, the Death Notice is per se unreasonable."

## IV.   THE GOVERNMENT IS ESTOPPED FROM FILING A NOTICE THAT IT INTENDS TO SEEK THE DEATH PENALTY UNDER 18 U.S.C. § 3593(A).

In addition to having waived its ability to file a § 3593(a) notice of its intent to seek the death penalty, the government is estopped from doing so. There are at least three different types of estoppel that apply here - judicial estoppel, equitable estoppel, and promissory estoppel.

**Judicial Estoppel**

For essentially the same reasons that the district courts gave in applying the judicial estoppel doctrine in *Constanza-Galdomez* and *Spurlock*, this Court should hold that the government is judicially estopped from seeking the death penalty in the instant case.

As the court stated in *Constanza-Galdomez*:

The Supreme Court laid our three factors for courts to consider in *New Hampshire v. Maine*, 532 U.S. 742 (2001): (1) "a party's later position must be clearly inconsistent with its earlier position;" (2) a court must "inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) a court must ask "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

All three of those factors favor applying judicial estoppel here. A notice of intent to seek the death penalty is the direct opposite of the prior statement by the government that it would not. This Court effectively accepted that statement in managing this case as a non-capital RICO case for its duration. . . . Finally, and most concerning to this Court in this case, allowing the government to reverse course would impose an unfair detriment on the defense.

*Constanza-Galdomez*, 2025 WL 1712436, at *12; *see also Spurlock*, 2025 WL 1360499, at *17 (alternatively applying the judicial estoppel doctrine "as a standalone basis" to prevent the government from seeking the death penalty after initially filing a no-seek notice).

The government's August 11, 2025 notice is diametrically contrary to the government's prior no-seek announcement.  This Court relied on the government's no-seek notice.  *Cf. Spurlock*, 2025 WL 1360499, at *18 ("The Court has … adopted and relied on the July 2024 No-Seek Notice in . . . explicit and implicit ways, many of which the Court has already discussed, throughout the eight months since that decision, [and] . . . addressing pretrial timing and motions with a scheduled non-capital trial in mind"); *accord Constanza-Galdomez*, 2025 WL 1712436, at *12 ("A notice of intent to seek the death penalty is the direct opposite of the

prior statement by the government that it would not.  This Court effectively accepted that statement in managing this case as a non-capital RICO case for its duration.").

Finally, the government clearly would derive an unfair advantage and it would impose an unfair detriment on the defense if the government is not estopped from seeking the death penalty. *See Spurlock*, 2025 WL 1360499, at *18. Therefore, the government should be estopped from seeking the death penalty.

**Equitable Estoppel**

"To establish equitable estoppel it is not necessary that actual fraud be shown.  It is only necessary to show that the person estopped, by his statements or conduct, misled another to his prejudice." *United States for Use and Benefit of Noland Co. v. Wood*, 99 F.2d 80, 82 (4th Cir. 1938); *accord United States for the Use and Benefit of Humble Oil & Refining Co. v. Fidelity and Casualty Co. of New York*, 402 F.2d 893, 897 (4th Cir. 1968).

"As colleagues at bar and officers of the court, and to ensure the efficient, accurate and just operation of judicial proceedings, counsel must be able reasonably to rely on representations made by fellow counsel in the context of litigation." *Miranda v. Contreras*, 754 A.2d 277, 281 (D.C. App. 2000).  Based on the government's formal representation made in its January 2025 no-seek announcement, this Court should apply the equitable-estoppel doctrine as well as the related but distinct judicial-estoppel doctrine.  When the government announced its no-seek decision, Mr. Castano Restrepo and his defense team were misled into believing that the death penalty was off the table and thereby relied to their detriment.

Finally, the reasonableness of defense counsel's detrimental reliance on the no-seek announcement is underscored by the provisions in the *Justice Manual*[4], which show that the Department of Justice has long believed that such notice is required by § 3593(a) when the Department decides not to file a notice to seek the death penalty in a given case. And the *Justice Manual* also explicitly and repeatedly states that a no-seek notice reflects a "final decision" by the Department. As an objective matter, the January 2025 no-seek announcement gave the defense good reason to believe that the government would not change its formal position.

---

[4]        The *Justice Manual* provides in pertinent part that:

### 9-10.030 - Purposes of the Capital Case Review Process

The review of cases under this Chapter culminates in a decision to seek, ***or not to seek***, the death penalty against an individual defendant. Each such decision must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws. . . .

                ***

### 9-10.150 - Post-Decision Actions

The United States Attorney or Assistant Attorney General should promptly inform the district court and counsel for the defendant once the Attorney General has made the ***final decision*** [one way or the other]. Expeditious communication is necessary ***so that the court is aware, in cases in which the Attorney General directs the United States Attorney or Assistant Attorney General not to seek the death penalty***, that appointment of counsel under 18 U.S.C. § 3005 is not required or is no longer required. In cases in which the Attorney General directs the United States Attorney or Assistant Attorney General to seek the death penalty, the district court and defense counsel should be given as much opportunity as possible to make proper scheduling decisions.

JUSTICE MANUAL §§ 9-10.030 & 9-10.150 (emphasis added).

15

**Promissory Estoppel**

The government's no-seek announcement was a "clear and definite promise" that the government would not seek the death penalty; the government had a reasonable expectation that Mr. Castano Restrepo and his defense team would rely to their detriment on that promise; Mr. Castano Restrepo and his defense team did so rely to their detriment on the no-seek announcement; and the only manner to avoid this detriment is to enforce the government's promise.[5]

The government's formal announcement qualified as a "promise" because it was a clear manifestation of an intention to refrain from acting in a specified manner, conveyed in such a way that Mr. Castano Restrepo and his defense team were entirely justified in understanding that an irrevocable commitment not to seek the death penalty had been made. This is particularly true in view of the Justice Manual provisions quoted *supra* and the fact that the Department of Justice previously had treated its no-seek notices as permanent.

In *Spurlock,* the court found that the Government Notice changing its decision to waive the death penalty, as occurred herein, "violates the Federal Death Penalty Act ("FDPA"), 18 USC § 3593, because the government never sought leave to amend its July 2024 No-Seek Notice **and does not have good cause to do so**…" *Id.,* DE 419:17 (emphasis added).

---

[5]     That fact that there was no "consideration" (or mutuality of obligation) does not foreclose the application of the promissory estoppel doctrine. *See, e.g.*, *Merex A.G. v. Fairchild Weston Systems, Inc*., 29 F.3d 821, 824 (2d Cir. 1994) (discussing the history of the promissory estoppel doctrine in the United States); *see also Cunningham Energy, LLC v. Vesta O&G Holdings, LLC*, 578 F.Supp.3d 798, 811-12 (N.D. W. Va. 2022) (discussing promissory estoppel doctrine under West Virginia law); *see generally* RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981).  Indeed, by definition, the promissory estoppel doctrine applies when there is lack of consideration or lack of mutuality or for any other reason that precludes an action for breach of contract but where a party has detrimentally relied on another party's promise.  *Merex A.G.*., 29 F.3d at 824.

*Spurlock* found that the principles of Judicial Estoppel prevented the prosecution's change of mind and estoped them from seeking the death penalty.

> The Court also finds—as a standalone basis for the use of discretion to strike the Death Notice—that the principles of judicial estoppel preclude the government from reversing its formal, timely-filed July No-Seek notice, especially where no case-related developments occurred following the July Notice to bear on the reversal decision. The doctrine of judicial estoppel is intended "to protect the integrity of the judicial process," by "prohibiting parties from deliberately changing positions according to the exigencies of the moment" and "playing fast and loose" with the courts. *New Hampshire v. Maine*, 532 U.S. 742, 742-43, 749-51 (2001) (emphasizing that "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him"). While "the circumstances under which judicial estoppel may appropriately be invoked are not reducible to any general formulation," and are subject to the Court's discretion, both Defendant and the government apply the three guiding factors set out by the Supreme Court in *New Hampshire*, 532 U.S. at 742-43.20 First, "a party's later position must be clearly inconsistent with its earlier position." *Id.* at 743. Second, courts "inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id.* And third, courts ask "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.*

*Spurlock*, DE 419: 29-30.

As in *Spurlock*, each of the factors supports the application of judicial estoppel herein. First, the government, in response to an inquiry from the Court, unequivocally announced a waiver of the death penalty on January 6, 2025. The prosecution's notice of intent to seek the death penalty is opposite to its earlier waiver. Second, while there is no allegation that anyone was misled on January 6, 2025, the subsequent actions of the prosecutor and the DOJ meet this factor. The defense was not timely notified about the reconsideration of the death penalty such that it could begin to conduct an adequate investigation into mitigation. Third, even after the defense was denied a reasonable extension of time to conduct an investigation into mitigation, the prosecutor told both defense counsel that he did not think there would be an authorization to seek the death penalty

while simultaneously obtaining a superseding indictment with the special circumstances necessary to obtain the death penalty. And finally, even after filing the superseding indictment, there was another delay of a month before, finally, the notice of intent to seek death was filed shortly before trial.

The prosecution has obtained a distinct advantage. The defense had to make a presentation to the DOJ without an adequate time period to investigate mitigation, and the late filing of the notice of intent to seek death has placed the defense in the position of being forced to object to the delay of the September 8, 2025 trial date, lest any delay allow the prosecution to get through the back door a timely filed notice that they cannot get through the front door.

## V.      THERE IS NO CHANGE OF CIRCUMSTANCES SUPPORTING THE CHANGE OF THE WAIVER OF THE DEATH PENALTY

**The Prosecution's Death Notice Violates 18 U.S.C. § 3593**

The prosecution's Death Notice also violates the plain text of the Federal Death Penalty Act for several reasons. First, the notice provision of 18 U.S.C. § 3593(a) does not authorize the Government to reverse a decision not to seek the death penalty. Even if it did, the prosecution would be required at a minimum to seek the Court's leave to do so and to establish good cause for its reversal, neither of which it has done. Next, even an authorized death notice needs to be filed reasonably in advance of the scheduled trial date; the less than one month notice fails to satisfy that requirement. And finally, Mr. Castano Restrepo would be irreparably prejudiced by the prosecution's about-face.

**The statute does not authorize the prosecution to reverse a no-seek decision.**

The notice provision of the Federal Death Penalty Act does not permit the prosecution to renege on a formal decision not to seek the death penalty both because a formal no-seek announcement under § 3593(a)(1) is binding and because principles of statutory construction make

18

clear that amendment is only permitted as to the list of proposed aggravating factors under § 3593(a)(2).

Once the prosecution avers under § 3593(a)(1) that it does not intend to pursue the death penalty, its ability to capitally prosecute the defendant irrevocably ceases. *United States v. Casseus*, 282 F.3d 253, 256 (3d Cir. 2002) ("[A]fter the [G]overnment declared that it would not seek the death penalty, the appellants were no longer capital defendants.")..; *see also United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003) ("[T]he [G]overnment's **irrevocable** decision not to pursue the death penalty eliminated Waggoner's right under § 3005 to a second court-appointed counsel.")(emphasis added). The prosecution's unqualified statement that it would not seek the death penalty has therefore rendered its subsequent Death Notice a nullity. *See, e.g., Spurlock*, 2025 WL 1360499, at *21 (opining that the Federal Death Penalty Act "must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so," without deciding on the categorical prohibition); DE 154 at 8 n.7 (citing *Spurlock* with approval).

Principles of statutory construction dictate that death notices may only be amended to alter the list of noticed aggravating circumstances, and not the decision whether to seek the death penalty in the first place. Where "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotations and citation omitted). In the notice provision of the Federal Death Penalty Act, the language authorizing amendment appears only in § 3593(a)(2), which governs the notice required as to aggravating circumstances, and not in § 3593(a)(1), which governs the decision to seek capital punishment. It is illogical to describe a complete course-

reversal as an "amendment." The language and structure of the Federal Death Penalty Act thus make clear that a purported amendment that reverses a no-seek determination is prohibited.

> **Even if § 3593 allowed for the reversal of a no-seek, it would require, at minimum, that the prosecution request leave to amend and establish "good cause," which it has not.**

Section 3593(a)(2) provides that "[t]he court may permit the attorney for the [G]overnment to amend the notice upon a showing of good cause." This statutory language plainly requires the prosecution to seek this Court's leave before attempting to alter its § 3593(a) notice. The prosecution has not done so. This failure therefore violates the text of the Federal Death Penalty Act and the notice should be stricken.

The prosecution also cannot demonstrate good cause. The sole basis for attempting to reverse course on its decision not to seek the death penalty is a policy memorandum issued by the current Attorney General. The prosecution simply changed its mind, rendering the good cause requirement meaningless as the prosecution would always be able to point to some change in its decision-making to justify its new course of action. Politics is not good cause in death penalty litigation.

The good cause requirement requires the prosecution to act with reasonable diligence at a minimum. *See Spurlock*, 2025 WL 1360499 at *22 ("[I]t is clear that § 3593(a) good cause must focus on the diligence of the [G]overnment in uncovering the new information contained in the Amended Death Notice and the timing of when that information was obtained.").

Every Court to have addressed no-seek reversals has focused on the issue of "good cause". In *Spurlock*, "the Court agreed … that the FDPA must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so. Reading the statute to allow reversal of a no-seek notice *without* good cause, as the prosecution proposes, would run contrary to the

fundamental principles of statutory construction and public policy." DE 419, at 37. In *Constanza*, *DE* 130, at 22 the Court held that "… because the government has not offered any good cause for its change in decision, but rather argued that the rules should not apply to it, it has not shown good cause either. The government violated Section 3593(a) in amending the death notices without good cause.". In *Dangleben*, the Court observed, in denying the prosecution Motion to Stay proceedings, that "the Court seriously questions whether the Government can amend its 'no-seek' notice without a demonstration of 'good cause.'") [DE 154] (citing *Spurlock*). In *Cole and Smith*, where the Court advised that it will be striking the Notices of Intent but has not yet issued its Memorandum Opinion of reasons, the Court had ordered the prosecution to file a brief addressing, among other matters, "Whether the Section 3593 Notice fulfills all requirements under 18 U.S.C. § 3593 …" and "Whether the Government is legally empowered to reverse a "No-Seek Notice" to a "Seek Notice". [DE 172]. *Spurlock*, *Constanza* and *Dangleben* had all spoken to the fact that the "requirements under 18 U.S.C. 3593" included "good cause", which was a dispositive factor in whether the prosecution is legally empowered to reverse a 'No-Seek Notice.

There is no good cause *sub judice*, because the cause upon which this change rests is political, not factual or legal. As in *Spurlock*, "All relevant information regarding the government's death decision was known at the time the government submitted its notice of intent not to seek death." *Spurlock,* DE 419: 39-40.

## VI.    THE NOTICE SHOULD BE STRUCK BECAUSE THE DEFENSE WAS GIVEN NO TIME TO ADEQUATELY INVESTIGATE MITIGATION

Beyond the issue of the notice being late, the prosecutor and the Department of Justice forced defense counsel to make a presentation against the death penalty with almost no time to prepare properly. Based on Mr. Williams's in-court announcement on January 6, 2025, the defense

21

conducted no mitigation investigation or otherwise sought to prepare a defense consistent with a death penalty prosecution. Then the defense was presented with a near *fait accompli* - a short time after just concluding a lengthy trial to quickly find, prepare, and present mitigation evidence to the committee in Washington, DC, unaided by a mitigation specialist, without conducting any mitigation investigation, and without benefit of learned counsel to assist in the preparation of the evidence.

As the District Court in *Spurlock* noted, the defense relied on the waiver of the death penalty to its detriment:

> By the time the government suddenly asked the defense to prepare new mitigation for potential reversal of its no-seek decision, Spurlock had spent multiple additional months in pretrial detention *without the real opportunity to continue his mitigation investigation* or to integrate that investigation into his broader strategy, without the benefit of learned counsel, and without advice from counsel related to continued exposure to capital punishment.

*Spurlock,* DE 419: 32.

This Court can similarly have no confidence that the Department of Justice Committee received adequate mitigation evidence on behalf of Mr. Restrepo, based on the initial waiver and the hurried timeframe upon which the prosecutor and the DOJ insisted that mitigation be presented. As one Court observed, "[i]f the Review Committee does not have a defendant's mitigation evidence, then it cannot consider all of the appropriate factors relevant to each case." *United States v. James*, No. 8:18CR333, 2019 U.S. Dist. LEXIS 57942, at *7 (D. Neb. Apr. 4, 2019).

Undersigned counsel did nothing to obtain such evidence after Mr. Williams' in-court announcement waiving the death penalty and then was given scant time to come up with something once he was informed that the prosecution was changing its mind about the waiver and had set a meeting for the presentation before the DOJ committee. The prosecution did not, and most likely cannot come up with even one good reason why the time to present mitigation evidence to the DOJ's committee in Washington could not have been delayed.

Under these circumstances, this Court can have no confidence that an adequate mitigation investigation was done and that the full amount of mitigation was presented to the DOJ.

Affidavits filed in *United States v. Constanza, et al* (D MD) 1:22-cr-00409-SAG and included as exhibits two-four support this conclusion.  Exhibit Two: Affidavit of Susan Garvey, National Mitigation Coordinator for the Administrative Office of the  U.S. Courts: Three and a half months is not sufficient time to prepare adequate mitigation (counsel herein had less than a month);  Exhibit Three: Affidavit of Russell Stetler, National Mitigation Coordinator for the Administrative Office of the  U.S. Courts from 2005-2020: Summarizing the work needed to do to prepare adequate and Supreme Court mandated mitigation and the time needed to do so; Exhibit Four: Affidavit of Matthew Rubenstein, Capital Resource Counsel Attorney for the federal public defender program and member of the Federal Capital Trial Project: the average number of months between an indictment and the Attorney General's Capital Case Review Committee during the Obama, Trump 45 and Biden administrations was 15 months.

## CONCLUSION

Well settled, "while [a prosecutor] may strike hard blows, he is not at liberty to strike foul ones". *Berger v. United States*, 295 U.S. 78, 88 (1935). **As discussed above, every court to have addressed the issue, in every context and procedural scenario, has opined that no-seek reversals are most foul.**

The legal dispute at issue is not merely about a violation of Mr. Castano Restrepo's rights. Instead, "[a]t stake is the honor of the Government [and] public confidence in the fair administration of justice." *United States v. Carter*, 454 F.2d 426, 428 (4th Cir. 1972) (*en banc*). For the foregoing reasons, this Court should strike the prosecution August 11, 2025, Death Notice, DE 46, with prejudice.

      **WHEREFORE**, the Defendant respectfully requests that the Court grant this Motion, strike the Notice of Intent to Seek the Death Penalty, and grant such other relief as is just and proper.

      Respectfully Submitted,

      S/*Philip L. Reizenstein*

      Philip L. Reizenstein, Esq.
      Reizenstein And Associates
      Florida Bar# 634026
      2828 Coral Way
      Suite 540
      Miami, FL, 33145
      (305) 444-0755
      Phil@Reizensteinlaw.com
      Service@Reizensteinlaw.com