EXHIBIT TWO

Affidavit of Susan Garvey

## Declaration of Susan Garvey

I, Susan Garvey, declare as follows:

### 1.    Referral question

1.    I have been asked whether three and a half months is sufficient time to undertake a mitigation investigation and develop a mitigation presentation for a capital case where the defendants are foreign nationals.  The answer is no.  The tasks associated with undertaking a mitigation investigation, as I explain, are labor intensive and frequently dependent on systems outside the control of defense counsel.  A mitigation investigation also requires developing trusting relationships with potential mitigation witnesses; a process that is likewise time-consuming.  Even in cases involving individuals born and raised in the United States, a mitigation investigation often takes years.  But investigating in other countries further complicates estimations of time, as numerous factors can impact and impede counsel's efforts.

2.    I have also been asked whether delay in seeking the death penalty can adversely affect a mitigation investigation.  In my experience, the passage of time often means witnesses have died or cannot be located and documents or materials relevant to mitigation themes have been destroyed.  The passage of time can be particularly problematic when investigation must be undertaken in a foreign country.

3.    My expertise regarding the standard of care applicable for investigating and developing a mitigation case is based on my qualifications, my experience conducting mitigation investigation, the standards set forth in federal constitutional law and the prevailing standards of the capital legal community.

### 2.    Qualifications and Experience

4.    I began investigating mitigation in federal habeas cases in 1990 and have regularly presented at and attended capital defense training programs since then. I am also an attorney licensed to practice in California and have devoted my career to working on behalf of clients facing the death penalty.  Currently, I am the National

Declaration of Susan Garvey
Page 2 of 24

Mitigation Coordinator for the Administrative Office of the U.S. Courts' Habeas Assistance and Training ("HAT") Project, a position I have held since January 2024.

5.      This position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the decision of the Supreme Court in *Wiggins v. Smith*, 539 U.S. 510 (2003), and the 2003 revision of the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.    My principal responsibilities include consulting with and training lawyers, investigators, mitigation specialists, and experts in connection with habeas corpus death penalty cases pending in the federal courts.

6.      Among my responsibilities, I assist defense teams representing capital clients in the federal habeas courts by providing guidance on mitigation issues, vetting and suggesting referrals for defense team members and experts, and participating in case-specific consultations.  I am also extensively involved in planning and delivering training.  This includes speaking to the standard of care for capital trial defense teams in the years following the *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam), decision, striking down the death penalty as then applied.

7.      My investigative career began at the California Appellate Project (CAP), a non-profit legal resource center the State Bar of California created in 1983 to assist lawyers throughout the state who were handling direct appeals and post-conviction representation.  As capital habeas practice was new to California, CAP created a mitigation unit, and I was the first person hired in 1990.  In 1990, there were over 250 people on California's death row. Both of my supervisors at CAP had extensive experience in death penalty mitigation investigation, one having worked primarily in the South. The unit conducted comprehensive in-house training, often inviting experienced capital litigators from across the country to teach investigators the national standard of practice for conducting a mitigation investigation.  I worked as a mitigation investigator for close to three years on federal capital habeas cases.

8.      While at CAP, I conducted numerous mitigation investigations following the national standard of care procedures and methodology I describe in this declaration. For example, I met face to face with witnesses over multiple occasions to develop rapport, establish trust, and overcome barriers to disclosure.  When witnesses assigned

Declaration of Susan Garvey
Page 3 of 24

labels or made conclusions about clients or their family members, I asked follow-up questions to uncover anecdotes and symptoms, which is a more useful form of information for defense team members and experts. I constantly educated myself about clients' cultures and conducted research to provide a wider context for clients' individual experiences. Where appropriate, I advocated to include team members whose ethnic and other backgrounds aligned with those of my clients, thus increasing the opportunities to establish rapport and fully explore and explain each client's cultural background. I gathered documents about clients' family histories and summarized the facts from these documents. I also employed other organizational tools to collate and organize information gathered through the mitigation investigation.

9.    I interviewed for and identified signs and symptoms of mental impairments and disorders when expressed by clients or their family members. I documented these indicia for the attorneys who supervised the cases.

10.    The team that defended Mr. Theodore Kaczynski in *United States v. Kaczynski*, 2:96-cr-00259, (E.D. Cal.) hired me as one of the investigators soon after I graduated law school in 1996. My work included interviewing friends, neighbors, childhood friends, relatives, documenting his life in Montana, and reviewing the evidence seized from his cabin. The mitigation investigation I conducted was informed by my training at CAP and my practical experience conducting mitigation investigations. Mr. Kaczynski's case resolved by plea, in large part due to our client's mental illness that was documented and corroborated by our thorough psychosocial history investigation.

11.    Prior to assuming my current role, I worked at the Habeas Corpus Resource Center ("HCRC"), beginning when it opened its doors in 1999. The California legislature created HCRC to represent individuals on California's death row, in state and federal capital habeas corpus proceedings. HCRC also provides training and support for private attorneys in capital habeas cases. As an attorney, I frequently visited my clients and worked to develop rapport and trust. I supervised teams comprised of individuals skilled in conducting interviews and gathering documents, directed others conducting mitigation investigations, and determined which experts to retain as well as the scope of their evaluations. I also prepared witnesses for evidentiary hearings.

Declaration of Susan Garvey
Page 4 of 24

12.     I was the Deputy Director of Training at HCRC for almost six years. In this role, I managed, revised, and implemented HCRC's training program. A significant facet of HCRC's core curriculum focused on educating lawyers and investigative staff on their responsibility to conduct a thorough and comprehensive mitigation investigation. These trainings were grounded in the professional standards I learned as an investigator and those I practiced at HCRC. I also helped conceptualize, plan, and present HCRC's annual Spring and Fall conferences whose presenters and attendees included practitioners from across California. In addition to conceptualizing HCRC conferences, I also taught at them beginning in 2005.

13.     In addition to my duties as the HCRC Training Director, I conducted numerous training and seminars outside of my office. In 2001, I conducted a training at the University of Colorado School of Law on the scope of evidence that can be considered mitigating in a capital case. I have also served as faculty at various national conventions organized by HAT. HAT assists capital post-conviction attorneys engaged in capital   28 U.S.C § 2254 litigation and sponsors several trainings every year. Throughout my career, I have lectured on numerous topics relating to the investigation and presentation of mitigation evidence and working with mental health experts.

14.     Since 2006, I have routinely served as faculty at the yearly Capital Case Defense Seminar ("CCDS"). CCDS is the largest national conference devoted to helping practitioners representing capitally charged individuals at trial as well as in appellate and post-conviction proceedings. Since its inception in 1980, CCDS has recruited faculty from across the country to align with the national standard of care for counsel in capital cases. CCDS attracts attendees from outside California for this reason, and over a thousand attendees routinely attend the conference. CCDS offers numerous sessions that cover a wide range of topics related to capital defense work, including mitigation investigation. Indeed, it has a separate track of programming devoted solely to this topic. It also has a post-conviction track that focuses on the standard of care at the time cases were tried. In California that ranged from approximately 1985-2000. I have also conducted California and out-of-state case consultations on trial and post-conviction capital cases as part of CCDS's programing.

Declaration of Susan Garvey
Page 5 of 24

15.     I was a member of the CCDS planning committee from 2014 to 2022, and I served as one of the three co-chairs from 2019 to 2022.  The committee spends approximately ten months envisioning the program for the upcoming year, including identifying topics surrounding the development of mitigation evidence, advancements in identifying neurocognitive impairments, mental illnesses and disorders, intellectual disability, and the adverse consequences clients of color have faced throughout their lives and within the criminal system.  The committee also identifies speakers and works with them to ensure attendees receive guidance to assist them in their work.

16.     Beginning in approximately 2003, HCRC developed a program entitled Habeas College to assist private counsel who were not employed by state-created entities or non-profit organizations and who accepted appointments to represent individuals sentenced to death in California courts.  With 58 counties, California had, and continues to have, the largest number of individuals sentenced to death in the country with widely varied demographics.  Although some counties sought death sentences more than others, counsel appointed to represent individuals in post-conviction proceedings were expected to follow a uniform standard of care—the same standard of care expected of counsel representing capitally charged clients at trial—irrespective of where judgment was imposed.  Many of the cases private counsel accepted were tried in the 1990s so the program focused on the standard of care at that time.

17.     It had two main components.  First, HCRC conducted an intensive five-day training program, during which HCRC staff educated private counsel on the prevailing professional guidelines for capital representation.  I helped develop the curriculum and taught several sessions.  Second, a designated HCRC attorney provided ongoing support from appointment to the filing of the state habeas petition.  My work involved ongoing discussions with counsel regarding their efforts to assemble a team, conduct mitigation investigation, gather materials, and consult with experts.

Case 1:24-cr-20463-RKA  Document 59-2  Entered on FLSD Docket 09/01/2025  Page 7 of 25
Case 1:22-cr-00409-SAG  Document 101-6  Filed 05/27/25  Page 6 of 24
Declaration of Susan Garvey
Page 6 of 24

### 3. The Evolution of the Standard of Care Requiring Counsel to Investigate, Develop and Present Mitigating Evidence

18.  After the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam), striking down the death penalty as then applied, thirty-five states enacted death-penalty statutes that sought to satisfy the Eighth Amendment's proscription against cruel and unusual punishment.  The duty to investigate, develop, and present mitigating evidence developed in tandem.

19.  Attorneys trying death penalty cases cultivated effective practices and principles "to give the jury a reason not to kill [the] client."  As an experienced capital defense attorney wrote in 1979, the "reason can be virtually anything . . . The reasons may be simple or complex.  No matter what, your task is to find a reason for the jury not to kill and then sell it to them."[1]  This has meant humanizing the client by "relat[ing] [the] client's life story in a way that will make the jury want to give him a second chance on life."[2]

20.  Every capital case is unique and thus the mitigation investigation that must be conducted is shaped by the particular client's background and the context of the crime.  In 1983, Professor Gary Goodpaster published *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299 (1983), in which he expressed the core principle at the heart of the duty to investigate mitigating evidence: "counsel must know what mitigating evidence there is, know what evidence may be used to rebut it, and make reasonable decisions about what mitigating evidence to use.  Penalty phase investigation and preparation therefore are fundamental to effective advocacy in capital cases."[3]  This entails the "duty to investigate the client's life history, and emotional and psychological make-up, as well as the substantive case

---

[1] Dennis N. Balske, *The Penalty-Phase Trial: A Practical Guide*, The Champion, 40, 41 (Mar. 1984).

[2] Dennis N. Balske, *New Strategies for the Defense of Capital Cases*, 13 Akron L. Rev. 331, 357 (1979).

[3] Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 320 (1983).

Case 1:24-cr-20463-RKA   Document 59-2   Entered on FLSD Docket 09/01/2025   Page 8 of 25
Case 1:22-cr-00409-SAG   Document 101-6   Filed 05/27/25   Page 7 of 24

Declaration of Susan Garvey
Page 7 of 24

and defenses. There must be an inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology, and present feelings."[4]   In his words, "[t]he importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized."[5]

21.     Law professors, capital practitioners, federal studies, state criminal defense organizations, and ultimately the American Bar Association have re-iterated this basic axiom of mitigation investigation countless times.  As another practitioner and professor expressed in 1993:

> To find mitigating evidence, a capital defense attorney must . . . explor[e] all of the significant relationships and events in the client's life. . . . Beginning with information obtained from the defendant and his immediate family, counsel (or an investigator) tries to obtain information first from the most compact family unit (i.e., the family members who were with the defendant from the time of his birth) and then from the spreading circles of people and institutions that the defendant had contact with during the course of his life.[6]

22.     The practices and principles successful capital defense counsel espoused coalesced in 1989, when the ABA published Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("1989 ABA Guidelines").  As the introduction to the 1989 ABA Guidelines states, "[t]hese Guidelines amplify previously adopted Association positions on effective assistance of counsel in capital cases."[7]  The Guidelines Commentary cite to published materials that describe the bases for the specific duties and actions defining the prevailing standards.[8]

---

[4] *Id*. at 323-324; *see also* Balske, *Penalty Phase*, *supra*, at 42 (noting capital counsel's duty to "conduct the most extensive background investigation imaginable").

[5] Goodpaster, *supra*, at 324.

[6] Welsh S. White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care,* 1993 U. Ill. L. Rev. 323, 341 (1993).

[7] 1989 ABA Guidelines at 1.

[8] *See, e.g.*, 1989 ABA Guidelines at 36 n.5 (citing Dennis Balske, *The Death Penalty Trial:  A Practical Guide*, The Champion (Mar. 1984), and the 1986 California Death Penalty Defense Manual, in support of Guideline 1.1.); *id*. at 36-37, 39 nn.11, 14, & 28 (citing Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death*

*cont'd...*

Case 1:24-cr-20463-RKA   Document 59-2   Entered on FLSD Docket 09/01/2025   Page 9 of 25
Case 1:22-cr-00409-SAG   Document 101-6   Filed 05/27/25   Page 8 of 24

Declaration of Susan Garvey
Page 8 of 24

23.     In 2003, the ABA revised the Guidelines to reflect current standards of

practice in the capital defense field.  The 2003 Guidelines provided further explanation

and detail as to counsel's duties, renumbered the guidelines, addressed additional issues

such as counsel's responsibility when representing a foreign national and trial counsel's

duties after a capital conviction, and provided standards for compensating non-attorney

_____

*Penalty Cases*, 58 N.Y.U. L. Rev. 299 (1983), in support of Guideline 1.1.); *id*. at 37
n.15 (citing Indiana Public Defender Council, Indiana Death Penalty Defense Manual
(1985), in support of Guideline 1.1.); *id*. at 75 n.7 (citing Gary Goodpaster, *The Trial
for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299
(1983), in support of Guideline 8.1.); *id*. at 75 n.9 (citing Comment, *The Cost of Taking
a Life:  Dollars and Sense of the Death Penalty*, 18 U.C. Davis L. Rev. 1221 (1985), in
support of Guideline 8.1.); *id*. at 77 n.1 (citing material in the 1986 California Death
Penalty Defense Manual, in support of Guideline 9.1.); *id*. at 92 n.2 (citing the 1986
California Death Penalty Defense Manual, in support of Guideline 11.3.); *id*. at 92 n.3
(citing Dept. of Public Advocacy, Kentucky Public Advocate Death Penalty Manual
(1983), in support of Guideline 11.3.); *id*. at 98 n.10 (citing Indiana Public Defender
Council, Indiana Death Penalty Defense Manual (1985), in support of Guideline
11.4.1.); *id*. at 100 n.5 (citing Indiana Public Defender Council, Indiana Death Penalty
Defense Manual (1985), in support of Guideline 11.4.2.); *id*. at 100 n.6 (citing material
in the 1986 California Death Penalty Defense Manual, in support of Guideline 11.4.2.);
*id*. at 103 n.1 (citing Indiana Public Defender Council, Indiana Death Penalty Defense
Manual (1985), in support of Guideline 11.5.1.); *id*. at 98 n.10 (citing Tennessee
Association of Criminal Defense Lawyers, The TACDL Death Penalty Defense Manual:
Tools for the Ultimate Trial (1985), in support of Guideline 11.5.1.); *id*. at 36 n.5 (citing
Dennis Balske, *New Strategies for the Defense of Capital* Case, 13 Akron L. Rev. 331
(1979), in support of Guideline 11.5.1); *id*. at 106 nn.1-2 (citing material in the 1986
California Death Penalty Defense Manual, in support of Guideline 11.6.1.); *id*. at 110
n.3 (citing material in the 1986 California Death Penalty Defense Manual, in support of
Guideline 11.6.2.); *id*. at 115 n.2 (citing Indiana Public Defender Council, Indiana Death
Penalty Defense Manual (1985), and Dept. of Public Advocacy, Kentucky Public
Advocate Death Penalty Manual (1983), in support of Guideline 11.7.1.); *id*. at 121 n.3
(citing the 1986 California Death Penalty Defense Manual, in support of Guideline
11.7.3.); *id*. at 136-37 nn.3, 4, 9, & 15 (citing material in, or directly to, the 1986
California Death Penalty Defense Manual, in support of Guideline 11.8.6.); *id*. at 136
n.5 (citing Indiana Public Defender Council, Indiana Death Penalty Defense Manual
(1985), in support of Guideline 11.8.7.); *id*. at 137 n.8 (citing Dept. of Public Advocacy,
Kentucky Public Advocate Death Penalty Manual (1983), in support of Guideline
11.8.7.); *id*. at 140 n.2 (citing the 1986 California Death Penalty Defense Manual, in
support of Guideline 11.9.1.); *id*. at 142 nn.1, 3, & 5 (citing Indiana Public Defender
Council, Indiana Death Penalty Defense Manual (1985), in support of Guideline
11.9.2.); *id*. at 142 n.4 (citing material in the 1986 California Death Penalty Defense
Manual, in support of Guideline 11.9.2.).

Case 1:24-cr-20463-RKA   Document 59-2   Entered on FLSD Docket 09/01/2025   Page 10 of 25
Case 1:22-cr-00409-SAG   Document 101-6   Filed 05/27/25   Page 9 of 24
Declaration of Susan Garvey
Page 9 of 24

defense team members.[9] With respect to the duty to conduct a mitigation investigation, although the update further illuminated the parameters and contours of this obligation, and provided additional support solidifying that these standards codified long-standing practices, the Guidelines represented the standard of care prior to and since the publication of the 1989 Guidelines. "The revision of the Guidelines in 2003 reflected the evolution of national capital defense practice in the 1990s."[10]

24.     The 2003 revision, like the 1989 Guidelines, based its crystallization of capital counsel's duties on established practices and standards. As a well-published expert in mitigation investigation and a law professor jointly stated, the 2003 Guidelines "continue to stand as the single most authoritative summary of the prevailing professional norms in the realm of capital defense practice."[11]

25.     The Guidelines outline additional responsibilities for counsel representing foreign nationals. Guideline 10.6 obligates counsel to inform their client of the right to communicate with a relevant consular office, obtain consent to contact the consular office and upon consent, immediately do so. Because "foreigners facing the death penalty may be especially vulnerable and often suffer from a range of inherent disadvantages … [including] significant physical and cultural barriers to a competent mitigation investigation"[12] consular assistance can be invaluable.

26.     In 2008, the ABA published Supplementary Guidelines for The Mitigation Function of Defense Teams in Death Penalty Cases ("Supplementary Guidelines"), culminating a "two-year drafting and review process by experts in the field of death penalty litigation".[13]     Practitioners sought to "summarize prevailing

---

[9] 2003 ABA Guidelines, 31 Hofstra L. Rev 913 (2003).

[10] Russell Stetler & W. Bradley Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation*, 41 Hofstra L. Rev. 635, 675-76 (2013).

[11] Stetler & Wendel, *supra*, at 635. Courts have cited the Guidelines close to a thousand times as informing the determination of whether counsel rendered constitutionally deficient performance as defined by *Strickland*. List available at https://www.americanbar.org/content/dam/aba/administrative/death_penalty_represent ation/allcites.pdf (last visited April 23, 2024).

[12] Gregory J Kuykendall et al., *Mitigation Abroad: Preparing A Successful Case For Life The Foreign National Client*, 36 Hofstra L Rev. 989, 992 (2008).

[13] 36 Hofstra L. Rev. 677.

Case 1:24-cr-20463-RKA   Document 59-2   Entered on FLSD Docket 09/01/2025   Page 11 of 25
Case 1:22-cr-00409-SAG   Document 101-6   Filed 05/27/25   Page 10 of 24
Declaration of Susan Garvey
Page 10 of 24

professional norms for mitigation investigation, development and presentation by capital defense teams."[14]  The methodology employed to draft these Supplementary Guidelines mirrored the methods used in 1989 and 2003 when the ABA Guidelines were first promulgated and then revised: gathering materials generated by capital practitioners and disseminated at conferences, and interviewing attorneys and other individuals successful in obtaining life sentences.[15]

27.     As the Guidelines, Supplementary Guidelines, Supreme Court jurisprudence and all the material upon which they are based make plain, one of counsel's primary duties is to conduct a thorough mitigation investigation. Advancements in many fields of science have enhanced the capital community's understanding of mental and psychological impairments and disorders.  Empirical data have provided insight into what juries find to be mitigating. These developments shape the duty to investigate mitigating evidence and the most effective means to conduct it. While scientific discoveries, research and technological advancements inform counsel's responsibilities, counsel's fundamental duty to conduct a thorough mitigation investigation, utilizing all the resources available, and obtain reliable, readily available, and compelling evidence to illuminate the client's humanity has not changed.

### 4.     Scope of Mitigation Investigation

28.     The prevailing standard of care requires capital defense attorneys to conduct a thorough independent investigation to explore all avenues that might lead to mitigating evidence. *See, e.g., Williams v. Taylor*, 529 U.S. 362, 396 (2000) (citing 1980 ABA Criminal Justice Standards, Standard 4-4.1 cmt. at 4-55, in assessing the effectiveness of trial counsel's performance). The breadth of information considered mitigating is as extensive as the characteristics of the client, the facts of the client's

---

[14] 36 Hofstra L. Rev. 677.

[15] Sean D. O'Brien, *When Life Depends on It: Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra. L. Rev. 693, 697-702 (explaining methodological approach to formulating the Supplementary Guidelines).

Case 1:24-cr-20463-RKA   Document 59-2   Entered on FLSD Docket 09/01/2025   Page 12 of 25
Case 1:22-cr-00409-SAG   Document 101-6   Filed 05/27/25   Page 11 of 24

Declaration of Susan Garvey

Page 11 of 24

entire life, circumstances surrounding the crime and the client's rehabilitative efforts since arrest.  *See, e.g.*, *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986).

29.     Because the contours of a mitigation investigation are specific to the client and the crime, there is no set time frame associated with fulfilling this task nor a uniform checklist that ensures compliance with counsel's Sixth Amendment duties. But counsel cannot complete a mitigation investigation in three and half months.  Because two principal sources for mitigation and what they reveal are documentary material and witness interviews, thousands of hours are routinely expended and done so over a lengthy period of time. These parallel tracks of investigation reinforce emerging mitigation themes as they are developed and often trigger counsel's duty to explore new areas of mitigation.[16]  As Dr. Lee Norton, founder of the Center for Trauma Therapy, summarized, "[t]he investigation is not complete until the information uncovered becomes redundant and provides no new insight."[17] In cases where the client is a foreign national, even more time is required, as further explained herein.

30.     For one, representing a foreign national requires acquiring understanding of the client's culture.[18]  Regardless of whether the client had recently immigrated, counsel possessed the duty to "learn about the client's culture, about the circumstances of his upbringing in his country of origin, and about the difficulties the client's immigrant community faces in this country."[19]  Culture, as an authoritative article stated:

> influence[s] all aspects of a client's life, including how a client's medical or mental illness is interpreted and treated, and the client's relationships with family and between family and community due to poverty, poor schooling, interactions with law enforcement, prior traumatic events, racism, and bias.  Even physical ailments such as stress, malnutrition,

---

[16] Norton, *Capital Cases: Mitigation Investigations*, The Champion 43, 43 (May 1992).

[17] Norton, *supra*, at 45.

[18] Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital Mitigation*, 36 Hofstra L. Rev. 883, 887 (2008) (citations omitted).

[19] 2003 ABA Guidelines, Guideline 10.7 cmt., at 1026.

Case 1:24-cr-20463-RKA Document 59-2 Entered on FLSD Docket 09/01/2025 Page 13 of 25
Case 1:22-cr-00409-SAG Document 101-6 Filed 05/27/25 Page 12 of 24
Declaration of Susan Garvey
Page 12 of 24

alcoholism, and lead poisoning must be assessed in light of the defendant's culture.[20]

31.    Secondly, the complexities involved with representing a client of a different race, ethnicity, or culture, and the importance of understanding the client's experiences and perceptions, require counsel to incorporate into the defense effort, either as team members or assisting consultants, individuals knowledgeable about or culturally fluent in the client's community.[21]   Individuals steeped in a client's culture possess backgrounds that might facilitate the development of trust and improve communication with the client and the client's family members.[22]

### a.    Gathering Records

32.    Turning to the actual practice, mitigation investigation begins with the gathering and review of documentary evidence.  Counsel must therefore obtain releases from the client and their family so they can procure the client's medical, school and other private records.  Counsel are also expected to utilize statutory schemes to obtain public records, such as the Federal Freedom of Information Act ("FOIA").    Similarly, counsel is obligated to collect court files for the client and family members' civil and criminal records. *See Rompilla*, 545 U.S. at 383-84 (prevailing standards required reviewing client's court file, a public, readily available document).  Where court records are sealed, for example because the accused was a juvenile, counsel must seek judicial orders for their disclosure.

33.    The client's and the client's family's experiences define the scope of readily available records counsel is obligated to obtain, but generally these records include: birth records; medical and hospital records; death certificates; social services records; mental health and institutional records; education and school records; juvenile records such as dependency and delinquency; military records; employment and social

---

[20] Holdman, *supra,* 36 at 900-01.

[21] 2003 ABA Guidelines, 31 Hofstra L. Rev. at 1022 (10.7 cmm. counsel should explore "experiences of racism or other social or ethnic bias; cultural or religious influences."); *id.* at 1026.

[22] Russell Stetler, *Mitigation Evidence in Death Penalty Cases*, The Champion 35, 36 (Jan./Feb. 1999).

Case 1:24-cr-20463-RKA Document 59-2 Entered on FLSD Docket 09/01/2025 Page 14 of 25
Case 1:22-cr-00409-SAG Document 101-6 Filed 05/27/25 Page 13 of 24

Declaration of Susan Garvey
Page 13 of 24

security records; criminal records, including jail, probation, prison, and parole records, culminating with the client's current jail records; and court files.[23]

34.    Record collection is an indispensable component of a mitigation investigation for several reasons. Records contain information a client may not have known about his or his family's history. They may contain descriptions of events that witnesses experienced but have difficulty sharing whether due to impaired memory, shame, or trauma. Records can also help put occurrences in a timeline and can corroborate witness testimony. A seasoned capital practitioner emphasized the importance of this endeavor:

> Obtaining records from institutions may be especially important. If counsel hopes to present mitigating evidence relating to mental retardation or brain damage, school records (showing that the defendant had low grades, repeated the same grade, or had behavioral problems) may be critical. Similarly, if counsel contemplates introducing evidence of defendant's good behavior while incarcerated, as permitted by *Skipper v. South Carolina*, obtaining the defendant's prison records is indispensable. Moreover, other records, including, for example, reports relating to the defendant made by mental health experts or other authorities, almost always will be significant.[24]

35.    Effective and competent capital practice dictates gathering records for the client's family going back at least three generations. Such excavation enables counsel to discover genetic pre-dispositions to mental impairments, familial patterns of abuse, migration history and environmental factors – such as racism and poverty – that defined the nature and nurture factors that shaped a client's life.

36.    Multigenerational investigation plays a vital role in enabling counsel to identify the longitudinal patterns of mental illness and disorders. Children who inherit

---

[23] John H. Blume, *Mental Health Issues in Criminal Cases: The Elements of a Competent and Reliable Mental Health Evaluation*, The Advocate, at 42, 44 (Aug. 1990) (listing records of client and their family members that counsel must obtain: birth records, medical records, social services records, family court records, education records, military records, institutional records and all records relevant to prior psychiatric or psychological evaluation, law enforcement records, jail and prison records, attorney and court files for prior offenses, death records); *see also* Russell Stetler, *Mitigation Evidence in Capital Cases*, The Champion, 35, 38 (Jan./Feb 1999).

[24] White, *supra*, at 341.

Case 1:24-cr-20463-RKA   Document 59-2   Entered on FLSD Docket 09/01/2025   Page 15 of 25
Case 1:22-cr-00409-SAG   Document 101-6   Filed 05/27/25   Page 14 of 24

Declaration of Susan Garvey
Page 14 of 24

genetic vulnerabilities and are parented by individuals who, through no fault of their own, suffer from compromised mental functioning are particularly susceptible to developing signs and symptoms of major mental illness themselves.   It is commonly accepted paradigm, supported by science, that mental illness runs in families. Unearthing sources such as criminal and civil court files, old newspapers, military and probate records, going back at least three generations enables counsel to identify telling symptoms and functional impairments even in the absence of complete psychiatric records.

37.     The Commentary to ABA Guideline 10.7 (Investigation) underscores the primacy and relevancy of record gathering: "Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. . . .  The collection of corroborating information from multiple sources  –  a time-consuming task  –  is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence."[25]

38.     Records also have the potential to explain why a client's development looked markedly different than his siblings.  Records and witness interviews often establish, for example, the existence of "individuals who intervened and assisted in the lives of siblings but not in the life of the client."[26]  It is essential to explain why siblings did not follow the client's trajectory, especially when a genetic predisposition to major mental illness is germane to an assessment of a client's mental impairments and in circumstances where the siblings experienced comparable neglect, trauma, or deprivation.

39.     Records also provide useful background information about witnesses which assist the mitigation specialist in preparing to interview them.  *See Rompilla*, 545 U.S. at 391 (prior conviction record provided background information from witnesses that counsel should have interviewed).  Records reveal events witnesses cannot recall or recount and assist counsel in identifying the necessary experts to retain and the scope and focus of an expert evaluation.

---

[25] 31 Hofstra L. Rev. at 1024-25.

[26] Norton, *supra*, at 38.

Case 1:24-cr-20463-RKA   Document 59-2   Entered on FLSD Docket 09/01/2025   Page 16 of 25
Case 1:22-cr-00409-SAG   Document 101-6   Filed 05/27/25   Page 15 of 24
Declaration of Susan Garvey
Page 15 of 24

40.     Records also contain leads to other records and potential witnesses. Looking at records can trigger the client's and family members' memories, generating leads for further information gathering.  And in some circumstances, counsel might use records – including photographs or other memorabilia – to aid a witness in their testimony.  Records might also corroborate, refute, or supplement information provided by the client, their family members, and other lay witnesses.

41.     Gathering, reviewing, and organizing material from records is a time-intensive process.  In my experience, institutions and other repositories often take long periods of time to comply with authorized records requests.  Military and prison records routinely take more than a year to secure.  Public record act litigation is often necessary and can be lengthy and time consuming because government agencies can be recalcitrant about disclosing information.  Subpoenas or court orders may be required to obtain records.  And conducting thorough court searches in the communities where the client and his family members lived takes many hours.  I have spent weeks in various courthouses combing the indexes for records related to my client and his family and reviewing germane court cases.

42.     The growth of the internet over the last thirty years has sped up record gathering in some respects as more and more material can be obtained digitally, but it has also lengthened the process.  Email requests and online searching do not obviate the duty to obtain records still maintained by institutions only in paper form.  Courts, for example, have rarely digitized the complete collection of court files.  Thus, in many cases, the mitigation investigation entails both a thorough online search for records and in-person visits to the same institutions to manually search for those not digitized and to ensure all records have been procured.  This is not duplication of efforts, but rather the necessary steps a team must take to ensure thoroughness.

43.     Gathering records from a foreign country presents additional challenges. Even with consular assistance, the wealth of documents identified above that document a client and their family's functioning may not be available.  A foreign country's infrastructure, political upheaval, or high rate of poverty mean that medical or school records may not exist.[27]  And even if they do, obtaining them can require counsel to

---

[27] Kuykendall, *supra*, at 1005-06.

Declaration of Susan Garvey
Page 16 of 24

jump through numerous bureaucratic hoops.  Consular assistance can be helpful, but
"[t]he resources and capacities of individual consular posts vary greatly, and locating
and retrieving historical records can be a time-consuming process even for well-
resources consulates"[28]

44.    Digesting historical records from foreign countries presents its own
difficulties.  Translating them is just a piece of the process, as counsel often needs
someone steeped in the countries' systems (such as medical and educational) to explain
the significance of what is recorded or not recorded.   The team may already have
someone who can accomplish this, but frequently counsel must seek in-country aid from
people who taught in the schools, for example. These individuals, who although they
might not have known the client, must be identified, and interviewed as part of the
mitigation investigation because it is their expertise that illuminates what the records
detail.

### b.   Interviewing Witnesses

45.    The second significant task associated with investigating mitigation is
interviewing people who knew the client and his family throughout the entire course of
their lives.[29] The goal, again, is to unearth evidence probative of mitigation themes
"until the information becomes redundant."[30]

46.    Just as "[t]he quality of the client's cooperation may depend significantly
on counsel's skill and sensitivity in developing a human and emotional relationship with
him,"[31] so too does the cooperation witnesses provide.  Counsel is best situated to
effectuate his duty to conduct a thorough mitigation investigation when counsel
assembles a team with members who possess specialized skills, such as mitigation

---

[28] Kuykendall, *supra*, at 1007.

[29] Dennis N. Balske, *Penalty-Phase*, *supra*, at 42.

[30] Lee Norton, *supra*, at 45.

[31] Gary Goodpaster, *supra*, at 322.

Case 1:24-cr-20463-RKA Document 59-2 Entered on FLSD Docket 09/01/2025 Page 18 of 25
Case 1:22-cr-00409-SAG Document 101-6 Filed 05/27/25 Page 17 of 24
Declaration of Susan Garvey
Page 17 of 24

specialists. [32] Lacey Fosburgh, a journalist hired to investigate mitigation in a California capital case explained in 1982:

> [A] significant legal blind spot existed between the roles played by the private investigator and the psychiatrist, the two standard information-getters in the trial process. Neither one was suited to the task at hand here--namely discovering and then communicating the complex human reality of the defendant's personality in a sympathetic way.
>
> . . .
>
> Significantly, the defendant's personal history and family life, his obsessions, aspirations, hopes, and flaws, are rarely a matter of physical evidence. Instead they are both discovered and portrayed through narrative, incident, scene, memory, language, style, and even a whole array of intangibles like eye contact, body movement, patterns of speech--things that to a jury convey as much information, if not more, as any set of facts. But all of this is hard to recognize or develop, understand or systematize without someone on the defense team having it as his specific function. *This person should have nothing else to do* but work with the defendant, his family, friends, enemies, business associates and casual acquaintances, perhaps even duplicating some of what the private detective does, but going beyond that and looking for more. This takes a lot of time and patience. [33]

47.     Interviewing witnesses, as Ms. Fosburgh explained, requires dedicated focus and skills in drawing out narratives. Mitigation specialists build rapport and trust which are essential to overcoming barriers to disclosure of information. A crucial part of this process is educating witnesses on the meaning of "mitigating evidence" in the capital case context. Lay witnesses might naturally intuit that "mitigating evidence" is limited to positive information about a client or good deeds he performed. Or they may not even know the difference between the guilt phase and the penalty phase and the types of information that can be presented in each. Dr. Lee Norton, an experienced investigator specializing in trauma-informed interviewing, explained:

---

[32] See James Hudson, et al., *Using the Mitigation Specialist and the Team Approach*, Champion 33, 36 (June 1987) ("The mitigation specialist is a professional who, as attorneys across the nation are now recognizing, should be included and will be primary to the defense team."). Two of the authors were from the Mitigation Specialist Department of the Ohio Public Defender's Office.

[33] Lacey Fosburgh, The Nelson Case: A Model for a New Approach to Capital Trials, Forum, 31, 32 (Sept.-Oct. 1982) (emphasis added).

Case 1:24-cr-20463-RKA Document 59-2 Entered on FLSD Docket 09/01/2025 Page 19 of 25
Case 1:22-cr-00409-SAG Document 101-6 Filed 05/27/25 Page 18 of 24
Declaration of Susan Garvey
Page 18 of 24

One of the greatest hurdles in communicating with and gaining the trust of lay witnesses is explaining that what they may have thought was "bad" about their friend or loved one is actually helpful information. For example, descriptions of the client's inexplicable outbursts from the age of about eight when he was involved in a near-fatal car accident help the mental health experts determine the presence and etiology of brain damage. In order to gain the cooperation of lay witnesses, the defense must take the time to explain not only what information is needed, but why it is important.[34]

48.     Central to obtaining information from lay witnesses is developing a relationship of trust and rapport such that they become willing to share information they deem harmful or shameful -- such as trauma experienced by the client or behavior that seemed disconnected from reality, or details about private topics such as socioeconomic status, cultural and religious practices, family dynamics, intergenerational trauma, and mental illness.   Building trust is a prerequisite to successfully imparting the understanding that such information is of vital importance to the client's case for life; competent practitioners are keenly aware that their questions are likely to initially elicit incomplete answers or deflections away from such topics, at least initially, and have learned to gently and sensitively persist until the witness is ready to disclose.

49.     Because "[t]he information needed in mitigation is simply not disclosed to strangers over the telephone.  Full disclosure comes only in person with great patience, no matter how skilled the interviewer,"[35]  interviews must be done in person, in settings conducive to disclosure such as the witness's home.  These interviews should be private, one-on-one visits.   Even though witnesses might initially be reluctant to disclose sensitive information, counsel still has the duty to ask interviewees specific questions related to mitigating factors. For these reasons, the mitigation investigation almost always necessitates multiple interviews with each witness to painstakingly elicit the information they possess about the client's functioning and behavior.

50.     Interviewing witnesses must also include asking about other witnesses who might have known the client or the client's family and gathering memorabilia such

---

[34] Norton, *supra*, at 44.

[35] Russell Stetler, *Mitigation Evidence*, *supra*, at 39; *see also* Supplementary Guidelines, 10.11 (C), 36 Hofstra L. Rev. 677, 689.

Declaration of Susan Garvey
Page 19 of 24

as pictures, school reports, medical records, or family genealogy materials.  Information
regarding additional witnesses and documents informs the ongoing investigation and
serves to verify existing information and identify witnesses it is necessary to re-
interview.  Thus, the duty to investigate mitigation is a "cyclical, rather than linear
[undertaking], because witnesses will need to be reinterviewed when new information
has been discovered."[36]

51.     In every case, the process of interviewing family members, neighbors,
teachers, friends, classmates, employers, etc. is a time-consuming undertaking because
establishing rapport and developing ongoing trust requires multiple visits, and meeting
witnesses in their comfort zone.   In my experience this process takes thousands of hours
at a minimum, but many more when a foreign investigation is necessary.    Several
factors dictate why this is so.

> [L]ogistical difficulties may include having to travel to remote,
> impoverished areas to locate and interview witnesses. Determining the
> whereabouts of witnesses can also be more problematic in foreign
> countries, since the computerized investigative databases typically used
> to locate witnesses in the United States may not exist.[37]

52.     Political unrest or high rates of criminal activity create dangerous
conditions which must be considered well in advance and solutions – such as escorts or
drivers – put in place before the actual process of interviewing witnesses and gathering
data about the environment in which the client was raised begins.  The best laid plans,
however, can be thwarted by unexpected natural or political events which place counsel
back to square one in terms of conceptualizing the mitigation investigation and ensuring
the safety of team members and witnesses.

53.     Cultural barriers present another obstacle.  They can manifest in many
circumstances.  For example,

> [M]ental health issues may be even more stigmatizing than in the United
> States and witnesses' understanding of these issues may be affected by
> religious and folk beliefs. Similarly, misunderstandings about the nature
> of the legal process and the purpose of the investigation may hinder the

---

[36]  Stetler, *Mitigation Evidence*, *supra*, at 38.

[37]  Kuykendall, *supra*, at **

Declaration of Susan Garvey
Page 20 of 24

process of obtaining beneficial information. While capital defense lawyers understand that domestic·violence and trauma can provide the most compelling kinds of mitigating evidence, a foreigner might perceive such evidence as "bad" for the client, and withhold it from counsel. Consequently, the investigation team requires additional time and sensitivity to explain the need for accurate, albeit uncomfortable, memories of the defendant.[38]

54.     Barriers such as these underscore the need for counsel to ensure some member of the team possesses knowledge about the client's culture, upbringing and ideally familiarity with the region or regions.   Mitigation specialists are often best suited for this role, but it is not enough that they share a common language or heritage with the client.[39]  Identifying an individual with the skills to develop rapport in the specific cultural environment where a client was born and/or raised also takes time. Even if such a skilled investigation is identified, they might not have the ability in the time period counsel needs them, to take on the task of visiting a foreign country multiple times to talk to multiple witnesses such that critical mitigation evidence can be elicited.

55.     In addition, whoever on the team conducts the mitigation investigation in the foreign country, they have the added responsibility of documenting the living conditions and environmental factors that may have adversely affected the client's development.  The level of poverty – and daily danger – that some clients experienced is often not known to most Americans.  Unclean water, famine, and exposure to toxins are not uncommon in some countries.   Images of the squalor in which a client is raised can be powerful mitigation evidence so where appropriate, it should be gathered. Counsel may also determine that a video of the home, town, or city conditions in which the client was raised could carry great mitigating weight, thus adding additional tasks to the burdensome undertaking that is foreign mitigation investigation.   Equally important, and time consuming, is investigating the journey itself from country of origin to the United States.  Clients invariably endure physical hardships, hostile terrain, and threats to their safety.  The traumas associated with surviving the journey constitute themed in mitigation which are important to illuminate.

---

[38] Kuykendall, *supra*, at 1008-09.

[39] Kuykendall, *supra*, at 1009.

Case 1:24-cr-20463-RKA  Document 59-2  Entered on FLSD Docket 09/01/2025  Page 22 of 25
Case 1:22-cr-00409-SAG  Document 101-6  Filed 05/27/25  Page 21 of 24
Declaration of Susan Garvey
Page 21 of 24

56.   If these laborious tasks do not commence upon counsel's appointment – through no fault of counsel – the mitigation investigation ultimately conducted will likely be prejudicially disadvantaged by the delay.  Some of the prejudice flows from the logistical obstacles identified above – it can be very hard to find people particularly years after their identity and location might have been know.  But lapses in time can mean that people die, records are destroyed or countries once deemed safe to visit are no longer.

57.   My experience investigating habeas corpus claims years after an individual has been sentenced to death is somewhat analogous.  In determining whether trial counsel was ineffective under the Sixth Amendment, I worked, with a team, to investigate what mitigating evidence existed that trial counsel failed to discover but could have and that which might have persuaded at least one juror to vote against the death penalty.  But in the years that had ensued from judgment to the investigations we undertook, so many materials had been destroyed or were missing.  Even with the ability afforded by databases in the United States that enable tracking individuals easier and quicker, it was often the case that people had passed away or were suffering from diseases that compromised their mental functioning and memories.   I have had cases where judges have cited the losses of witnesses and materials as frustrating the process of determining whether trial counsel was ineffective under the Sixth Amendment.

### 5.   Time Required to Procure and Prepare Appropriate Mental Health Expert Assistance

58.   Once counsel has conducted the mitigation evidence there is yet another aspect of working up a case in mitigation that cannot be truncated or put on a fixed time table: working with experts.  The Supreme Court's 1985 decision in *Ake v. Oklahoma* made clear that indigent capital defendants are constitutionally entitled to funding for ancillary services reasonably necessary to prepare a guilt or penalty defense.[40]  As early as 1989, "[u]tilization of experts ha[d] become the rule, rather than the exception, in

---

[40] *Ake v. Oklahoma*, 470 U.S. 68 (1985).

Case 1:24-cr-20463-RKA   Document 59-2   Entered on FLSD Docket 09/01/2025   Page 23 of 25
Case 1:22-cr-00409-SAG   Document 101-6   Filed 05/27/25   Page 22 of 24

Declaration of Susan Garvey
Page 22 of 24

proper preparation of capital cases."[41]   This is so because counsel has a duty to investigate and present mental health evidence when facts in a client's history indicate the likely presence of mental or psychological impairments or disorders.

59.     The standard of care requires much more than simply retaining a psychiatrist or psychologist to go to the jail, meet the client for an hour or two and then testify at the penalty phase. It has long been understood that the mitigation investigation is the foundation of every reliable mental health evaluation in capital cases.  It is "essential that a mental health professional obtain as much information as possible regarding a client's social and medical history to determine what genetic, organic, environmental, and other factors may have played a role in the client's" development.[42] A thorough medical and social history is the "single most valuable element to help the clinician reach an accurate diagnosis."[43]

60.     Just as it is necessary, when representing a foreign national, to include individuals on the team versed in the client's culture, culture and language play a significant role in selecting appropriate experts.  Because a client who suffers from intellectual disability cannot be subjected to the death penalty, determining whether a client meets the diagnostic criteria is a facet of every capital case.  If a client is a non-English speaker from a foreign country, counsel must work with experts who are bi-lingual and can determine, based on the client's culture and background, appropriate

---

[41] Commentary to 1989 ABA Guidelines, Guideline 1.1; *id.* .4.1.D.7.A-C, 11.8.6.B.8 (counsel should present "[e]xpert testimony concerning any of the above and the resulting impact on the client, relating to the offense and to the client's potential at the time of sentencing."); 1989 ABA Guidelines, Guideline 11.8.6 cmt. ("Attorneys skilled in narrowing the focus of trial to exclude irrelevant references to the life and character of a client may find themselves unprepared for the sentencing phase of a capital case where the life and character of the client may have to be revealed in detail.  The assistance of one or more experts (e.g. social worker, psychologist, psychiatrist, investigator, etc.) may be determinative as to outcome, as set out in Guideline 11.4.1(a) and 11.4.1(7).").

[42] Blume, *supra*, at 46.

[43] H. Kaplan & B. Sadock, *Comprehensive Textbook of Psychiatry* at 837 (4th ed. 1985); David C. Stebbins & Scott P. Kennedy, *Zen and the Art of Mitigation Presentation, or, The Use of Psycho-Social Experts in Penalty Phase of a Capital Trial*, The Champion, 14, 17 (1986) ("A complete social history is necessary for psychological experts to gain a full understanding of the [client].").

Declaration of Susan Garvey
Page 23 of 24

assessments and testing.  Identifying the appropriate expert or experts often requires additional research and as is the case with mitigation investigators, the paucity of appropriate experts means they may not be available in the time frame for which counsel seeks their assistance.

61.    When contemplating whether to present expert testimony at trial, counsel will frequently determine that such testimony is indispensable for explaining the significance of evidence outside ordinary knowledge, and specifically for conveying how the client's genetic and experiential inheritances, together with the events, environments, and upbringing he experienced adversely impacted his development and shaped his behavior and functioning.  However, a mitigation presentation that relies solely on expert testimony will likely fail to persuade.

62.    Expert testimony can illuminate the "influences converged in the years, days, hours, minutes, and seconds leading up to the capital crime, and how information was processed in a damaged brain,"[44] but it cannot operate as a substitute for the client's life story told by witnesses and documented in records.  Nor can it replace the multigenerational investigation which illuminates the antecedents and factors that contributed to one's development from the moment of birth.  Rather, it complements this evidence.  As Professor Sundby of the Capital Jury Project explains, empirical evidence shows that expert testimony presented in a vacuum is not effective:

> If an expert performs as a soloist, presenting theories unsupported by facts established by more credible witnesses who are free of the suspicions attached to experts, the testimony is likely to be discounted at best or have a negative spillover effect at worst. If, on the other hand, the expert takes the role of accompanist and helps harmoniously explain, integrate and provide context to evidence presented by others, the jury is far more likely to find the expert's testimony useful and reliable.[45]

63.    Because expert testimony must dovetail with lay witness testimony and elucidate the behavioral and functional consequences associated with a client's life experiences as well as the signs and symptoms of mental illness they manifested,

---

[44] Russell Stetler, *Mental Disabilities and Mitigation*, The Champion, 49, 51 (April 1999).

[45] Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 Va. L. Rev. 1109, 1144 (1997)

Declaration of Susan Garvey
Page 24 of 24

ongoing communication with experts is critical. Dialogue should be a two-way street, with, for instance, experts providing recommendations for additional investigation, testing or additional experts, and counsel must continually provide the experts with additional social history information as it is unearthed.

64.     Consistent, lengthy consultation with experts is also critical because symptoms typically wax and wane over time. It may take months or years for experts to build adequate rapport with a client and for the client to manifest the full range of symptoms of their illness or disorder in the expert's presence. And new evidence uncovered by the mitigation investigation as it progresses may prompt new areas of inquiry that the expert needs to explore directly with the client. It is therefore common practice that multiple interviews over time must be conducted by most experts.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States and the State of California on May 23, 2025.


Susan Garvey
National Mitigation Coordinator