EXHIBIT THREE

Affidavit of Russell Stetler

# DECLARATION OF RUSSELL STETLER

I, RUSSELL STETLER, declare as follows:

1. I served as the original National Mitigation Coordinator for the Federal Death Penalty projects from 2005 until my retirement from full-time work in 2020. A complete summary of my background and qualifications is attached hereto as Appendix A.

## *I. Summary of Opinions*

2. I was asked by counsel for Wilson Constanza-Galdomez, Edis Omar Valenzuela-Rodriguez, and Jonathan Pesquera-Puerto in a pending federal case in the United States District Court for the District of Maryland, No. SAG-22-0409, to provide this declaration in support of their motion to preclude the Government from belatedly seeking the death penalty when there is a firm trial date of September 2, 2025.

3. I was asked to address four interrelated questions in this declaration:

   a. What are the current prevailing professional norms in the investigation of mitigation evidence in federal death penalty cases?

   b. What special problems arise in mitigation investigation when the capital clients were born in foreign countries and much of the mitigation investigation in the clients' home countries involves witnesses who do not speak English and who have no understanding of the U.S. criminal legal system?

   c. How does the social history resulting from a thorough mitigation investigation affect the assessment of mental health issues in a death penalty case?

   d. Can a constitutionally mandated thorough mitigation investigation be completed by September 2025 with the death penalty as a potential punishment option?

4. I will answer the last question first. If trial begins in September 2025, there is insufficient time to conduct a thorough and constitutionally necessary mitigation. I base that conclusion on several facts. Because they proceeded for more than two years without qualified learned counsel for each defendant, and because counsel are responsible for ensuring that a thorough mitigation investigation is completed, no actual mitigation investigation has been started. In addition, other requirements for an effective mitigation investigation have not been met. For example, none of the teams have one or more culturally competent mitigation specialists, nor do they have someone (for each defendant) qualified by training and experience to screen for the mental disorders and impairments that pervade the capital client population, including intellectual disability, which might exempt one or more of these defendants from eligibility for execution under *Atkins v. Virginia,* 536 U.S. 304 (2002) and its progeny (barring execution of individuals with intellectual disability). Defense counsel have detrimentally relied on the Government's explicit decision not to seek the death penalty in this case. Belatedly reversing that decision thwarts all the orderly principles of timely appointment, opportunity for fully informed defense input before Main Justice makes its grave decision about whether to seek the death penalty in eligible cases, and respect for the prevailing norms of effective capital defense representation reflected in the Model CJA Plan adopted by the Judicial Conference of the United States in October 2016.[1]

5. All the pretrial preparation to date by noncapital defense counsel may be of little or no value if the death penalty is added as a punishment option. Facing a noncapital trial, defense

---

[1] *See* GUIDE TO JUDICIARY POLICY, VOL. 7A, APPX. 2A: MODEL PLAN FOR IMPLEMENTATION AND ADMINISTRATION OF THE CRIMINAL JUSTICE ACT, XIV.B.9: "All attorneys appointed in federal capital cases should comply with the American Bar Association's 2003 Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Guidelines 1.1 and 10.2 et seq.) and the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases." *Id*. at 28 (adopted by the Judicial Conference of the United States, Oct. 3, 2016).

counsel may have had no objection to joinder and in fact may have confidentially fashioned a joint defense agreement that would have facilitated a division of labor among the attorneys for the three defendants to allow each to focus on different categories of evidence, such as forensics or the testimony of particular witnesses. Once the death penalty is introduced, the need for severance is paramount because of the constitutional requirement of individualized sentencing and the multiple ways in which the Federal Death Penalty Act stresses relative culpability; and mitigation investigation is central to individualized sentencing. The statute specifically enumerates, as mitigating factors, "duress," "minor participation," and the role of "equally culpable defendants."[2] Capital defense requires a unified strategy for the culpability and sentencing phases. The development of mitigating evidence is not a separate enterprise that can be added on a few months before trial but must begin from the moment defense counsel are appointed in a potential death penalty case.

6. The prevailing norms in mitigation investigation are addressed in detail in this declaration, but the critical points can be summarized succinctly. Counsel's duty to conduct a thorough mitigation investigation is well established. Five decisions of the Supreme Court of the United States have confirmed trial counsel's duty to conduct a thorough mitigation investigation in a death penalty case: *Williams v. Taylor,* 529 U.S. 362 (2000); *Wiggins v. Smith,* 539 U.S. 510 (2003); *Rompilla v. Beard,* 545 U.S. 374 (2005); *Porter v. McCollum,* 558 U.S. 30 (2009) (per curiam); and *Sears v. Upton,* 561 U.S. 945 (2010) (per curiam). The U.S. Supreme Court's decision in *Wiggins* not only underscored counsel's duty to conduct thorough mitigation investigation (*id.* at 522) but also acknowledged the critical role of the nonlawyer whose post-conviction mitigation investigation provided the proof of how Mr. Wiggins had been prejudiced

_____

[2] 18 U.S.C. §§ 3592 (a) (2-4).

by the deficient performance of his trial counsel (*id*. at 516-17). The American Bar Association's

revised Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty

Cases were adopted in the same year as the *Wiggins* decision.[3] The ABA Death Penalty

Guidelines summarizing the prevailing professional norms (as revised in 2003) have been widely

circulated and discussed at capital training seminars ever since.[4] Supplementary Guidelines for

the Mitigation Function of Defense Counsel in Death Penalty Cases, published in 2008, elaborate

on these duties.[5] The ABA Death Penalty Guidelines and Supplementary Mitigation Guidelines

have received particular recognition in federal court, both for federal defender organizations and

counsel appointed under the Criminal Justice Act. The Defender Services Program has four goals

in its strategic plan: timely provision of assigned counsel, delivery of counsel services consistent

with the best practices of the legal profession, cost-effective services, and protection of the

independence of the defense function. Among its strategies for achieving the "best practices"

goal, the Defender Services Program adopted a specific strategy for capital representation stating

that appointed counsel should comply with the 2003 ABA Guidelines for the Appointment and

---

[3]The revised ABA Guidelines were published in 31 HOFSTRA L. REV. 913 (2003). The symposium issue of that law review included articles on the importance of teamwork (*see* Jill Miller, *The Defense Team in Capital Cases*, 31 HOFSTRA L. REV. 1117 (2003)) and the critical role of a mitigation specialist in conducting the required investigation (*see* Pamela Blume Leonard, *A New Profession for an Old Need: Why a Mitigation Specialist Must Be Included on the Capital Defense Team,* 31 HOFSTRA L. REV. 1143 (2003)). The *Wiggins* Court favorably cited the original 1989 edition of the ABA Guidelines as "well-defined norms." *Wiggins, supra* ¶, 6at 524.

[4] In his State of the Union Address in 2005, President George W. Bush announced that he would "soon send to Congress a proposal to fund special training for defense counsel in capital cases, because people on trial for their lives must have competent lawyers by their side." As a result, a consortium of criminal defense organizations was funded through the Bureau of Justice Assistance (BJA) at the Department of Justice to hold bring-your-own-case training programs beginning later that year. These programs focused on mitigation development and were structured around the revised ABA Guidelines as reflecting the prevailing norms and standard of care in capital defense representation two decades ago.

[5] Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, published in 36 HOFSTRA L. REV. 677 (2008). This symposium issue of the law review included over a dozen articles, totaling more than four hundred pages (*id.* at 663-1093), by law professors; capital defenders; experts in mitigation, psychology, and psychiatry; the head of the ABA's Death Penalty Representation Project; a former judge of the Alabama Cout of Criminal Appeals; and the chief judge of U.S. District Court for the Eastern District of Louisiana (the late Hon. Helen G. Berrigan). Two articles addressed issues especially relevant to the cases at issue here: cultural competency and mitigation investigation abroad in cases involving foreign nationals.

Performance of Defense Counsel in Death Penalty Cases and the 2008 Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases.[6] As noted *supra* ¶ 3 and note 1, the Judicial Conference of the United States endorsed similar language in its October 2016 Model CJA Plan.

7. The twenty-first--century editions of the ABA Guidelines and the Supplementary Guidelines for the Mitigation Function highlighted what capital defenders have long recognized: a team should be assembled to begin the mitigation investigation at the earliest opportunity.[7] The need to establish the team as early as possible stems from the complexity of capital defense representation. Commencing the mitigation investigation early derives in part from the nature of mitigation investigation itself: it is a slow, time-intensive process involving the interaction between documentary records and witness interviews. Mitigation interviewing is itself a cyclical process that requires building trust and rapport with the client and witnesses.[8] The need for a full team and adequate time is especially important when an indigent defendant faces capital prosecution supported by all the resources of the United States government.

---

[6] *See* JON B. GOULD & LISA GREENMAN, REPORT TO THE COMMITTEE ON DEFENDER SERVICES, JUDICIAL CONFERENCE OF THE UNITED STATES, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION IN FEDERAL DEATH PENALTY CASES (2010) 91, n.90 (Goal 2, Quality of Representation, Strategy 16, Capital Representation).

[7] *See* ABA Guideline 10.4.C (The Defense Team) ("As soon as possible after designation, lead counsel should assemble a defense team . . ."). 31 HOFSTRA L. REV. at 999; Commentary to Guideline 10.7 (Investigation):

> The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses (e.g., by suggesting additional areas for questioning police officers or other witnesses), decisions about the need for expert evaluations (including competency, mental retardation, or insanity), motion practice, and plea negotiations.

*Id.* at 1023 (citation omitted).

[8] *See* Lee Norton, *Mitigation Investigation,* THE CHAMPION, May 1992, at 43, 45 (discussing cyclical interplay of records and interviews); Russell Stetler, *Mitigation Evidence in Death Penalty Cases,* THE CHAMPION, Jan./Feb. 1999, at 35, 39 (citing need for hundreds of hours to collect, decipher, and decode old records, as well as patience in eliciting disclosures from both witnesses and clients). The record-gathering process is especially difficult in cases involving foreign nationals.

8. The cyclical process of rapport building applies to all clients and potential mitigation witnesses. Only patience, and the rigorous practice of building trust and rapport through multiple, in-person, one-on-one interviews, can elicit a full and candid picture of the client's developmental years, social influences, and mental vulnerabilities. Professor W. Bradley Wendel and I explained how counter-intuitive mitigation is for both clients and witnesses.[9] "Fact witnesses" understand why they are being interviewed: they are percipient witnesses to an event (e.g., the light was green or the light was red).[10] Mitigation witnesses, by contrast, are "slice of life" witnesses "who observed the client over a period of months or even years and may have shared traumatic experiences."[11] They do not even think of themselves as witnesses: they know nothing of the capital offense, and everything about the mitigation investigation is as counter-intuitive for witnesses as it is for the client:

> Clients and their loved ones are inevitably confused when the legal team contesting the capital allegations announces it is simultaneously investigating the evidence to be presented only after his conviction. They cannot fathom why the defense team insists on preparing for a sentencing proceeding. There is no other area of criminal law where jurors play a role in sentencing, and the focus on that life-or-death decision is often misunderstood by clients and their families as an indication that the defense team assumes the client's guilt, believes nothing that he says about the allegations, and has already given up any hope of avoiding a conviction.
>
> The client's family members are often in shock about the allegations and cannot believe their loved one could be guilty. Clients and family members go through something resembling the stages of grief, with early emotions of denial and anger before accepting the reality of what the client faces. The legal concept of mitigation is alien to anything they have ever known or experienced, considering it arises in no other context in the criminal legal system. Not surprisingly, family members and others whom the client may identify as potentially helpful witnesses mistakenly assume that they are wanted as traditional character witnesses, rather than as factual witnesses with intimate

---

[9] Russell Stetler & W. Bradley Wendel, *Mitigation Reports in Capital Cases: Legal & Ethical Issues,* 13 ST. MARY'S J. ON LEGAL MALPRACTICE & ETHICS 48 (2023). The paper was originally presented at the Journal's 22nd Annual Symposium on Legal Malpractice & Ethics on Jan. 27, 2023, in San Antonio, Texas.

[10] *Id.* at 101.

[11] *Id.*

knowledge of all the painful experiences that may have shaped the client's development. Their initial statements are likely to be emotional responses and conclusory opinions, rather than the solid facts on which mitigation evidence must ultimately rest.[12]

This problem is exacerbated when the defendants are foreign nationals from Honduras and El Salvador and the individuals who knew the trajectory of his childhood development most intimately cannot imagine its relevance to a legal proceeding in which jurors, rather than judges, determine the appropriate sentence.

9. The purpose of a thorough mitigation investigation is to develop social history evidence that will humanize the defendant, help jurors to understand why he may have committed the capital offense, and evoke compassion and empathy by identifying the client's individual frailties that at once establish human kinship and expose vulnerabilities and disadvantage. Moreover, a thorough social-history investigation provides the foundation for reliable mental health evidence and enables counsel to make informed decisions about what kinds of mental health experts to consult and what questions they should address. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation in the wide spectrum of areas that they may address in a capital case, which range from the statutorily defined issues of competency and criminal responsibility to the broadest varieties of statutory and non-statutory mitigation that have mental health aspects. The fruits of a thorough mitigation investigation not only provide capital defendants with the effective representation to which they are entitled under the Sixth Amendment but assure jurors of the opportunity to consider all the evidence relevant to the reasoned moral judgment they are asked to render, thereby also assuring the courts of an outcome that is reliable and just.

---

[12] *Id*. at 91-92 (citation omitted).

10. The need to investigate mental disorders and impairments in the context of sentencing evidence is equally well established. *See Ake v. Oklahoma*, 470 U.S. 68, 80 (1985) (due process right to psychiatric assistance when mental condition is relevant to culpability *or punishment*).[13] Without the social history that results from a thorough mitigation investigation, trial counsel cannot make an informed and thoughtful decision about which experts to retain in order to gauge the nature and extent of a client's possible mental disorders or impairments. Mental health experts, in turn, require social history information for complete and reliable assessments, so consultations without such background information are inevitably futile.

### II. Prevailing Norms in the Development of Mitigating Evidence in Capital Cases

11. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case and has been for as long as I have done this work. In every seminar in which I have participated since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases. When I began working on capital cases in 1980, investigation was already firmly established as an integral part of the criminal defense function generally. When the American Bar Association published the second edition of its Standards for Criminal Justice (1980), Standard 4.4-1 of the Defense Function described the duty to investigate as follows: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues

---

[13] The High Court noted that "[m]any states, as well as the Federal Government, currently make psychiatric assistance available to indigent defendants," citing, among other statutes, subsection (e) of the Criminal Justice Act, 18 U. S. C. § 3006A, providing that indigent defendants shall receive the assistance of all experts "necessary for an adequate defense." *Accord,* McWilliams v. Dunn, 582 U.S. 183 (2017).

leading to facts relevant to the merits of the case *and the penalty in the event of conviction*." *Id.* at 4:53 (emphasis added). The Commentary to this Standard noted concisely, "Facts form the basis of effective representation." *Id.* at 4:54. In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.* at 4:55.[14] These ABA Standards were cited by the Supreme Court of the United States a quarter century ago in reference to counsel's obligation to conduct a thorough investigation of a capital defendant's background. *Williams v. Taylor*, *supra* ¶ 6, at 396.

12. These standards covered criminal defense generally. Discussions of *capital* defense provided more specific detail about counsel's duties in investigating mitigating evidence. As early as 1979, Dennis Balske (an experienced capital litigator who had practiced in the South) emphasized, "Importantly, the life story must be complete."[15] In 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases in a widely read and often cited law review article.[16] He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation,

---

[14] *See also* Joseph B. Cheshire V, *Ethics and the Criminal Lawyer: The Perils of Obstruction of Justice*, THE CHAMPION (Jan./Feb. 1989) at 12 ("Defense counsel have a right and a duty to approach and interview every witness that might have any information regarding the particular issue involved in their client's case.").

[15] Dennis N. Balske, *New Strategies for the Defense of Capital Cases,* 13 AKRON L. REV. 331, 358 (1979).

[16] Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y.U. L. REV. 299 (1983). Goodpaster's article was cited by Justice O'Connor, writing for the High Court's majority, in *Strickland v. Washington*, 466 U.S. 668, 689-90 (1984), Justice Marshall, dissenting, cited the article three times. *Id.* at 716 nn.13, 15; 718.

and the care with which it is conducted, cannot be overemphasized."[17] Five years after his

original law review article, Dennis Balske wrote in the national defense bar magazine to advise

capital defense counsel that they "must conduct the most extensive background investigation

imaginable. You should look at every aspect of your client's life from birth to present. Talk to

everyone that you can find who has ever had any contact with the defendant."[18]

13. At the beginning of the 1980s, a capital defense lawyer in California hired a former

*New York Times* reporter to investigate the life history of his client. The reporter, the late Lacey

Fosburgh, had previously written a best-selling book about a murder case she had covered for the

newspaper.[19] After her successful work in developing the capital client's mitigation evidence,

Ms. Fosburgh wrote about the critical role she had played:

> A significant legal blind spot existed between the roles played by the private
> investigator and the psychiatrist, the two standard information-getters in the trial
> process. Neither one was suited to the task at hand here -- namely discovering and
> then communicating the complex human reality of the defendant's personality in
> a sympathetic way.
>
> Significantly, the defendant's personal history and family life, his
> obsessions, aspirations, hopes, and flaws, are rarely a matter of physical evidence.
> Instead they are both discovered and portrayed through narrative, incident, scene,
> memory, language, style, and even a whole array of intangibles like eye contact,
> body movement, patterns of speech -- things that to a jury convey as much
> information, if not more, as any set of facts. But all of this is hard to recognize or
> develop, understand or systematize without someone on the defense team having
> it as his specific function. *This person should have nothing else to do* but work
> with the defendant, his family, friends, enemies, business associates and casual
> acquaintances, perhaps even duplicating some of what the private detective does,

---

[17] Goodpaster, *The Trial for Life, supra* note 18, at 323-324.

[18] Dennis Balske, *The Penalty Phase Trial: A Practical Guide,* THE CHAMPION, Mar. 1984. at 40, 42.
*Accord* Norton, *Mitigation Investigation, supra* note 5, at 44 ("[I]t is necessary to interview almost literally
everyone who has known him or her, including relatives, neighbors, medical and mental health personnel, teachers,
friends, co-workers and employers, prison personnel and other inmates, military personnel, social service agency
personnel, etc. This generally means going back decades, and usually with very few clues to trace these people.")
*See also* David C. Stebbins & Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-
Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, Aug. 1986. at 14, 18 ("capital defense
attorneys must recognize that the profession demands a higher standard of practice in capital cases"); Robert R.
Bryan, *Death Penalty Trials: Lawyers Need Help*, THE CHAMPION, Aug. 1988, at 32 ("There is a requirement in
every case for a comprehensive investigation not only of the facts but also the entire life history of the client.").

[19] LACEY FOSBURGH, CLOSING TIME: THE TRUE STORY OF THE "GOODBAR" MURDER (1977).

but going beyond that and looking for more. This takes a lot of time and patience.[20]

Capital defense lawyers across the country soon recognized the value of nonlawyers with expertise in the development of sentencing evidence -- ultimately referred to as "mitigation specialists." The California defense bar prominently featured one such nonlawyer on the cover of its monthly magazine *Forum* in 1987.[21] The national defense bar magazine, *The Champion*, discussed the use of social workers in developing mitigating evidence in 1986.[22] The following year, another article in the same magazine commented tersely, "The mitigation specialist is a professional who, as attorneys across the nation are now recognizing, should be included and will be primary to the defense team."[23]

14. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important

---

[20] Lacey Fosburgh, *The Nelson Case: A Model for a New Approach to Capital Trials*, in CALIFORNIA STATE PUBLIC DEFENDER, CALIFORNIA DEATH PENALTY MANUAL, 1982 supplement, N6-N10, N7, July 1982 (emphasis added).  This article also appeared in the magazine of the California defense bar, FORUM, Sept.-Oct. 1982. *See also* Report by the Team Defense Project, *Team Defense in Capital Cases*, FORUM, May-June 1978, and Michael G. Millman, *Interview: Millard Farmer*, FORUM, Nov.-Dec. 1984, at 31-33. Goodpastor's article, *supra* note 18, began with a discussion of Farmer's successful presentation of mitigation in a Harris County case in the 1975, State v. Bernardino Sierra (involving 3 murders, torture, 2 maimings, & 12 robberies), Goodpaster, *supra* note 18, at 299-300 & nn.1-4.

[21] Anne E. Fragasso, *Interview: Casey Cohen*, FORUM, Jan.-Feb. 1987, at 22, 26.

[22] Cessie Alfonso & Katharine Bauer, *Enhancing Capital Defense: The Role of the Forensic Social Worker*, THE CHAMPION, June 1986, at 26, 26-29.

[23] James Hudson et al., *Using the Mitigation Specialist and the Team Approach*, THE CHAMPION, June 1987, at 33, 36. Hudson and one of his co-authors had worked in the *Mitigation Specialists Department* of the Ohio State Public Defender's Office. *Id.* at 33.

because of the additional mitigating factors that may be disclosed beyond the fact of psychiatric disorder or organicity.[24]

15. Since 2000, the U.S. Supreme Court has found trial counsel ineffective in five cases for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); and *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam). Every case but *Sears* was tried in the 1980s, and *Sears* was tried in 1993, more than thirty years ago. In *Williams,* the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial in 1986 and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.). In *Wiggins*, a case tried in 1989, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation in accordance with the ABA Guidelines. "Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. In *Rompilla*, tried in 1988, trial counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health experts. 545 U.S. at 377, 379. Similarly, in *Porter*, also tried in 1988, trial counsel were found deficient despite a "fatalistic and

_____

[24] *See, e.g.*, John Hill & Mike Healy, *The Death Penalty and the Handicapped*, FORUM, May-June 1986, at 18-20 (discussing implications of childhood disorders affecting the brain and other disabilities for penalty phases in capital cases); David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION, Apr.1988, at 34, 36 (discussing need for adequate time to overcome clients' distrust and the value of a neuropsychologist or neurologist in cases with head trauma).

uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation. 558 U.S. at 40. Quoting *Williams*, the Court in *Porter* reaffirmed this duty: "It is unquestioned that under the prevailing professional norms" at the time of Porter's trial, counsel had an "obligation to conduct a thorough investigation of the defendant's background." *Id*. at 39 (citation omitted). Among the mitigation that Porter's counsel failed to present was "brain damage that could manifest in impulsive, violent behavior." *Id*. at 36. In *Sears*, the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings. The Court noted, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented . . ." 561 U.S. at 954. Post-conviction evidence emphasized significant frontal lobe brain damage causing deficiencies in cognitive functioning and reasoning. *Id*. at 946. Four of these five individuals have subsequently received sentences of less than death, and the fifth case remains in litigation as of this writing. Terry Williams received a life sentence by negotiated disposition in Danville, Virginia, in 2000.[25] On October 15, 2004, the State of Maryland agreed to a disposition sending Kevin Wiggins to a state facility for mental health treatment and rehabilitation services, but making him eligible for parole based on time already served.[26] On August 13, 2007, the Lehigh County (Pennsylvania) District Attorney's Office stipulated to a life sentence for Ronald Rompilla.[27] On July 21, 2010, the Brevard-Seminole (Florida) State Attorney's Office announced that it would allow George Porter, Jr., to be

---

[25] Frank Green, *Death Penalty Cases Scrutinized: More Hearings Are Being Ordered in Virginia*, RICHMOND TIMES-DISPATCH (Apr. 9, 2001) at A1, *available at* truthinjustice.org/va-dpreview.htm.

[26] *See* Jenner & Block, *12 Year Battle for Kevin Wiggins Comes to an End* (Oct. 15, 2004), jenner.com/news/news_item.asp?id=12759624.

[27] Associated Press, *Death Row Inmate Gets New Life Term*, USA TODAY, usatoday.com *See* /news/topstories/2007-08-13-477084247_x.htm.

resentenced to life.[28] On July 19, 2023, the Eleventh Circuit Court of Appeals remanded the case of Demarcus Sears to the trial court for a resentencing proceeding.[29] All five cases involved mental health evidence, including brain damage or cognitive impairment, that was not discovered and presented at trial.

### III. The Need for a Culturally Competent, Qualified Mitigation Specialist

16. After a decade of experience with the federal death penalty, the Committee on Defender Services of the Judicial Conference of the United States appointed a subcommittee of federal judges under the Hon. James R. Spencer of the Eastern District of Virginia to study the cost and quality of defense representation. The subcommittee report, commonly referred to as the Spencer Report,[30] found that, as of 1998, the work of mitigation specialists was "part of the existing 'standard of care' in a federal death penalty case."[31] The report noted that mitigation specialists "have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review."[32] In a capital case, competent defense counsel have a duty to conduct a thorough life-history

---

[28] Kaustuv Basu, *Aging Killer May Get Reprieve from Death Row*, FLA. TODAY (July 21, 2010). [28] *See* Jenner & Block, *12 Year Battle for Kevin Wiggins Comes to an End* (Oct. 15, 2004), jenner.com/news/news_item.asp?id=12759624.

[29] Sears v. Warden GDCP, 73 F.4th 1269 (11th Cir. 2023); LEGAL DEFENSE FUND, DEATH ROW USA, Winter 2025, at 49, *available at:* DRUSA Winter 2025.DOC (last visited Mar. 14, 2025).

[30] FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May 1998), *available at:* https://www.uscourts.gov/sites/default/files/original_spencer_report.pdf (last visited Mar.15, 2025).

[31] *Id.*, Commentary to 7. Experts, Sec. II, Recommendations and Commentary.

[32] *Id.*

investigation, but generally lack the skill to conduct the investigation themselves.[33] Moreover, even if lawyers had the training, skills, and patience, they do not have the time to conduct thorough mitigation investigation because of all the other work that is demanded of them in representing a capital client. Besides, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence. Capital defense counsel have long retained a mitigation specialist to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes. As noted *supra* ¶ 13, even before the term "mitigation specialist" had been coined, penalty phase biographical investigation was widely accepted in the 1980s as a critical part of the capital defense function.

17. As revised in 2003, the ABA Death Penalty Guidelines, state unequivocally that lead counsel at any stage of capital representation should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11).

18. The consensus supporting teamwork and using a mitigation specialist simply represents the most efficient and cost-effective means of conducting the thorough mitigation investigation that is constitutionally required. There are of course lawyers who are skilled in developing mitigation, and some even serve as mitigation specialists in cases where they are not serving as counsel. Training in mitigation investigation has always been available to lawyers, and it is imperative that lawyers fully appreciate what thorough mitigation investigation

---

[33] *See*, generally, Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help but Can't Be Delegated*, THE CHAMPION, Mar. 2007, at 61.

involves. However, mitigation specialists bring to the defense team knowledge and experience that is unsurpassed because they do nothing else: mitigation investigation is their full-time job.

19. Like all specialized professionals, mitigation specialists have toolkits that enable them to tackle all the problems from locating witnesses who are not eager to be found to organizing and distilling all the information that flows from the parallel tracks of interviews and document gathering. They obtain computerized detailed earnings reports from the Social Security Administration to identify employers that the client may not even remember and specific dates of employment even if the client recalls the job. They know how to use public records online and at courthouses, as well as state and county vital records offices. They are familiar with the federal Freedom of Information Act and the corresponding open records laws of individual states. They use the commercial vendors who market the non-financial data collected by credit bureaus, which relentlessly acquire consumer last-known-address information from every source from warranty cards on household appliances to the Social Security Administration's death index. Mitigation specialists have up-to-date knowledge of the authorizations needed to comply with the Health Insurance Portability and Accountability Act (HIPAA) and other privacy protections. They use chronologies to digest records, decode medical acronyms, and decipher handwritten notes; genograms to visualize the multigenerational family tree; and maps to track every address where the client has ever lived. They use www.newspapers.com for media searches, government websites to identify toxic environmental locations, and a wide range of search engines from Google to the Wayback Machine. They must be able to access all the social media platforms and digital devices that contain social-history information about a client and his family, such as Meta and Twitter.

20. Courts have found the various editions of the ABA Criminal Justice Standards and Death Penalty Guidelines useful in assessing the reasonableness of counsel performance. As the Supreme Court noted in *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010): "We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . .'" The High Court cited *Strickland*, 466 U.S. 668, 688 (1984); *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam); *Florida v. Nixon*, 543 U.S. 175, 191, and n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000). The Court concluded: "Although they are 'only guides,' *Strickland*, 466 U.S. at 688, and not 'inexorable commands,' *Bobby*, 558 U.S. at 8, these standards may be valuable measures of the prevailing norms of effective representation . . ." The *Padilla* Court also cited law review articles and the publications of criminal defense and public defender organizations (such as the National Association of Criminal Defense Lawyers and the National Legal Aid and Defender Association) as guides to prevailing professional norms. *Id.* at 367. *Accord Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (per curiam) (capital reversal finding trial counsel ineffective and citing *Padilla*'s analysis of "prevailing professional norms," 559 U.S. at 366, and quoting verbatim the first two sentences of its analysis of prevailing norms).

21. The Commentary to the 2003 edition of the ABA Guidelines explained in detail why mitigation specialists are vital members of the capital defense team:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. . . .

. . . The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.[34]

22. Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases discuss these skills in even more detail.[35] Supplementary Guideline 5.1.B, for example, specifies the need for someone with

the training and ability to obtain, understand and analyze all documentary and anecdotal information relevant to the client's life history. Life history includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors.[36]

23. Supplementary Guideline 5.1.C continues:

Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime. They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals

---

[34] 31 HOFSTRA L. REV. at 959 (citations omitted).

[35] The Supplementary Guidelines were published a decade after a multi-year survey and drafting process. *See* Sean D. O'Brien, *Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases: When Life Depends on It*, 36 HOFSTRA L. REV. 693 (2008) (noting that the survey and national review process for the Supplementary Guidelines began years prior to publication). The draft of these Supplementary Guidelines was circulated and discussed at numerous national training programs in the years leading up to publication. I personally discussed them in presentations on mitigation at multiple training programs before publication. *See supra* ¶¶ 8, 13.

[36] Supplementary Guidelines, *supra* note 1, at 682.

> may have against the disclosure of sensitive information and to assist the client
> with the emotional impact of such disclosures. They must have the ability to
> advise counsel on appropriate mental health and other expert assistance.[37]

A core team member, usually the mitigation specialist, must also have the specialized training, as

described in Supplementary Guideline 5.1.E, to identify, document and interpret "symptoms of

mental and behavioral impairment, including cognitive deficits, mental illness, developmental

disability, neurological deficits; long-term consequences of deprivation, neglect and

maltreatment during developmental years; social, cultural, historical, political, religious, racial,

environmental and ethnic influences on behavior; effects of substance abuse and the presence,

severity and consequences of exposure to trauma."[38]

 24. Without a thorough social history investigation, it is impossible to ascertain the

existence of previous head injuries, childhood trauma, and a host of other life experiences that

may provide a compelling reason for a juror to vote for a life sentence. Moreover, without a

social history, counsel cannot make an informed and thoughtful decision about which experts to

retain, in order to gauge the nature and extent of a client's possible mental disorders and

impairments. Mental health experts, in turn, require social history information to conduct a

complete and reliable evaluation.[39]

 25. The social history investigation should include a thorough collection of objective,

reliable documentation about the client and his family, typically including medical, educational,

---

[37] *Id.*
[38] *Id.* at 683.
[39] See Richard G. Dudley, Jr., & Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); Douglas Liebert & David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43 (1994). See also George W. Woods et al., *Neurobehavioral Assessment in Forensic Practice*, 35 INT'L J. OF L. & PSYCHIATRY 432 (2012).

employment, social service, and court records.[40] Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Records are sometimes mistakenly presumed destroyed when they are in fact simply stored offsite in dusty warehouses that no one is eager to visit. Great diligence is required to ensure compliance with appropriate requests. In-person visits may be needed to obtain records that require extra effort to retrieve. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

26. The Commentary to ABA Guideline 10.7 (Investigation) notes, "Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. . . . The collection of corroborating information from multiple sources – a time-consuming task – is important wherever possible to ensure the reliability and thus the persuasiveness of the evidence. Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes . . ."[41]

---

[40] My list is abbreviated for the sake of describing some generic categories of records. Writing in 1992, Lee Norton offered a more comprehensive list: "birth certificate (vital statistics, county health department or hospital); birth records (hospital); mother's obstetric records (private physician clinic); school records; medical records (hospital, physician, emergency room, clinic); psychiatric/psychological records; records of all priors (court, police, jail, attorney, pre-sentence investigations); parole/probation (especially field notes); prison (daily, psychological, medical); 'training' schools/reformatories/juvenile detention centers; social services (food stamps, AFDC, WIC, welfare, Social Security, foster homes, counseling, reports of abuse); military (medical, psychological, training, tests/evaluations); lawsuits/involuntary commitments; employment (tests, evaluations, medical, job assignments, worker's compensation, pay scale)." Norton, *Mitigation Investigation, supra* note 8, at 45. She added, "Each record obtained will refer to other records and reports . . . which must be obtained, and individuals who must be located and interviewed, thus expanding the investigation." *Id.*

[41] 31 HOFSTRA L. REV. at 1024-25.

27. Records invariably provide valuable background information on clients and their families. *See Rompilla v. Beard*, *supra* ¶ 6, at 390 (court file – a readily available public document – contained "a range of mitigation leads that no other source had opened up"). In an earlier ineffectiveness case, *Williams v. Taylor*, *supra* ¶ 6, the Supreme Court found the life-history records such powerful mitigating evidence that the High Court added a footnote to quote a caseworker report verbatim:

> The home was a complete wreck. . . . There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash. … The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them. . . . The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey.[42]

This excerpt provides a lucid example of a vivid illustration of family dysfunction – and a story that even the most skilled interviewer could never have elicited simply by talking with family members. The records documented an event that Terry Williams and his siblings were too young to remember, and his parents were too intoxicated to register in memory. Records have no inherent bias, and contemporaneous records are in any event more credible than witnesses who share previously undisclosed memories.

28. Life-history records enable capital defense teams to interview all witnesses more effectively – not only the witnesses who created the records in the first place (like the teachers who produced report cards) but also family members and friends who can organize their memories more accurately if there is hard documentation of dates and places. The frailty of

---

[42] 529 U.S. at 395, n.19.

human memory obliges us all to rely on records, and they provide the essential skeletal framework for social history investigation. They are helpful in preparing witnesses to testify.

29. A social history cannot be completed in a predetermined time frame. Several years ago, I noted, "The most recent scholarly estimate of the time required for thorough mitigation investigation is . . . that it often takes '*thousands of hours'* to complete the extraordinarily difficult and time-consuming task."[43]  In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation/LGBTQ+ status, ability/disability, body type, and physical appearance.[44]

30. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. Lee Norton, writing in

---

[43] Russell Stetler, *The Past, Present, and Future of the Mitigation Profession: Fulfilling the Constitutional Requirement of Individualized Sentencing in Capital Cases,* 46 HOFSTRA L. REV. 1161, 1204 (2018), citing Robert J. Smith, *Forgetting Furman,* 100 IOWA L. REV. 1149, 1173 n.130 (2015) (emphasis added).

[44] While these social and cultural differences have long been recognized as practical barriers in mitigation investigation (*see* Stetler, *Mitigation Evidence, supra* note 8, at 36), they are also seen as structural inequalities in the literature of social psychology analyzing intersectionality in the dynamics of power. In many ways, the unequal power relationship between imprisoned clients facing capital charges and defense teams in the free world (whom they did not choose) is the most fundamental obstacle to trust.

1992, stressed the cyclical nature of the work.[45] Dr. Norton summarized what is involved in every mitigation investigation succinctly:

> The two chief means of obtaining information in a life history investigation are intensive interviews and record searches. Life history investigations involve interviewing the client and virtually everyone who has ever known the client, and finding every piece of paper regarding the client ever generated. Both tasks require special knowledge and expertise which the attorney may not (and probably does not) possess. Therefore, one of the first tasks in the preparation of any capital case is securing the assistance of an individual with the skills that make him or her competent to conduct the life history investigation.[46]

Elaborating on the cyclical nature of the investigation, Dr. Norton stressed that "[t]he investigation is not complete until the information uncovered becomes redundant and provides no new insight."[47]

31 The most fundamental point in the Supplementary Guidelines for the Mitigation Function (*supra* ¶ 6, note 8) is the need for multiple, in-person, face-to-face, one-on-one interviews with family members and others who are familiar with the client's life and family history (Guideline10.11.C). Only with these multiple, in-person contacts can rapport and trust be patiently established. Psychologist Kathleen Wayland, Ph.D., has explained why such rapport is the key to eliciting traumatic disclosures:

> Rapport between interviewer and subject is a necessary, though by no means a sufficient, condition for disclosure to occur. Interviewers must be highly knowledgeable in their understanding of trauma dynamics in order to recognize the psychological meaning of the complex dynamics involved in interpersonal – often familial – violence. Given the nature of traumatic experience and the barriers to disclosure, there is a need for multiple, repeated interviews over time. Interviewers must be conscious of the possibility of retraumatization during interviewing. They must have skills to avoid or minimize this possibility and knowledge of how to respond to witnesses who are flooded and overwhelmed during interviews. Interviewers must be aware that clients often disclose traumatic material in small increments, and be able to judge the client's limits and allow

---

[45] *See* Norton, *Mitigation Investigation*, *supra* note 8, at 43-45.
[46] *Id.* at 43.
[47] *Id*. at 45.

him to discuss at a pace that is psychologically tolerable, to gauge the pace at which disclosure can occur, and to remain focused on the main goals of trauma interviews: (1) to maintain trust, rapport, and cooperation with those being interviewed; (2) to efficiently obtain information; and (3) to avoid or minimize retraumatization.[48]

Whether with clients or mitigation witnesses, this rapport is essential to *engagement* – the capacity to participate in the process of disclosing information that may be painful and invasive.

32. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that can inspire compassion, empathy, mercy, and understanding. Unlike insanity and competency, both of which are strictly defined by statute and temporal limitations, mitigation need not involve a mental disease or defect, and it may encompass the entire trajectory of the client's life. In many cases, clients facing the death penalty suffer mental impairments that do not meet the legal definition of insanity or incompetency but are powerfully mitigating disabilities that are given great weight when juries are charged with assessing individualized culpability.

33. For clients who are psychiatrically disordered or brain damaged, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions. Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same environment turn out differently. It is an objective scientific fact. Psychiatric evidence can provide a context to explain the capital crime and past behaviors as more than simply bad choices made by the client.

34. Over the years, I have been involved in hundreds of capital cases, including scores of trials and post-conviction hearings, throughout the country. I have provided evidence as an

---

[48] Kathleen Wayland, *The Importance of Recognizing Trauma Throughout Capital Mitigation Investigation and Presentations*, 36 HOFSTRA L. REV. 921, 960 (2008).

expert on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in over two hundred fifty cases around the country. *See* Appendix A, *infra* ¶ 9. My personal experience of the effectiveness of mitigation evidence accords with the empirical research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases.[49]

***¶IV.  Special problems when the capital clients were born in foreign countries and much of the mitigation investigation in their home countries involves witnesses who do not speak English and who have no understanding of the U.S. criminal legal system***

35. Mitigation investigation is particularly complex when the client does not share the attorney's cultural background.[50] Attorneys may too readily overlook symptoms of impairment, attributing them to language difficulties or cultural differences. Cultural issues may involve not only race, ethnicity, and language, but religion, politics, socioeconomic status, or any other characteristics that define social identity. Diversity and ethnocultural competency in capital defense teams are of practical importance. A defense team representing foreign nationals from Central America face enhanced barriers to disclosure of sensitive life-history information. *See supra* ¶¶ 8, 29-30.

_____

[49] *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness). *See also* John H. Blume et al., *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 HOFSTRA L. REV. 1035, 1038 (2008) ("The [Capital Jury Project] studies reveal that many different types of mitigation resonate with jurors. Low intelligence, mental illness, child abuse, extreme poverty, remorse, lack of a significant prior record, and lesser culpability are just some of the categories of mitigation that, in a particular case, can lead jurors to choose life over death."); *id*. at 1051 ("[E]vidence that the defendant was under the influence of extreme emotional disturbance or mentally ill at the time of the crime is also mitigating to almost half of all jurors. Almost a third of jurors found exposure to serious child abuse mitigating, and a like number found childhood poverty mitigating.").

[50] *See* Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital Mitigation*, 36 HOFSTRA L. REV. 883 (2008); *see also* Dudley & Leonard, *Getting It Right, supra* note 39, at 978, 980 (noting importance of ethnocultural competency in mental health evaluations and the potential role of "cultural brokers" to advocate for the needs of people from cultures that are different from the defense team).

36. This counter-intuitive confusion (described *supra* ¶ 8) applies to witnesses who have spent their whole lives in America, but it is even worse for those who have grown up and live outside the United States and are wholly unfamiliar with our criminal legal system. Over the course of my career, I have personally traveled outside the country for investigations in Germany, Honduras, and Nigeria, and I have supervised staff from the various offices where I have worked as they conducted investigations in Colombia, the Dominican Republic, Jamaica, Mexico, Peru, and Thailand. I know from experience how hard it is in international investigations to explain all aspects of the defense function in U.S. law, and particularly the mitigation function in capital cases. The problems of course are only exacerbated when any administration's policies view the citizens of any other country with hostility, suspicion, and fear because those sentiments may pervade the jury pool --and they are often reciprocated by the citizens of countries outside the United States. The trauma of violence and war in Central America has also had profound impact both on those who leave and those who remain in those regions – and, in turn, on how they are viewed through the various lenses of American politics. Immigration to the United States is itself often traumatic and always involves culture shock with attendant profound psychosocial adjustments.

37. The strategies for overcoming these barriers to disclosure are unchanged. Mitigation investigation abroad still requires patience and the building of trust and rapport through multiple, in-person, one-on-one interviews.[51] It also requires diligently gathering whatever records are available.[52] But there is more: "When assessing the physical environment in which a client was born, it is important to be mindful of the fact that circumstances may have changed dramatically

---

[51] *See* Gregory Kuykendall, Alicia Amezcua-Rodriguez, & Mark Warren, *Mitigation Abroad: Preparing a Successful Case for Life for the Foreign National Client,* 36 HOFSTRA L. REV. 969, 1007-1008 (2008).
[52] *Id*. at 1005, 1007.

in the years since the client's childhood. Accordingly, it is important to gather information regarding the conditions that were present during the client's childhood."[53]

## V. Standard of Care in Capital Mental Health Evaluations[54]

38. Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses and historical experts (i.e., the professionals who encountered the capital client long before the alleged offense).[55] Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and

---

[53] *Id.* at 1010-1011 (also noting the need to collect demonstrative evidence, including photographic documentation and objective data about living conditions)..

[54] As noted *infra* Appendix A, notes 66-68, I am the author of multiple publications relevant to this question: a law review article, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. REV. 407 (2014) ; two book chapters, *Dead Men Talking: Mental Illness and Capital Punishment*, *in* FORENSIC MENTAL HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., & Amy Smiley, Ph.D., eds., 2001) with Leah George; *Punishment*, *in* PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY, 2d ed. (Richard Rosner, M.D., ed. A PRACTITIONER'S GUIDE TO REPRESENTING CAPITAL CLIENTS WITH MENTAL DISORDERS AND IMPAIRMENTS (2008), with Dick Burr, Matthew Cross, David Freedman, Anne James, & Kathy Wayland. When the Court was asked to affirm the application of *Ake*'s holding in Alabama, I was one of the twenty-three named capital attorneys and investigators in the amicus brief of the National Association of Criminal Defense Lawyers in support of petitioner McWilliams, and my declaration was appended to the amicus brief as Appendix X, 90a-981. *See* McWilliams v.Dunn, 582 U.S. 183 (2017).

[55] During the operative years of the New York death penalty statute (1995 to 2004), for example, the Capital Defender Office offered the testimony of historical experts in several cases. A school psychologist who had tested a client routinely as part of mandated triennial review for Special Education explained the significance of his borderline intellectual functioning (FS IQ 76-81). People v. George Davis Bell (Ind. 128-97, Judge Cooperman, Queens County, N.Y., 1999). In another case, a different school psychologist explained the impact of learning disabilities (at age eleven, reading just above a second-grade level; at fourteen, just above fourth grade; and at seventeen, just above fifth grade). People v. José J. Santiago (Ind. 1210/99, Judge Bristol, Monroe County, N.Y., 2000). In a third case, a psychiatrist had treated the client's mother after her suicide attempt when the client was nine -- thirty years before the capital trial. From the records, the psychiatrist testified to the history of mood disorders and suicidality in the maternal lineage, as well as family dysfunction, including fights over promiscuity, gambling, and drinking. From her current perspective, the psychiatrist opined about the devastating impact on the children of the mother's mood disorder, suicidality, and psychiatric removal from the family. People v. John F. Owen (Ind. 547-99 cons. with 414-99, Judge Egan, Monroe County, N.Y., 2001). *See* Stetler, *The Mystery of Mitigation, supra* note 12 at 258 (n.92). *See also* Scott E. Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109, 1123 (1997) (finding that two-thirds of the witnesses whom jurors thought "backfired" were defense experts).

potential evidence can only be discovered through life-history investigation. However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of his life and to be able to offer an empathic framework for understanding the resultant disorders and disabilities. Expert testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

39. The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation. Because psychiatrically disordered or cognitively impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons). Additional components of a reliable evaluation will include a thorough physical examination (including neurological examination) and appropriate diagnostic testing. The standard mental status examination cannot be relied upon in isolation for reliable clinical assessments any more than the expert can be relied upon in isolation in the courtroom context.

40. Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts. At the same time, it is important that counsel not prematurely rule out disorders and impairments simply because they have not observed florid symptoms. The signs of mental disorders typically wax and wane, and many clients are skilled at masking stigmatized impairments and conditions. It is not at all

uncommon for capital defendants to present well, striving to avoid the potential shame and

embarrassment of being labeled "crazy" or "retarded." Only after the social history data have

been meticulously digested and the multiple risk factors in the client's biography have been

identified will counsel be in a position to determine what kind of culturally competent expert is

appropriate to the needs of the case, what role that expert will play, and what referral questions

will be asked of the expert.[56] Psychiatrists and psychologists have different training and

expertise, and within each profession are numerous subspecialties including the disciplines that

study the effects of trauma on human development. The potential roles of experts include

consultants; fact gatherers needed to measure cognitive capacities or to elicit client disclosures

(and/or to assess their credibility); and testifying witnesses, to name but a few. To make

informed decisions about the kinds of experts that may be needed and the referral questions they

will address, counsel first needs a reliable social history investigation.

41. The importance of independently corroborated social history data was also well

recognized among mental health practitioners as early as the 1980s. A leading psychiatric text in

that period described an accurate and complete medical and social history as the "single most

---

[56] *See* Dudley & Leonard, *Getting It Right, supra* note 39, at 985, for examples of referral questions:
• How does this type of mental health difficulty explain or contribute to the behavior of this
defendant, especially as it relates to the crime?
• What is the course of this type of mental health difficulty? How do we know that the defendant
was affected by the difficulty at the time of the crime?
• How do the defendant's multiple mental health difficulties interact with each other to result in
the type of behavior evidenced by the defendant?
• Does the defendant suffer from mental health difficulties that the decision-maker might find
mitigating even though they did not directly lead to the defendant's criminal behavior?
• Why was the defendant not treated for these mental health conditions before he was charged with
this crime?
• If the defendant was never successfully treated for his mental health difficulties, does he still
require, and is he still likely to benefit from treatment? And if so, is appropriate treatment
available in a prison setting?
• How will the defendant's mental illness impact his ability to adjust to life in prison, including
whether he is at risk of harming himself or others, and will treatment improve his ability to adjust
to life in prison?
• Is the defendant expressing a commonly held belief of similarly placed individuals, an unusually
strongly held belief, or a delusional  belief? *Id.* at 982.

valuable element to help the clinician reach an accurate diagnosis."[57] The same text noted that the individuals being evaluated are often poor historians: "The past personal history is somewhat distorted by the patient's memory of events and by knowledge that the patient obtained from family members."[58] Thus, "retrospective falsification, in which the patient changes the reporting of past events or is selective in what is able to be remembered, is a constant hazard of which the psychiatrist must be aware."[59] This problem is particularly acute in the forensic context, as two other leading authorities pointed out in 1980:

> The thorough forensic clinician seeks out additional information on the alleged offense and data on the subject's previous antisocial behavior, together with general "historical" information on the defendant, relevant medical and psychiatric history, and pertinent information in the clinical and criminological literature. To verify what the defendant tells him about these subjects and to obtain information unknown to the defendant, the clinician must consult, and rely upon, sources other than the defendant.[60]

## VI. Conclusions

42. My experience in more than four decades of capital defense work and my extensive research on over six hundred highly aggravated capital cases from 1979 to 2024 where juries declined to impose death sentences support the conclusion that adequate mitigation investigation and effective mitigation presentation matter, regardless of how vile or heinous the crimes may appear.[61]

---

[57] H. KAPLAN & B. SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 837 (4th ed. 1985).

[58] *Id.* at 488.

[59] *Id.*

[60] Richard J. Bonnie & Christopher Slobogin, *The Role of Mental Health Professionals in the Criminal Process: The Case for Informed Speculation*, 66 VA. L. REV. 427, 508-509 (1980).

[61] *See* Stetler et al., *Mitigation Works, supra* ¶ 10, note 9, 51 HOFSTRA L. REV. at 149-206. These cases came from federal, military, and state courts from thirty-three different states with the death penalty, as well as federal cases from Massachusetts, Michigan, the Commonwealth of Puerto Rico, and the District of Columbia. *Id.* at 149. This study identified over six hundred highly aggravated cases in three unambiguous categories (child murder, law enforcement murder, and multiple murder) where juries declined to impose the death penalty. The database included more than four hundred multiple murder cases. Eighty-five cases in the database were federal capital prosecutions.

43. The professional norms and standards in the investigation and presentation of mitigation evidence are well established. There is no simple metric for determining how much time is needed to conduct a thorough mitigation investigation and provide the social history that is recognized as the bedrock of reliable capital mental health assessments. Counsel has an obligation to complete the mitigation investigation not only to provide the effective representation that their capital client deserves, but also to offer the comprehensive information on which jurors can rely to make the reasoned moral decision about whether he should be executed or sentenced to spend the rest of his life in prison without hope of release. As in the case of *Sears v. Upton, supra* ¶ 6, this evidence might not make these defendants "any more likable to the jury, but it might well [ ] help[ ] the jury understand" their crimes.[62]

44. It is my considered professional opinion that a constitutionally mandated thorough mitigation investigation cannot be completed if trial is to begin in September 2025.

*   *   *

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct and was executed this 26th day of May 2025 at Berkeley, California.

RUSSELL STETLER

---

[62] *See* Sears, 561 U.S. at 951.

# APPENDIX A

### *Background and Qualifications*

1. I served as the first National Mitigation Coordinator for the federal death penalty projects (described more fully at their web site, www.capdefnet.org) from 2005 until my retirement from full-time work in the spring of 2020. I continue to write, train, and consult on mitigation evidence in death penalty cases throughout the United States. The National Mitigation Coordinator position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), and the revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases that same year.[63] In that position, I consulted with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases. I was involved in training and case brainstorming with defense teams in capital prosecutions throughout the country in this time frame. Defense teams from many jurisdictions, including many federal capital defense teams, regularly brought their death penalty cases to the weeklong Bryan R. Shechmeister Death Penalty College at Santa Clara University Law School, where I served on the program's faculty for twenty-five years between 1996 and 2021 (when the program was held virtually).

2. From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty

---

[63] *See* GOULD & GREENMAN, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION IN FEDERAL DEATH PENALTY CASES, *supra* note 4, at 111-112 (Commentary describes authorization of the position to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts" and my role as the National Mitigation Coordinator in case consultations and training). Gould and Greenman updated the 1998 Spencer Report discussed *infra* ¶ 23 & notes 39-42.

statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with lawyers, investigators, mitigation specialists, and experts who were retained by contract or employed directly by the Capital Defender Office or the private bar in connection with death penalty cases in New York.

3. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco that coordinated the appellate and post-conviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with staff attorneys and court-appointed counsel, as well as investigators, mitigation specialists, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.

4. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. All my work on death penalty cases has been on behalf of indigent clients, either through funding authorized by courts or public defender offices, or as an employee of indigent defense agencies. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and in post-conviction proceedings. Most of these conferences were organized and attended by attorneys specializing in capital defense. I investigated mitigation evidence in over two dozen death penalty cases in California in the 1980s.

5. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have lectured on these subjects not only in New York and California, but in most of the other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming, as well as in Puerto Rico, a jurisdiction where only federal death penalty cases have been prosecuted.[64] I have also lectured on numerous occasions under the auspices of the Administrative Office of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. Over more than three decades, I have lectured at over four hundred fifty continuing legal education programs around the country, as well as dozens of additional programs at law schools and related professional conferences in the United States, Europe, and Asia.

6. Since the 1990s, I have lectured on mitigation investigation in death penalty cases at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual capital punishment conference, often referred to as the "Airlie" conference because of its traditional location at Airlie House in Warrenton, Virginia), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times over more than thirty years, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for

---

[64] At the time I lectured on these subjects in Colorado, Connecticut, Delaware, Illinois, Maryland, New Jersey, New Mexico, New York, Virginia, and Washington, capital punishment was permitted in those jurisdictions.

Criminal Justice (CACJ) and the California Public Defenders Association (CPDA), which is attended by over a thousand practitioners. I was a co-chair of the planning committee for this seminar in 2009 and from 2011 to 2015. I delivered the virtual keynote address of this seminar in 2021 (attended by fifteen hundred participants and later published by *Santa Clara Law Review*) and remained on the faculty through 2024. I have also taught at the death penalty colleges at the Santa Clara University School of Law in California and the DePaul University College of Law in Illinois. I have taught at more than a dozen capital defense seminars throughout the country under the auspices of the National Institute of Trial Advocacy and over a dozen "bring-your-own-case" capital brainstorming seminars under the auspices of the National Consortium for Capital Defense Training and its regional counterparts. I also designed and organized the annual Capital Mitigation Skills Workshop, held annually under the auspices of the national Habeas Assistance and Training Counsel Project since 2012 until it was interrupted by the Covid pandemic in 2020. It resumed in January 2023 and was held again in May 2023, June 2024, and January-February 2025 in response to the continuing high demand for the skills training.

7. In the 1990s, I contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA). This multi-volume reference includes a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on *Mitigation Evidence in Death Penalty Cases*, *Mental Disabilities and Mitigation,* and *Post-Conviction Invetigation in Death Penalty Cases* in *The Champion*, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in *Indigent Defense*, published by the National Legal Aid and Defender Association. These and

other articles of mine were cited in the Commentary to the ABA Guidelines for the Appointment

and Performance of Defense Counsel in Death Penalty Cases (rev. 2003), *supra* note 1.[65]

8. I am the author or co-author of over a dozen law review articles,[66] several book

chapters,[67] and a practice guide on mental health issues in capital cases.[68] My published work on

mitigation has been cited by post-conviction courts in overturning death sentences because of

trial lawyers' failure to provide effective representation, as demonstrated by their failure to

conduct thorough mitigation investigations. *See State v. Revis*, 49-CC-2005-000142.60, Circuit

---

[65] Citations in the Commentary to Guideline 4.1, The Defense Team and Supporting Services, 31 Hofstra L. Rev. at 959-60 n.105; Guideline 10.7, Investigation, *id.* at 1022 n.210, 1027 n.226; Guideline 10.9.1, The Duty to Seek an Agreed-Upon Disposition, *id.* at 1042 n.249; Guideline 10.15.1, Duties of Post-Conviction Counsel, *id.* at 1085 n.348.

[66] *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1),* 31 HOFSTRA L. REV. 1157 (2003); *Dying Twice: Incarceration on Death Row*, 31 CAPITAL U. L. REV. 853 (2003), with Norman L. Greene, William D. Buckley, Craig Haney, Joseph Ingle, & Michael B. Mushlin; *Using the Supplementary Guidelines on the Mitigation Function to Change the Picture in Post-Conviction*, 36 HOFSTRA L. REV. 1067 (2008) with Mark E. Olive; *The Mystery of Mitigation: What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J. L. & SOC. CHANGE, (2008); *The Unknown Story of a Motherless Child*, 77 UMKC L. REV. 947 (2009); *The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA L. REV. 635 (2013) with W. Bradley Wendel; *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. REV. 407 (2014); *The ABA Guidelines: A Historical Perspective*, 43 HOFSTRA L. REV. 731 (2015) with Aurélie Tabuteau; *The Past, Present, and Future of the Mitigation Profession: Fulfilling the Constitutional Requirement of Individualized Sentencing in Capital Cases*, 46 HOFSTRA L. REV. 1161 (2018); *Lockett v. Ohio and the Rise of Mitigation Specialists*, 10 CONLAWNOW 51 (2018); *Death Penalty Keynote: Why Mitigation Matters, Now and for the Futur*e, 61 SANTA CLARA L. REV. 699 (2021); *Mitigation Works: Empirical Evidence of Highly Aggravated Cases Where Juries Rejected the Death Penalty*, 51 HOFSTRA L. REV. 89 (2022), with Maria McLaughlin & Dana Cook; *Mitigation Reports in Capital Cases: Legal and Ethical Issues*, 13 ST. MARY'S J. LEGAL MAL. & ETHICS 48 (2023), with W. Bradley Wendel. *Mitigation That Worked: Empirical Evidence of Why Jurors Rejected the Death Penalty in Some Highly Aggravated Cases,* 53 HOFSTRA L. REV. (*forthcoming* 2025).

[67] *Dead Men Talking: Mental Illness and Capital Punishment*, in FORENSIC MENTAL HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., & Amy Smiley, Ph.D., eds., 2001) with Leah George; *Punishment*, in PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY, 2d ed. (Richard Rosner, M.D., ed., 2003) with Robert Lloyd Goldstein; *Mitigation Matters*, in TELL THE CLIENT'S STORY: MITIGATION IN CRIMINAL AND DEATH PENALTY CASES (Edward Monahan & James Clark, eds., 2017) with John Blume; *The History of Mitigation in Death Penalty Cases, in* SOCIAL WORK, CRIMINAL JUSTICE, AND THE DEATH PENALTY (Lauren A. Ricciardelli, ed., 2020); *Mitigation and the Death Penalty: Successes, Obstacles, and Forced Constraints, in* THE SLOW DEATH OF THE DEATH PENALTY: TOWARD A POST-MORTEM (Todd C. Peppers et al., eds., New York University Press, *forthcoming*).

[68] A PRACTITIONER'S GUIDE TO REPRESENTING CAPITAL CLIENTS WITH MENTAL DISORDERS AND IMPAIRMENTS (2008), with Dick Burr, Matthew Cross, David Freedman, Anne James, & Kathy Wayland.

Criminal Court, Marion County, Alabama (Presiding Judge John H. Bentley) (Feb. 13, 2015)

slip. op. at 27, and *Stokes v. Stirling,* 10 F.4th 236, 252 (4th Cir. 2021).[69]

9. Courts have qualified me as an expert witness in multiple state and federal

jurisdictions, and I have provided opinion evidence on standard of care issues in capital cases

(especially in the investigation and presentation of mitigation evidence) by live testimony or

affidavit over two hundred fifty times in numerous jurisdictions, including Alabama, Arizona,

Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa,

Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New Hampshire, New York, North

Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee,

Texas, Utah, Virginia, Washington, and Wyoming. I have testified as an expert witness thirty-

five times, including testimony in federal capital habeas corpus cases in the Districts of Arizona,

Arkansas (Eastern), California (Eastern), Iowa (Northern), Louisiana (Middle), Missouri

(Western) (three times), Texas (Northern), and Wyoming, as well as in state capital post-

conviction proceedings in Alabama, Arkansas, California, Colorado, Louisiana, Nevada, South

Carolina, Texas, and Wyoming. I have also testified as a pretrial or post-conviction expert

witness on mitigation standards in the state and federal trial courts of various states. My

testimony was cited favorably in a pretrial order precluding the State from seeking the death

---

[69] Revis was resentenced to life with parole. *See* Associated Press, *Inmate pleads guilty to lower charge, removed from death row,* Sept. 25, 2020 (reporting resentencing in Hamilton, Alabama), *available at:* Inmate pleads guilty to lower charge, removed from death row | AP News (last visited Feb. 14, 2025). In Sammie Stokes's case, the Supreme Court vacated the grant of habeas relief and remanded for further consideration in light of *Shinn v. Martinez Ramirez,* 142 S. Ct. 1718 (2022). *See Stirling v. Stokes,* 142 S. Ct. 2751 (2022). On remand, the Fourth Circuit "reaffirm[ed] [its prior] opinion" granting habeas relief and the Supreme Court denied the State's petition for writ of certiorari. *See Stokes v. Stirling,* 64 F.4th 131, 133 (4th Cir. 2023), cert. denied, No. 22-1234, 2023 WL 7287138 (U.S. Nov. 6, 2023). Stokes's resentencing was pending as of Jan. 1, 2025. *See* LEGAL DEFENSE FUND, DEATH ROW USA, Winter 2025, at 55, *available at:* DRUSA Winter 2025.DOC (last visited May 22, 2025).

penalty in the retrial of Jonathan Bruce Reed in 2011,[70] reversed on mandamus as unripe by the Texas Court of Criminal Appeals because Mr. Reed had not yet been re-convicted.[71] The United States District Court for the Middle District of Louisiana in *Wessinger v. Cain,* Case No. 3:04-637-JJB-SCR (July 27, 2013), and the United States District Court for the District of Wyoming in *Eaton v. Wilson*, Case No. 09-CV-261-J (November 20, 2014), issued orders in which the courts qualified me as an expert in the investigation and presentation of mitigating evidence, competent to testify about the performance of the petitioner's trial counsel, and found counsel deficient in each case. My testimony was also cited in a state post-conviction grant of relief for failure to investigate and present mitigation evidence in *Gutierrez v. State*, Case No. CR94-1795B, Second Judicial District Court, Washoe County, Nevada (Judge Jerome M. Polaha) (Aug. 21, 2017), slip op. at 30-32. The Ninth Circuit Court of Appeals also cited my testimony in granting sentencing relief for ineffective assistance of counsel in *Sanders v. Davis*, 23 F.4th 966, 979 (9th Cir. 2022), a case from Bakersfield (Kern County), California. *See also Thomas v. Wong,* United States District Court for the Northern District of California, No. C-93-0616 MHP (Sept. 9, 2009), slip opinion, where the court relied on my testimony as an expert on investigation (citing it five times) in granting a new trial because of trial counsel's pervasive failure to investigate in both phases in a case prosecuted in 1986.[72]

10. Over the years, I have been directly involved in hundreds of capital cases, including scores of trials and post-conviction hearings. I have also been consulted in various capacities on capital cases in numerous jurisdictions around the country, including numerous federal districts.

---

[70] State v. Jonathan Bruce Reed, Crim. Dist. Ct. #4, Dallas Co., Cause No. F81-01988-FK, Trial Court's Findings of Fact and Conclusions of Law Regarding Defendant's Motions to Preclude the Death Penalty, slip. op. (Apr. 20, 2011). The order was issued by the Hon. John Creuzot, who is now serving his second term as the elected district attorney of Dallas County.

[71] State ex Rel. Watkins v Creuzot, 352 S.W. 3d 493 (Tex. Ct. Crim. App. 2011). After Mr. Reed was convicted in the retrial, the District Attorney announced that he would decline to seek the death penalty.

[72] Aff'd, *Thomas v. Chappell*, 678 Fed.3d 1086 (9th Cir.2012), cert. denied 568 U.S. 1186 (2013).

38