**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-cr-20463-ALTMAN**

**UNITED STATES**,

*v.*

**GUSTAVO ALFONSO CASTANO RESTREPO**,

    *Defendant.*

                                  /

## ORDER DENYING MOTION TO STRIKE

Our Defendant, Gustavo Alfonso Castano Restrepo, has been charged with kidnapping Liliana Moreno in a way that resulted in the deaths of Liliana and her minor daughter, Daniella Moreno, in violation of 18 U.S.C. § 1201(a)(1)–(2). *See* Superseding Indictment [ECF No. 44] at 1. Restrepo now moves to strike, *see* Motion [ECF No. 59], the Government's Notice of Intent to Seek the Death Penalty (the "Death Notice") [ECF No. 46]. After careful review, we **DENY** the Motion.

### THE FACTS

On October 17, 2024, a federal grand jury in our District charged Restrepo with one count of kidnapping resulting in death. *See* First Indictment [ECF No. 3]. The Government alleges that Restrepo kidnapped Liliana Moreno—with whom Restrepo was having an affair—and their minor daughter, Daniella, in a manner that resulted in their deaths. The First Indictment didn't include special findings. Both the "Certificate of Trial Attorney" and "Penalty Sheet" that were attached to the First Indictment indicated that, if convicted, Restrepo was eligible for the death penalty. *Id.* at 3 ("Is this a potential death penalty case?" Answer: "Yes"); *id.* at 4 (noting that the "Max Penalty" for "Count #1," "Kidnapping Resulting in Death," is "Death"). On November 20, 2024, we set the trial in this case for December 16, 2024. *See* First Trial Order [ECF No. 25] at 1.

On November 26, 2024, Restrepo moved to continue the trial to May 2025. *See* First Motion to Continue [ECF No. 26] ¶ 7. In his motion, Restrepo recognized that, "[u]nder the charge, the defendant is facing either life in prison or the death penalty[,]" *id.* ¶ 6, and admitted that "[t]he Government has not yet decided on whether to seek the death penalty[,]" *id.* at 2 n.6. We continued the trial until January 13, 2025. *See* First Amended Trial Schedule [ECF No. 28] at 2.

On December 18, 2024, the Government moved to continue the trial from January 13, 2025, to September 2025. *See* Govt's Unopposed Motion to Continue [ECF No. 30]. Because "[t]he Government [ ] indicated that this is a death-eligible case[,] [and c]onsistent with our usual practice in such cases, and to better manage the complexities associated with this case, we [ ] set a Status Conference to discuss scheduling on January 6, 2025." December 31, 2024, Paperless Order [ECF No. 31]. During that status conference on January 6, 2025, the Government told us that it would not be seeking the death penalty in this case (the "No Seek"):

> Court: And is this a case where the death penalty is on the table?
>
> Government: Your Honor, I was advised today by the capital case unit that the committee's voted against, so it will be a no seek.
>
> Court: So we're done with that already.
>
> Government: Yeah, I don't expect—I'm expecting to get written confirmation shortly from the unit.
>
> Court: All right. That makes it unique in that regard.

January 6, 2025, Hearing Transcript at 2:1–10 [ECF No. 99-1]. Since the Government wasn't seeking the death penalty, we never set a deadline for it to file its potential death notice.

At the time of our hearing, and since July 1, 2021, the federal government had a moratorium on federal executions. *See* Memorandum from Merrick B. Garland, Att'y Gen., *Moratorium on Federal Executions Pending Review of Policies and Procedures* (July 1, 2021) (on file with the Department of Justice)

at 1 ("No federal executions will be scheduled during the pendency of these reviews.").[1] In a July 1, 2021, memorandum, then-Attorney General Merrick Garland had raised concerns "about the continued use of the death penalty across the country, including arbitrariness in its application, disparate impact on people of color, and the troubling number of exonerations in capital and other serious cases." *Ibid.* General Garland noted that, under the previous administration, "[i]n the last two years, the Department made a series of changes to its policies and procedures in this area." *Ibid.* General Garland directed a review of those changes and ordered that "[n]o federal executions will be scheduled during the pendency of these reviews." *Ibid.* Three-and-a-half-years later—and just before he left office—then-President Biden commuted "the sentences of 37 [of the 40] individuals on federal death row."[2] Press Release, The White House, FACT SHEET: President Biden Commutes the Sentences of 37 Individuals on Death Row (Dec. 23, 2024) (archived at https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2024/12/23/fact-sheet-president-biden-commutes-the-sentences-of-37-individuals-on-death-row/).[3]

On January 7, 2025, we entered our Second Amended Trial Schedule [ECF No. 33], setting the trial for June 2, 2025. *See* Second Amended Trial Schedule at 1. But, on March 3, 2025, the

---

[1] Federal Rule of Evidence 201 permits a federal court to take judicial notice of government documents, like the Attorney General's memo, because, generally, they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 652 (11th Cir. 2020) (quoting FED R. EVID. 201(b)); *see also Fagan v. U.S. Att'y Gen.*, 2025 WL 3170821, at *2 (S.D. Fla. Nov. 13, 2025) (Altman, J.) ("Under Fed. R. Evid. 201, we may take judicial notice of government publications and website materials." (cleaned up)); *Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*, 2017 WL 3503371, at *7 (S.D. Fla. Aug. 15, 2017) (Scola, J.) (recognizing that a court may take "judicial notice of information publically [sic] available from an official government website").

[2] The Government argues that, as a result of General Garland's memorandum and President Biden's commutations, "[a]t the time of the initial, no-seek notice, there was a *de facto* moratorium on the death penalty." Response in Opposition to Defendant's Motion to Strike Notice of Intent to Seek the Death Penalty ("Response") [ECF No. 66] ¶ 3.

[3] We'll also take judicial notice of President Biden's press release under Rule 201. *See Paez*, 947 F.3d at 652.

Government and Restrepo jointly moved to continue the trial "to a date in October 2025[.]" Third Motion to Continue [ECF No. 39] at 1. We granted that request and pushed the trial off until September 8, 2025. *See* March 13, 2025, Amended Trial Order [ECF No. 40] at 2.

On January 20, 2025, President Trump signed Executive Order No. 14164, Restoring the Death Penalty and Protecting Public Safety, 90 Fed. Reg. 8463 (Jan. 20, 2025). Section 3 of that order directed the Attorney General of the United States to "pursue the death penalty for all crimes of a severity demanding its use." *Ibid.* Consistent with that directive, on February 5, 2025, then-Attorney General Pamela Bondi issued a memorandum to all Department of Justice employees, outlining the Department's agenda to "reviv[e] the federal death penalty and lift[] the [prior administration's] moratorium on federal executions[.]" Memorandum from Pamela Bondi, Att'y Gen., Dep't of Just., *Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions* (Feb. 5, 2025) (on file with Department of Justice) (emphasis omitted).[4] In her memo, General Bondi directed "federal prosecutors at the Department, including at U.S. Attorney's Offices, [to] seek the death penalty—if that is a penalty proscribed [sic] by Congress—for the most serious, readily provable offenses, and if doing so is consistent with the relevant statutory considerations and other applicable regulations and Department of Justice guidance." *Id.* at 2. General Bondi's memorandum also made clear that this policy applied to no-seek decisions the Government had made during the Biden administration:

> The Attorney General's Capital Review Committee [("CRC")] is directed to review no-seek decisions in all pending capital-eligible cases (i.e., death-eligible cases that have not yet resulted in a conviction) charged between January 20, 2021, and January 19, 2025. This group shall reevaluate no-seek decisions and whether additional capital charges are appropriate. . . . The review required by this paragraph shall be completed within 120 days.

---

[4] We'll likewise take judicial notice of this Attorney General's memorandum under Rule 201. *See Paez*, 947 F.3d at 652.

*Id.* at 3; *see also* Office of Legal Policy, Dep't of Just., Report to Attorney General, *Restoring and Strengthening the Federal Death Penalty* (Apr. 24, 2026).[5] Because Restrepo was indicted on death-eligible charges on October 17, 2024, the Government's no-seek decision in his case was subject to this re-review process.

On March 24, 2025, 47 days after General Bondi issued her memo, the prosecutor in our case emailed Restrepo's lawyer to advise him that the Department of Justice would be reviewing its prior no-seek decision:

> Today I received notice from the DOJ Capital Crimes Section that the Section is going to review its decision whether or not to seek the death penalty against Mr. Castano Restrepo. They asked me to let you know and request that you provide me with some Monday dates during the next several weeks, when you can appear before the Committee in Washington, and make submissions on behalf of Mr. Castano.

Email Between Prosecutor and Defense Counsel [ECF No. 66-2]. In that same email, the prosecutor suggested that defense counsel "may want to bring this to Judge Altman's attention and request the appointment of learned counsel." *Ibid.* "Not surprising," defense counsel answered. "Kind of expected. Will get back to you. Thanks." *Ibid.*

On May 27, 2025, Restrepo moved for the appointment of learned counsel under 18 U.S.C. § 3005 and told us (for the first time) that "[t]he Government initially waived the death penalty but the new administration of the Department of Justice has authorized the current Assistant United States Attorney to notify counsel that the waiver is being reviewed." Motion for Appointment of Learned Counsel [ECF No. 42] at 1. "The DOJ," counsel added, "is seeking input from defense counsel as to mitigating circumstances that would support a waiver." *Ibid.* "The defense[,]" therefore, "seeks for the moment the appointment of learned counsel to prepare mitigation for presentation to the Government for the purposes of providing the Government information necessary for them to

---

[5] We'll take judicial notice of the Office of Legal Policy's memorandum under Rule 201.

affirm their prior decision to waive the death penalty." *Id.* at 1–2. On May 29, 2025, we granted that motion and appointed Stuart Adelstein "as second attorney to serve as Learned Counsel[.]" Order Appointing Learned Counsel [ECF No. 43].

On July 10, 2025, the Government filed a Superseding Indictment, which included the same underlying charge as the First Indictment—now supplemented with fifteen "Special Findings" under 18 U.S.C. §§ 3591(a)(2)(A)–(D), 3592(c)(1), 3592(c)(8), 3592(c)(9), 3592(c)(11), and 3592(c)(16). *See* Superseding Indictment at 2–4.

One month later, on August 11, 2025, the Government filed its Death Notice under 18 U.S.C. § 3593(a). Mirroring the Special Findings it had outlined in the Superseding Indictment, the Death Notice set forth certain "Statutory Threshold Factors Enumerated under 18 U.S.C. §§ 3591(a)(2)(A)–(D)[,]" "Statutory Aggravating Factors Enumerated Under 18 U.S.C. § 3592(c)[,]" and "Non-Statutory Aggravating Factors Authorized by 18 U.S.C. § 3593(a)(2)[.]" Death Notice at 1–4. When that Death Notice was filed, Restrepo's trial was set to start in 29 days, on September 8, 2025. *See* March 13, 2025, Amended Trial Order. On August 18, 2025, the Government moved to continue the trial until January 2026 because "two of the government's FBI case agents [were] unavailable" during the then-scheduled trial period. Gov't Motion to Continue Trial [ECF No. 48] at 6. The Government added that "the Court may and should continue the trial to cure any deficiency in the [Death] [N]otice." *Id.* at 14. Restrepo opposed the continuance, arguing that the Government was "trying to cure their inexplicable delays with a continuance, which does not remedy the infirmities of their untimely notice and reversal of their announcement not to seek the death penalty." Def. Opposition to Continuance [ECF No. 57] at 3; *see also* Gov't Reply in Support of Continuance [ECF No. 58].

On September 1, 2025, Restrepo moved to strike the Death Notice. *See generally* Mot. On September 2, 2025, we continued the trial for one year, until September 8, 2026. *See* Third Amended Trial Order [ECF No. 61]. The Government then filed its opposition to the Motion. *See* Response in

Opposition to Defendant's Motion to Strike Notice of Intent to Seek the Death Penalty ("Response") [ECF No. 66]. Restrepo replied, *see* Reply to Prosecution's Response to Defendant's Motion to Strike Notice of Intent to Seek the Death Penalty ("Reply") [ECF No. 69], and submitted several pieces of supplemental authority, *see* Notice of Filing Supplemental Authority ("First Supplemental") [ECF No. 71]; Second Notice of Filing Supplemental Authority ("Second Supplemental") [ECF No. 75]; Third Notice of Filing Supplemental Authority ("Third Supplemental") [ECF No. 89].

## THE LAW

"[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *see also Gregg v. Georgia*, 428 U.S. 153, 187 (1976) ("There is no question that death as a punishment is unique in its severity and irrevocability."); *Monge v. California*, 524 U.S. 721, 731–32 (1998) ("The penalty phase of a capital trial is undertaken to assess the gravity of a particular offense and to determine whether it warrants the ultimate punishment[.]"). "Because the death penalty is the most severe punishment . . . [c]apital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Roper v. Simmons*, 543 U.S. 551, 568 (2005); *see also Strickland v. Washington*, 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and dissenting in part) ("[W]e have consistently required that capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding."). For this reason, "in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner." *Illinois v. Somerville*, 410 U.S. 458, 461 (1973) (citations omitted).

### I.      The Federal Death Penalty Act

In 1994, Congress passed the Federal Death Penalty Act of 1994 (the "FDPA"), 18 U.S.C. §§ 3591–98. *See also* 140 Cong. Rec. 25260 (1994) ("Let us get tough with an effective, believable, and timely death penalty for violent offenders." (statement of Rep. Newt Gingrich)); *ibid.* ("I agree that tougher penalties for violent offenders are important. That is why . . . we have included the largest ever expansion of the death penalty[.]" (statement of Sen. Joseph Biden)). "The FDPA, which authorizes the death penalty for more than forty federal crimes, sets forth the general procedures for imposing a death sentence in federal cases." *United States v. Fernandez*, 231 F.3d 1240, 1243 (9th Cir. 2000); *see also United States v. Jones*, 132 F.3d 232, 247 n.11 (5th Cir. 1998), *aff'd sub nom.*, *Jones v. United States*, 527 U.S. 373 (1999) ("The legislative history also supports a holding that [18 U.S.C.] § 3593 was intended to create procedures for imposing the death penalty rather than create additional substantive crimes." (citing H.R. Rep. No. 103-467 (1994))). As part of those procedures, "[t]he FDPA requires the government to notify the defendant of the intent to seek the death penalty within a reasonable time before trial or before the district court accepts a guilty plea. This notice must include the aggravating factors that the government plans to offer at the sentencing hearing." *United States v. Lighty*, 616 F.3d 321, 342 (4th Cir. 2010) (first citing § 3593(a)(1); and then citing § 3593(a)(2)).

In § 3593(a), the FDPA provides as follows:

(a) **Notice by the Government**. If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice—

   (1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and

(2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information. The court may permit the attorney for the government to amend the notice upon a showing of good cause.

The FDPA thus imposes two notice requirements. "First, if the government intends to seek the death penalty for a certain defendant, it must notify the defendant 'a reasonable time before trial' of its intent to do so." *Fernandez*, 231 F.3d at 1243 (quoting § 3593(a)(1)). "Second, the government must notify the defendant of all aggravating factors that it 'proposes to prove as justifying a sentence of death' if the defendant is convicted of the underlying offense." *Ibid.* (quoting § 3593(a)(2)). The notice "that the government will seek the sentence of death" is commonly referred to as a "death notice." *United States v. Wilk*, 452 F.3d 1208, 1210 (11th Cir. 2006) ("Appellant . . . appeals the district court's denial of his motion to strike the government's Notice of Intent to Seek the Death Penalty (the 'Death Notice')[.]").

## II.     The Timeliness of the Death Notice

Our Circuit uses an "objective reasonableness" test, *id.* at 1221, to determine whether the government served its death notice "a reasonable time before the trial," § 3593(a). In making this assessment, we consider the "totality of the circumstances," including: "(1) what transpired in the case before the formal Death Notice was filed; (2) the period of time remaining for trial after the Death Notice was filed; (3) the status of discovery and motions in the proceedings; (4) the nature of the charges in the indictment; (5) the nature of the aggravating factors claimed to support the death penalty; and (6) the anticipated nature of the defense, if known." *Wilk*, 452 F.3d at 1221; *see also id.* at 1221 n.23 ("Our conclusion that evaluating objective reasonableness requires an unrestricted

9

evaluation of all the circumstances is thus not inconsistent with the Fourth Circuit's approach." (citing *United States v. Ferebe*, 332 F.3d 722, 737 (4th Cir. 2003) ("To judge an accused's challenge to the reasonable timeliness of a Death Notice requires evaluation of, among other factors that may appear relevant, (1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and, in addition, (4) the status of discovery in the proceedings.")))).

## ANALYSIS

Restrepo asks us to strike the Death Notice for three reasons. *First*, he contends that the text of § 3593 doesn't allow the Government to reverse a no-seek decision. *Second*, he says that the Death Notice was untimely and thus didn't meet the "reasonable time" requirement of § 3593(a). *Third*, he argues that the Government should be estopped—under the doctrines of judicial, promissory, and equitable estoppel—from reversing its prior no-seek decision. We address—and reject—each argument in turn.

### I.       § 3593 Doesn't Prohibit the Government from Reversing Its No-Seek Decision

Restrepo says that the Death Notice "violates the plain text of the Federal Death Penalty Act[.]" Mot. at 18. "[T]he notice provision of 18 U.S.C. § 3593(a)," Restrepo claims, "does not authorize the Government to reverse a decision not to seek the death penalty." *Ibid.* As Restrepo reads the FDPA, "a formal no-seek announcement under § 3593(a)(1) is binding[,] and [ ] principles of statutory construction make clear that amendment is only permitted as to the list of proposed aggravating factors under § 3593(a)(2)." *Id.* at 18–19; *see also* Reply at 7 ("The plain language of the statute means that the prosecution must seek the permission of the court and must show *good cause*; otherwise, the words in the statute are meaningless."). Even if § 3593(a) does allow the Government to reverse its prior no-seek decision, Restrepo adds, "the prosecution would be required at a minimum

to seek the Court's leave to do so and to establish good cause for its reversal, neither of which it has done." Mot. at 18. We disagree on all counts.

### a.   § 3593 Only Applies When the Government Seeks the Death Penalty

"[S]tatutory interpretation must begin with, and ultimately heed, what a statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (cleaned up). To that end, "a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). "As a general rule, if the language of the statute is plain, then our interpretative function ceases and we should 'enforce the statute according to its terms.'" *In re Griffith*, 206 F.3d 1389, 1393 (11th Cir. 2000) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241(1989)). And, on the issues that are pertinent to our discussion, § 3593(a) is unambiguous. It provides, in relevant part, as follows:

> **Notice by the Government.** If, in a case involving an offense described in section 3591, the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice[.]

§ 3593(a). In other words, "these provisions of the FDPA are implicated only if the government has made an authoritative decision to seek the death penalty." *Fernandez*, 231 F.3d at 1243. To reach this commonsense conclusion, we start with the first word, "if," which typically means "on the condition that" or "in the event that." *See Dodd v. United States*, 545 U.S. 353, 358 (2005) (observing that "the definition of 'if' is 'in the event that' or 'on condition that'" (quoting Webster's Third New International Dictionary 1124 (1993))); *see also* Merriam-Webster's Dictionary 410 (2020) (defining "if" as "in the event that" or "allowing that" or "on the assumption that"); Cambridge Dictionary 773 (2013) (defining "if" as "used to say that a particular thing can or will happen only after something else happens or becomes true"); The American Heritage Dictionary 874 (2011) (defining "if" as "on the condition that"). And the statute makes clear that the "condition" in question is triggered when

"the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter." § 3593(a). *If* that "condition" is satisfied, *then* (and only then) does the final part of the statute come into play—the requirement that "a reasonable time before the trial or before acceptance by the court of a plea of guilty, [the attorney for the government must] sign and file with the court, and serve on the defendant, a notice." *Ibid.*; *cf. State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 580 U.S. 26, 35 (2016) (explaining that "if" and "unless" are "clear[ ] conditional words"); *In re Whitaker Constr. Co., Inc.*, 439 F.3d 212, 222 (5th Cir. 2006) ("The use of the word 'if' before a comma implies a sufficient condition for whatever follows the comma."). As the Ninth Circuit explained, in short, "these provisions of the FDPA are implicated only if the government has made an authoritative decision to seek the death penalty." *Fernandez*, 231 F.3d at 1243.

In fact, § 3593(a)'s mandatory language *required* the Government to serve the Death Notice. Congress wrote that "the attorney shall . . . sign and file with the court, and serve on the defendant, a notice[.]" § 3593(a). "It is undisputed that the word 'shall' imposes a mandatory command." *Bufkin v. Collins*, 604 U.S. 369, 379 (2025) (quoting *Shapiro v. McManus*, 577 U.S. 39, 43 (2015)). "'Shall' means 'must.'" *Ibid.* (quoting *Kingdomware Tech., Inc. v. United States*, 579 U.S. 162, 171–172 (2016)). "Congress recognize[s] the difference between the mandatory term 'shall' and the permissive term 'may.'" *Whitehead v. Richardson*, 446 F.2d 126, 128 (6th Cir. 1971). As applied here, this means that, "if . . . the attorney for the government believes . . . that a sentence of death is justified," then he (or she) *must* serve a death notice. Since § 3593(a) doesn't apply to no-seek decisions, the statute's directive is no less mandatory when the government has served a no-seek at some point in the past. So, contra Restrepo's position that § 3593(a) *prohibited* the Government from serving the Death Notice, now that the Government has found that "a sentence of death is justified," the statute *obligated* the Government to serve that notice.

12

Section § 3593(a)'s inapplicability to no-seeks *also* makes sense given what § 3593(a) tells us the required "notice" *must* say.[6] The Supreme Court has said that the FDPA's "[s]tatutory language must be read in context and a phrase gathers meaning from the words around it." *Jones*, 527 U.S. at 389 (cleaned up) (looking to "the same subsection that petitioner relies upon" in interpreting the statute's meaning). Engaging in that analysis here makes clear that the specific kind of "notice" the FDPA contemplates is a death notice, and that the notice provisions thus don't apply to no-seek decisions—which are the *opposite* of a death notice. Under § 3593(a)(1), the "notice" must state that "a sentence of death is justified" *and* that "the government will seek the sentence of death." That wouldn't make sense if the "notice" were *either* a death notice *or* a no-seek because, when the government announces its decision **not** to seek the death penalty, it (by definition) is **not** "seek[ing] the sentence of death" and thus cannot certify that "a sentence of death is justified[.]" § 3593(a)(1).

The second subsection (§ 3593(a)(2)) likewise requires that the notice "set[ ] forth the aggravating factor or factors that . . . justify[ ] a sentence of death." *See also United States v. Battle*, 173

---

[6] The subsections of § 3593's notice provision provide that the government must "serve on the defendant, a notice":

> (1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and

> (2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

> > The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information. The court may permit the attorney for the government to amend the notice upon a showing of good cause.

§ 3593(a)(1)–(2).

F.3d 1343, 1347 (11th Cir. 1999) ("Section 3593(a) requires the Government to submit notice of, among other things, the 'aggravating factor or factors' it intends to rely on as grounds for the death penalty." (quoting § 3593(a)(2))). This "notice" would be nonsensical if it applied to no-seeks because, in the context of a no-seek (it goes without saying), there are no aggravating factors the government "intends to rely on as grounds for the death penalty," *Battle*, 173 F.3d at 1347, often because the government *doesn't* believe that the relevant factors "justify[ ] a sentence of death," § 3593(a)(2). The "notice provisions" of § 3593(a), in sum, can only apply to a death notice and thus have nothing to say about the government's decision to serve a death notice *after* it has earlier indicated an unwillingness to pursue the death penalty.

"[W]e ordinarily resist reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009). The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). And "[w]e cannot—certainly not in this case—interpolate into the statute a thing so important, which it does not contain." *Newton v. Mahoning Cnty. Comm'rs*, 100 U.S. 548, 562 (1879). Section 3593(a) applies only to the government's decision to serve a death notice. That death notice may (or may not) satisfy the statutory requirements of the FDPA, but this analysis has nothing to do with any prior decision by the government *not* to seek the death penalty. We, in short, won't read into the text of § 3593(a) words or phrases Congress chose not to include there.[7] *See Savage Serv. Corp. v. United States*, 25 F.4th 925, 945 (11th Cir. 2022)

---

[7] We recognize that we've adopted what appears to be a minority view. *See United States v. Spurlock*, 782 F. Supp. 3d 987, 1014–15 (D. Nev. 2025) ("[T]he FDPA must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so[.]"); *United States v. Constanza-Galdomez*, 787 F. Supp. 3d 131, 146 (D. Md. 2025) ("[T]he purpose of Section 3593(a) is to ensure that the government can only change its mind regarding a death notice when there is good cause to do so."); *United States v. Cole*, 799 F. Supp 3d 438, 456 (D.V.I. 2025) ("It simply cannot be— as the Government contends—that the filing of a No-Seek Notice represents a legal nullity, to which

14

("[I]t simply isn't our place to second-guess the legislature's fairness determinations or to supplant its considered judgment with our own."); *Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1296 (11th Cir. 1999) ("We take the provision as Congress wrote it, and neither add words to nor subtract them from it.").[8]

### b.   The Government Didn't Need "Good Cause" or the Court's Leave

In his second argument, Restrepo contends that, even if the FDPA allows the government to reverse its no-seek decision, "[t]he plain language of the statute means that the prosecution must seek the permission of the court and must show *good cause*." Reply at 7. Again, we disagree. As we've said, the FDPA requires the government, in its death notice, to "set[ ] forth the aggravating factor or factors that . . . justify[ ] a sentence of death." § 3593(a)(2). This subsection also provides that "[t]he court may permit the attorney for the government to amend the notice upon a showing of good cause." *Ibid.*

---

the FDPA attaches no significance."); *United States v. Dangleben*, 2025 WL 2647195, at *5 (D.V.I. Sep. 15, 2025) ("[T]he Court further determines that the Death Notice violates 18 U.S.C. § 3593. Section 3593(a) allows the government to amend a death notice 'upon a showing of good cause.'"). Still, some judges have declined to decide whether the FDPA prohibits the reversal of a no-seek. *See Cole*, 799 F. Supp. 3d at 456 ("[A]ssuming, without deciding, that the FDPA permits the reversal of a No-Seek Notice into a Seek Notice. . . ."); *United States v. Meehan*, 2026 WL 447431, at *6 (S.D. Ind. Feb. 17, 2026) ("[T]he Court's decision here does not address whether the government may ever seek the death penalty after filing a notice that it would not do so.").

In any event, our job is to say what the law is—not to repeat what other district judges have found the law, in their view, to be. *See Fishman & Tobin, Inc. v. Tropical Shipping & Const. Co.*, 240 F.3d 956, 965 n.7 (11th Cir. 2001) ("In the case of the Southern District of Florida Court, the only courts it must be obedient to are this Circuit and the Supreme Court of the United States.").

[8] *See also Minor v. Happersett*, 88 U.S. 162, 178 (1874) ("Our province is to decide what the law is, not to declare what it should be."); *Savage Serv. Corp. v. United States*, 25 F.4th 925, 945 (11th Cir. 2022) ("[I]t simply isn't our place to second-guess the legislature's fairness determinations or to supplant its considered judgment with our own."); *Mamani v. Berzain*, 825 F.3d 1304, 1310 (11th Cir. 2016) ("[U]nless and until the first and third branches of government swap duties and responsibilities, we cannot rewrite statutes."); *Torres v. Wal-Mart Stores E., L.P.*, 555 F. Supp. 3d 1276, 1294 (S.D. Fla. 2021) (Altman, J.) ("But here's the rub: . . . whether we think its policy rationales makes sense or not—we judges 'aren't free to rewrite clear statutes under the banner of our own policy concerns.'" (quoting *Azar v. Allina Health Servs.*, 587 U.S. 566, 581 (2019))).

15

In Restrepo's view, since the Government's original decision not to seek the death penalty implied that there were no aggravating factors warranting the death penalty, its subsequent Death Notice necessarily added a series of additional aggravating factors—an augmentation that, he says, would only be permitted under § 3593(a)(2) with permission of the court and a showing of good cause. *See* Mot. at 20 ("Section 3593(a)(2) provides that '[t]he court may permit the attorney for the [G]overnment to amend the notice upon a showing of good cause.' This statutory language plainly requires the prosecution to seek this Court's leave before attempting to alter its § 3593(a) notice. The prosecution has not done so. This failure therefore violates the text of the Federal Death Penalty Act and the notice should be stricken."). Not so.

Under § 3593(a)(2), "[t]he court may permit the attorney for the government to amend the notice upon a showing of good cause." But, by its own terms, this permission-and-good-cause requirement only applies when the government seeks to "amend" the death notice it's already filed. Since the Government in our case had filed no such notice, the Death Notice it ultimately submitted wasn't amending anything; it was simply the Government's original notice. And, as we've said, for the original notice, "[i]f . . . the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, a reasonable time before the trial . . . file with the court, and serve on the defendant, a notice[.]" § 3593(a). The Government, in short, didn't need to show "good cause" or seek leave to serve the *original* Death Notice it submitted here.

### c. Good Cause and Leave to File

Even *if* Restrepo were right that "[t]he plain language of the statute means that the prosecution must seek the permission of the court and must show *good cause*," Reply at 7, we'd grant the Government leave to file the Death Notice because we find that it has shown good cause.

16

Restrepo argues that "[t]he prosecution also cannot demonstrate good cause" because "[t]he sole basis for attempting to reverse course on [the Government's] decision not to seek the death penalty is a policy memorandum issued by the current Attorney General." Mot. at 20. "The prosecution simply changed its mind," in Restrepo's view, "rendering the good cause requirement meaningless as the prosecution would always be able to point to some change in its decision-making to justify its new course of action." *Ibid.* And "[p]olitics," he insists, "is not good cause in death penalty litigation." *Ibid.*

The Government counters that its "reversal of its no-seek notice is supported by public policy and good cause." Resp. at 17. "On January 6, 2025," it notes, "when the government stated it would not seek the death penalty, the death penalty was not available for this case because of the Biden Administration's moratorium." *Id.* at 17–18. "In particular," it adds, "the [Biden] Administration arbitrarily restricted the application of the death penalty to cases of terrorism or mass killings committed during hate crimes." *Id.* at 18. In other words, the Government explains, "during the Biden Administration, federal law prescribing the death penalty was a 'dead letter,' except in cases of terrorism or mass killings committed during hate crimes." *Id.* ¶ 2. The Government therefore urges us to find that "the United States' [Death] Notice is faithful to Congress's intent, expressed in Title 18, United States Code, Section 1201(a)(1), that the death penalty may apply where kidnapping results in the death of any person." *Id.* at 18.

Restrepo appears to raise three arguments against good cause. *First*, he says that a shift in DOJ policy, precipitated by a change in administration, cannot provide good cause because it's politically motivated. *Second*, he claims that the decision to reverse the no-seek in accordance with the then-effective DOJ policy wasn't within the Government's prosecutorial discretion. And *third*, he insists that, even if it were, General Bondi's memorandum cannot provide good cause for the reversal in this case. After careful consideration, we agree with the Government.

*First*, we think the change in DOJ policy at issue here *does* constitute good cause. "With each change of administrations, there come new policies." *Edwards v. U.S. Att'y Gen.*, 97 F.4th 725, 747 (11th Cir. 2024). "And whether the change in policy results from changing circumstances or a change in administrations, the wisdom of the policy is not a question we can review." *City & Cnty. of S.F. v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 799 (9th Cir. 2019); *see also United States v. Seewald*, 450 F.2d 1159, 1164 (2d Cir. 1971) ("Departmental policy can be changed and involves executive discretion not subject to judicial review."). In fact, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs and regulations." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring); *see also City & Cnty. of S.F. Francisco v. U.S. Citizenship & Immigr. Servs.*, 992 F.3d 742, 743 (9th Cir. 2021) (Van Dyke, J., dissenting) ("With the recent change in federal administrations, the Biden Administration stopped defending certain rules promulgated by the Trump Administration[.] . . . That in itself is neither surprising nor particularly unusual. Elections have consequences, as they say, and a common enough one is that new presidential administrations, especially of a different party, often disagree with some of the rules promulgated by their predecessors."). As the Supreme Court has made clear, "our business is not to judge the wisdom of the National Government's policy; dissatisfaction should be addressed to the President or, perhaps, Congress." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 427 (2003); *see also Hernandez v. Krome N. Serv. Processing Ctr.*, 2026 WL 851402, at *4 (S.D. Fla. Mar. 25, 2026) (Singhal, J.) ("When a duly elected Executive starts exercising the authority that Congress gave it in a way that differs from past administrations, people expect that the judiciary must do something about it. That is not the way the separation of powers works."); *Org. Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 980 (9th Cir. 2015) (Smith, J., dissenting) ("Inevitably, when the political pendulum swings and a different party takes control of the executive branch, the cycle begins anew. There is nothing improper about the political

branches of the government carrying out such changes in policy. To the contrary, such policy changes are often how successful presidential candidates implement the very campaign promises that helped secure their election. That is simply the way the modern political process works.").[9] We therefore reject Restrepo's argument that the Government cannot show good cause simply because "[t]he prosecution admits their new decision [to file the Death Notice] is directly and unilaterally the result of political change in administrations in January 2025." Reply at 3.

*Second*, we disagree that "[t]he decision to seek death after waiving the no-seek decision was not the product of careful prosecutorial discretion and an analysis of the facts of this case[.]" *Ibid.* As the Eleventh Circuit has explained, "[t]he decision to seek death in a given case is a matter of prosecutorial discretion." *Brooks v. Kemp*, 762 F.2d 1383, 1394 (11th Cir. 1985), *cert. granted*, *vacated on other grounds*, 478 U.S. 1016 (1986); *see also Jones*, 132 F.3d at 237 ("Exercising the discretion granted by the Federal Death Penalty Act, the United States Attorney prosecuting the case decided to seek the death penalty."); *In re United States*, 32 F.4th 584, 594 (6th Cir. 2022) ("[C]harging decisions traditionally fall within the power of the Executive branch—in this case, the prosecutors."). "Prosecutorial

---

[9] We might come out the other way if Restrepo could establish selective prosecution based on *his* political affiliations, which is plainly prohibited by the Fifth Amendment. *See United States v. Smith*, 231 F.3d 800, 807 (11th Cir. 2000) ("Prosecutors are given broad discretion in deciding against whom to focus limited prosecutorial resources, and a strong presumption of regularity supports those decisions. But they must exercise their charging discretion within constitutional constraints, including those imposed by the equal protection component of the Due Process Clause of the Fifth Amendment." (cleaned up)). But Restrepo never suggests that the Government is now seeking the death penalty because of *his* political views. *See generally* Mot.; Reply. Indeed, the record includes no evidence at all of his political preferences. Instead, he says only that the DOJ changed its policy because of an election. *See* Reply at 4–5 ("The prosecution did not seek death with one president; they do seek death with a different President . . . the change in this case was singularly because of policy."). He's thus forfeited any such argument. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented...are deemed waived.").

discretion encompasses the Executive's power to decide whether to initiate charges for legal wrongdoing and to seek punishment, penalties, or sanctions against individuals or entities who violate federal law." *In re Aiken Cnty.*, 725 F.3d 255, 266 (D.C. Cir. 2013) (Kavanaugh, J.). And "the President may exercise the prosecutorial discretion and pardon powers on any ground—whether based on the Constitution, policy, or other considerations." *Id.* at 266 n.10. The Government was therefore well within its discretion "to seek death after waiving the no-seek decision" based on a change in the way the Executive has chosen to exercise its discretion. Reply at 3

*Third*, Restrepo is wrong that the Government cannot show good cause merely because "[t]he sole basis for attempting to reverse course on [the Government's] decision not to seek the death penalty is a policy memorandum issued by the current Attorney General." Mot. at 20. General Bondi, as the then-Attorney General of the United States, was "the Nation's chief law enforcement officer." *Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985). In that role, she was empowered to "supervise all litigation to which the United States, an agency, or officer thereof is a party, and [ ] direct all United States attorneys, assistant United States attorneys, and special attorneys appointed under section 543 of this title in the discharge of their respective duties." 28 U.S.C. § 519; *see also* 28 U.S.C. § 516 ("[T]he conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General."). Restrepo offers no viable justification (and we can find none) for his claim that the Attorney General's authority to "direct all United States attorneys . . . in the discharge of their respective duties" doesn't include the authority to supervise death penalty litigation or to direct Assistant U.S. Attorneys to pursue the death penalty as Congress demands.

## II.    The Death Notice Was Timely

Having concluded that the FDPA doesn't prohibit the government's decision to reverse a prior no-seek, we must now determine whether the Death Notice complied with the FDPA. Restrepo

argues that "the notice is not timely, and is not even close to being timely." Mot. at 5. As Restrepo

sees it, the Death Notice "was filed on August 11, 2025, twenty-eight days before the trial scheduled

for September 8, 2025." *Id.* at 9. "Twenty-eight days," Restrepo insists, "does not meet the 'reasonable

time' required by 18 USC § 3593(a)." *Ibid.* Again, we disagree.

Section 3593(a) requires that, "if . . . the attorney for the government believes that the

circumstances of the offense are such that a sentence of death is justified . . . the attorney, a reasonable

time before the trial or before acceptance by the court of a plea of guilty, sign and file with the court,

and serve on the defendant a notice[.]" § 3593(a). As we've explained, to determine whether a death

notice was served "a reasonable time before the trial," "the applicable test is one of objective

reasonableness." *Wilk*, 452 F.3d at 1221. In applying that test, we consider the "totality of the

circumstances," including: "(1) what transpired in the case before the formal Death Notice was filed;

(2) the period of time remaining for trial after the Death Notice was filed; (3) the status of discovery

and motions in the proceedings; (4) the nature of the charges in the indictment; (5) the nature of the

aggravating factors claimed to support the death penalty; and (6) the anticipated nature of the defense,

if known." *Ibid.*

The second, third, fourth, fifth, and sixth factors weigh heavily for the Government here.

Starting with the second, the Government filed its Death Notice on August 11, 2025, and our trial is

set for September 8, 2026. *See* Death Notice; Third Amended Trial Order at 2. That period of 13

months between the Death Notice and the trial is plainly sufficient under *Wilk*, where the court found

that "six months was not only an objectively reasonable notice to complete the remaining discovery

and motions, it was more than enough time." *Wilk*, 452 F.3d at 1225; *see also United States v. Williams*,

318 F. App'x 571, 573 (9th Cir. 2009) (finding a "reasonable time" where "[t]rial is now scheduled to

commence more than one year after the Government filed its notice under section 3593(a)"). And

Restrepo never contends that 13 months is somehow insufficient. *See generally* Mot.

Instead, Restrepo resuscitates the same argument he advanced in his Opposition to Continuance—"that a continuance does not resolve the untimeliness of a notice to seek death." Mot. at 12; *see also* Def. Opposition to Continuance at 3 ("Under these and other extremely unique facts and circumstances, the government should not be rewarded with a continuance which might enable it to seek Mr. Restrepo's execution. They are trying to cure their inexplicable delays with a continuance, which does not remedy the infirmities of their untimely notice and reversal of their announcement not to seek the death penalty."). According to Restrepo, "[i]f a trial date is continued because the filing of the Death Notice is too close to the trial date, the Death Notice is per se unreasonable." Mot. at 12 (citations omitted). In saying so, he seems to be relying on several district-court decisions, which have interpreted the Fourth Circuit's opinion in *Ferebe* as holding that "an untimely Death Notice cannot be rescued by delaying the trial date." *United States v. Le*, 311 F. Supp. 2d 527, 532 (E.D. Va. 2004) (citing *Ferebe*, 332 F.3d at 738 (remanding the case to the district court because the Fourth Circuit couldn't determine from the record whether "the trial start date was cancelled in advance of the Death Notice's filing and irrespective of it")); *see also United States v. Ponder*, 347 F. Supp. 2d 256, 267 (E.D. Va. 2004) ("[I]f a trial date is continued because the filing of the Death Notice is too close to the trial date, the Death Notice is per se unreasonable."); *United States v. Hatten*, 276 F. Supp. 2d 574, 579 n.4 (S.D. W. Va. 2003) ("[D]elaying the trial date is not a remedy for an untimely death notice.");[10] *United States v. Breeden*, 2003 WL 22019060, at *2 (W.D. Va. Aug. 22, 2023) ("[A] court cannot continue a case for the purpose of allowing the government to file a timely Death Notice."). But we live in the Eleventh Circuit, which has explicitly rejected this very same argument:

---

[10] As we'll discuss below, *Wilk* cited, and rejected, the approach other courts took in *Ponder* and *Hatten*. *See Wilk*, 452 F.3d at 1223 n.26 ("A few district courts have examined whether the amount of time the government took to make a decision about whether to pursue the death penalty was reasonable. We reject that approach[.]" (first citing *Ponder*, 347 F. Supp. 2d at 263–65; and then citing *Hatten*, 276 F. Supp. 2d at 578)). So, to the extent Restrepo urges us to follow those decisions, the Eleventh Circuit has already instructed us *not* to.

§ 3593(a) states that the Death Notice must be filed "a reasonable time before the *trial*," not a reasonable time before the date the trial was scheduled to begin when the Death Notice was formally filed. Section 3593(a) does not state "before the date of trial," but rather states "before the trial. . . ." Simply put, there is nothing in § 3593 that restricts courts to counting only the days between the Death Notice and a scheduled trial date at the time of the filing of the Death Notice. . . .

Where a district court determines that the Death Notice was filed at a time when either party, particularly the defense, would reasonably be unprepared for a capital trial on the previously scheduled trial date, a continuance of the trial is appropriate. That a district court continues an earlier scheduled trial date for a murder case after a Death Notice is filed in order to make sure defense counsel has adequate preparation time for a now-required death defense is to be commended even if in the process it cures what might have otherwise been an untimely Death Notice.

*Wilk*, 452 F.3d at 1222–24 (quoting § 3593(a)); *see also id.* at 1225 ("District courts should have the ability to set trial dates to move the case along while it is a more simple murder case but then continue the trial date if and after a Death Notice is actually filed."). Since the Defendant will have more than 13 months from the day the Death Notice was filed to prepare for trial, this second factor weighs heavily for the Government.

"Our determination that the continuance was proper and the time interval between the Death Notice and the trial was [13 months] allows us to dispense quickly with the third, fourth, and fifth factors." *Ibid.* (considering a six-month period). On the third factor, the parties have been engaged in robust discovery practice for the better part of 17 months—a discovery practice we have monitored at our regular status conferences. *See* November 1, 2024, Status Conference Minutes [ECF No. 14]; November 6, 2024, Status Conference Minutes [ECF No. 20]; November 18, 2024, Status Conference Minutes [ECF No. 23]; January 6, 2025, Status Conference Minutes [ECF No. 32]; August 18, 2025, Status Conference Minutes [ECF No. 50]; September 2, 2025, Status Conference Minutes [ECF No. 62]. And, aside from a relatively uncomplicated motion for a bill of particulars [ECF No. 94], which we will resolve soon, there are no other pending motions in the case. This factor thus strongly favors the Government—and Restrepo notably doesn't contend otherwise. *See generally* Docket.

23

The fourth factor likewise leans decisively for the Government. As we've said, in *Wilk*, the Eleventh Circuit found reasonable a period of six months between the death notice and the trial in a case where "the nineteen-page second superseding indictment[,] [which] contain[ed] seven counts, span[ned] a broad period of time (nearly four years), involve[d] serious and lengthy allegations, and identifie[d] evidence (particular computer evidence) requiring expert access and review." *Wilk*, 452 F.3d at 1225. Our case isn't nearly as complicated. The Defendant is charged in one count of a Superseding Indictment that spans only four pages, and which arises out of conduct that spans only a single day. *See* Superseding Indictment at 1–2 (charging "Count 1 Kidnaping Resulting in Death" and alleging that, "[o]n or about May 30, 2016, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant . . . did willfully and unlawfully seize, confine, inveigle, decoy, kidnap, abduct, and carry away and hold a person, that is, Liliana Moreno . . . [and] that the commission of the aforesaid kidnapping resulted in the death of Liliana Moreno . . . [and] Daniella Moreno"). Indeed, at a recent status conference, the Government made clear that it could try the liability portion of this case with just 10 witnesses. *See* January 6, 2025, Hearing Transcript at 12:20 (noting that, without custodians, the Government had "maybe 10 to 15" witnesses).

The fifth factor similarly favors the Government because, as in *Wilk*, "the aggravating factors [in the Death Notice] merely tracked the language of the statute." *Wilk*, 452 F.3d at 1225. [11] As for

---

[11] Section 3592(c) provides that, "[i]n determining whether a sentence of death is justified . . . the jury, or if there is no jury, the court, shall consider each of the following aggravating factors for which notice has been given and determine which, if any, exist":

> (1) **Death during the commission of another crime**. The death, or injury resulting in death, occurred during the commission or attempted commission of, or during the immediate flight from the commission of . . . section 1201 (kidnapping)[;] . . .
> (8) **Pecuniary Gain**. The defendant committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value[;]
> (9) **Substantial Planning and Premeditation**. The defendant committed the offense after substantial planning and premeditation to cause the death of a person[;] . . .

the final factor, "the nature of the defense," the Eleventh Circuit has held "that six months is clearly more than sufficient time no matter what approach the defense decides to take." *Wilk*, 452 F.3d at 1225. Since we've given our Defendant more than twice as much time to prepare for trial after receiving the Death Notice, this sixth factor tilts emphatically for the Government.

That five of the six factors weigh completely for the Government is probably sufficient for us to deny the Defendant's Motion. But we'll address his arguments about the first factor anyway *both*

---

(11) **Vulnerability of victim.** The victim was particularly vulnerable due to old age, youth, or infirmity[;] . . .

(16) **Multiple killings or attempted killings.** The defendant intentionally killed or attempted to kill more than one person in a single criminal episode[.]

§§ 3592(c)(1), (8), (9), (11), (12).

The Death Notice tracks these aggravating factors from § 3592(c) and lists the "Statutory Aggravating Factors Enumerated Under 18 U.S.C. § 3592(c)" as:

1. **Death During the Commission of a Another Crime.** The death and injury resulting in the death of Liliana Moreno occurred during the commission and attempted commission of, and during the immediate flight from the commission of an offense under 18 U.S.C. § 1201(a)(1) (kidnapping) (18 U.S.C. 3592(c)(1)).

2. **Death During the Commission of Another Crime.** The death and injury resulting in the death of Daniella Moreno occurred during the commission and attempted commission of, and during the immediate flight from the commission of an offense under 18 U.S.C. § 1201(a)(1) (kidnapping) (18 U.S.C. § 3592(c)(1)).

3. **Expectation of Receipt of Anything of Pecuniary Value.** [Restrepo] committed the offense as consideration for the receipt, and in the expectation of the receipt, of anything of pecuniary value (18 U.S.C. § 3592(c)(8)).

4. **Substantial Planning and Premeditation.** [Restrepo] committed the offense after substantial planning and premeditation to cause the death of a person (18 U.S.C. § 3592(c)(9)).

5. **Multiple Killings.** [Restrepo] intentionally killed more than one person in a single criminal episode (18 U.S.C. § 3592(c)(16)).

6. **Vulnerable Victim.** The victim, Daniella Moreno, was particularly vulnerable due to youth (18 U.S.C. § 3592(c)(11)).

Death Notice at 3.

because that's the only factor he really spends much time on *and* because we think this factor likewise favors the Government.

In Restrepo's view, "[t]he first factor settles much of the matter in this case." Mot. at 11. "Unlike in *Wilk*," he says, "where the Court found that the defense knew from the outset that the case was a death penalty case, in this matter, the prosecutor announced a waiver of the death penalty on the record, less than sixty days from the indictment." *Ibid.* But the *Wilk* Court never so much as suggested that the change we have here—from a no-seek to a death notice—was what this first factor was primarily concerned with. Instead, addressing this first factor, *Wilk* found it relevant that "there [wa]s no allegation in this case that the government actually made a decision but then in bad faith intentionally delayed advising Wilk of its decision in order to shorten Wilk's preparation time." *Wilk*, 452 F.3d at 1223 n.26. Again, *Wilk* and its six-factor test were mainly concerned with ensuring that a defendant facing the ultimate penalty has enough time to prepare an adequate defense. *Wilk* thus has nothing to say about the subjective expectations of the defendant—did he believe that the government would *truly* seek the death penalty? Or did he become convinced that the government might forego that penalty? Were these subjective expectations material, the *Wilk* Court would have come out the other way on the propriety of the district court's continuance. After all, where the defendant is approaching his murder trial with no death notice from the government, he may become convinced—as our Defendant may have—that the government had chosen *not* to pursue the death penalty in the end. That the defendant in *Wilk* may thus have been disappointed (as Restrepo likely was) when, just one month before the scheduled trial, the government *finally* filed its death notice didn't seem to factor into the court's analysis at all.[12]

_____

[12] For what it's worth, even if subjective expectancy did matter somewhat, it could only matter in the context of the central question *Wilk* answered: Does the defendant have enough time to prepare? And, again, on this basic point, there's much to commend the Government's view that

And the *Wilk* Court *explicitly* elected *not* to second-guess the government's decision-making, with one exception we've mentioned already—where there's evidence that the government *purposefully* delayed the filing of the death notice *in order to* cheat the defendant of the time he needed to prepare for trial. Here's *Wilk* on this point:

> A few district courts have examined whether the amount of time the government took to make a decision about whether to pursue the death penalty was reasonable. We reject that approach as § 3593(a) is designed to protect the defendant from having to stand trial for his life without reasonable notice and time to prepare adequately. The § 3593(a) requirement does not obligate us to examine whether the government's ongoing decision making process took too long. The proper approach is to focus on whether the Death Notice reasonably gave the defendant adequate time before trial to prepare a defense, not whether the government reasonably should have made a decision earlier than it did. In addition, there is no allegation in this case that the government actually made a decision but then in bad faith intentionally delayed advising Wilk of its decision in order to shorten Wilk's preparation time.

*Wilk*, 452 F.3d at 1223 n.26 (first citing *Ponder*, 347 F. Supp. 2d at 263–65; and then citing *Hatten*, 276 F. Supp. 2d at 578).

In the end, on the crucial question *Wilk* confronted—how much time does the defendant need to prepare for his death-penalty trial?—our case (in which we gave the Defendant *more than double* the preparation time the court found sufficient in *Wilk*) plainly satisfies the *Wilk* standard. This first factor, in short, likewise favors the Government.

---

Restrepo and his lawyer expected the Government to pursue the death penalty long before trial. The First Indictment, after all, made clear that the maximum penalty for the crime with which Restrepo was charged was "Death." First Indictment at 2–3. And, in his first motion to continue the trial period, Restrepo noted that "the defendant is facing either life in prison or the death penalty[.]" November 26, 2024, Defendant's Motion to Continue ¶ 6. On January 6, 2025 (it's true), the Government did say that it would not be seeking the death penalty. *See* January 6, 2025, Hearing Transcript at 2:3–5 ("I was advised today by the capital case unit that the committee's voted against, so it will be a no seek."). Just *two months* later, however, the Government informed Restrepo that it would be reviewing this decision. *See* Email Between Prosecutor and Defense Counsel. And, far from evincing surprise, Restrepo's counsel responded: "Not surprising. Kind of expected." *Ibid.* That email was sent on March 24, 2025, *see ibid.*—almost 18 months before Restrepo's September 2026 trial is set to begin. Again, that's plainly enough notice under *Wilk*.

Having found that all six *Wilk* factors favor the Government, we reject Restrepo's argument that "the notice is not timely, and is not even close to being timely." Mot. at 5.

### III.   Estoppel

Finally, Restrepo argues that, "[i]n addition to having waived its ability to file a § 3593(a) notice of its intent to seek the death penalty, the government is estopped from doing so." *Id.* at 12. In Restrepo's view, "[t]here are at least three different types of estoppel that apply here—judicial estoppel, equitable estoppel, and promissory estoppel." *Ibid.* But "it is well settled that the Government may not be estopped on the same terms as any other litigant." *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984). Indeed, the Eleventh Circuit has "questioned whether estoppel can even be applied against the government." *Travieso v. Fed. Bureau of Prisons, Warden*, 217 F. App'x 933, 936 n.1 (11th Cir. 2007); *see also United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) (rejecting a judicial-estoppel argument against the government that was based on the government's policy reversal because "the government should not be unduly hindered from changing its position if that shift is the result of a change in public policy"). We could probably deny this part of the Motion on that basis alone. But, in the interest of completeness, we'll also explain why the Defendant's estoppel arguments fail—even if they were available to him.

#### a.   Judicial Estoppel

Restrepo relies first on the doctrine of judicial estoppel. "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis v. Wakelee*, 156 U.S. 680, 689 (1895). "This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (cleaned up). "Because the rule is intended

28

to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." *Id.* at 750.[13]

The Supreme Court has outlined three factors that "typically inform the decision whether to apply" judicial estoppel. *Ibid.* "First, the party's two positions must be clearly inconsistent." *United States v. Munoz*, 112 F.4th 923, 935 (11th Cir. 2024) (summarizing the *New Hampshire* factors). "Second, the party must have succeeded in persuading a court to accept its earlier position." *Ibid.* "And third, the party must 'derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Ibid.* (quoting *New Hampshire*, 532 U.S. at 750–51); *see also United States v. Alonso-Fonseca*, 2024 WL 4589660, at *2 (11th Cir. Oct. 28, 2024) ("It has also been applied to 'preclude[ ] a litigant from asserting a claim or defense that might otherwise be available to him against another party who has detrimentally altered his position in reliance on the former's misrepresentation or failure to disclose some material fact.'" (quoting *Fed. Deposit Ins. Corp. v. Harrison*, 735 F.2d 408, 410 (11th Cir. 1984))). As this summation should have already made clear, Restrepo fails the second and third factors of this test.

---

[13] The Fifth and Ninth Circuits have "assumed—without deciding—that the doctrine may be applied to the Government in a criminal case." *United States v. Glover-Wing*, 161 F.4th 370, 374 (5th Cir. 2025) (cleaned up); *see also United States v. Lehman*, 756 F.2d 725, 728 (9th Cir. 1985) ("We need not decide whether judicial estoppel is ever available against the government in a criminal case."). Like our decision today, the Fifth Circuit declined to reach "whether the government may be judicially estopped in a criminal case—when judicial estoppel simply does not apply to [the instant] case." *Glover-Wing*, 161 F.4th at 377. And, to our knowledge, the Eleventh Circuit has never applied the doctrine of judicial estoppel to the government in a *criminal* case. Instead, like the Fifth and Ninth Circuits, the Eleventh Circuit has sidestepped the issue by finding that judicial estoppel *didn't* apply in the factual circumstances of the cases before it. *See United States v. Campa*, 459 F.3d 1121, 1152 (11th Cir. 2006) ("Judicial estoppel is not applicable here because *Ramirez* was not a related proceeding, but rather an employment discrimination lawsuit."); *United States v. Gongora Baltan*, 798 F. App'x 597, 599 (11th Cir. 2020) ("The district court did not plainly err by failing *sua sponte* to invoke the doctrine of judicial estoppel to bar the government from requesting an exportation enhancement for Gongora and Salas.").

Starting with the second factor, Restrepo never "succeeded in persuading a court to accept its earlier position." *Munoz*, 112 F.4th at 935. Although the Government did initially tell us (and Restrepo) that it wouldn't be pursuing the death penalty, it didn't ask us to do anything with that information, and we were thus never "persuaded" either to accept or reject it.

Restrepo also fails the third *New Hampshire* factor because he hasn't shown either that the Government "'derive[d] an unfair advantage'" from the policy reversal or that it "impose[d] an unfair detriment on the opposing party if not estopped.'" *Ibid.* (quoting *New Hampshire*, 532 U.S. at 750–51). Restrepo contends that "the defense was given no time to adequately investigate mitigation." Mot. at 21. But that isn't true. As we've seen, the defense will have more than 13 months to present its mitigation case. What Restrepo *really* means is that "the prosecutor and the Department of Justice forced defense counsel to make a presentation [to the CRC] against the death penalty with almost no time to prepare properly." *Ibid.* But "[t]he Death Penalty Act itself gives defendants no right to participate in the process by which the Justice Department determines whether to seek the death penalty." *United States v. Boone*, 245 F.3d 352, 367 (4th Cir. 2001) (Kieser, J., concurring in part and dissenting in part). Rather, the DOJ "Manual contains guidelines for determining whether to seek the death penalty," which are "widely known as the 'death penalty protocols.'" *United States v. Lopez-Matias*, 522 F.3d 150, 155 (1st Cir. 2008). "Under the death penalty protocols, defense counsel must be provided a 'reasonable opportunity' to present mitigating evidence to the United States Attorney before he or she makes a recommendation whether to seek the death penalty." *Ibid.* But "[t]he DOJ Manual, which contains the death penalty protocol[s], expressly states that it does not create substantive or procedural rights enforceable by others and that it does not limit DOJ's lawful 'prerogatives[.]'" *United States v. Lee*, 274 F.3d 485, 493 (8th Cir. 2001); *see also Diaz v. U.S. Citizenship & Immigr. Servs.*, 499 F. App'x 853, 855 (11th Cir. 2012) ("When a plaintiff attempts to raise a cause of action on the basis of such internal guidance, we have said that the manual does not create

enforceable, substantive federal rights."); *Lopez-Matias*, 522 F.3d at 156 ("[W]e determine that a simple violation of the Manual does not create a basis for dismissing the [Death] Notice[.]"); *Nichols v. Reno*, 124 F.3d 1376, 1377 (10th Cir. 1997) (finding that the defendant has no "protectable interest" in enforcement of the death-penalty protocols).

The First Circuit rejected a similar claim in *Lopez-Matias*, where the defendants sought to strike the prosecution's death notice because (they said) they "had no meaningful chance to present mitigating evidence before the government made its decision[.]" 522 F.3d at 152. The First Circuit held that "[w]e need not consider whether counsel had such an opportunity here" because "the first page of that manual warns that the guidelines do not create any rights." *Id.* at 155. "[A] violation of the Manual, by itself, would not give rise to the sanction imposed here." *Id.* at 156.

So too here. Restrepo had no "substantive or procedural" right to present his mitigation evidence to the CRC (or to any other government official) before the Department of Justice rendered its decision. *See id.* at 155. He's thus failed to show any "unfair detriment" here. *See Heckler*, 467 U.S. at 62 ("To analyze the nature of a private party's detrimental change in position, we must identify the manner in which reliance on the Government's misconduct has caused the private citizen to change his position for the worse. . . . [T]his is not a case in which the respondent has lost any legal right, either vested or contingent, or suffered any adverse change in its status. When a private party is deprived of something to which it was entitled of right, it has surely suffered a detrimental change in its position. Here respondent lost no rights but merely was induced to do something which could be corrected at a later time."); *Costa v. Immigr. & Naturalization Servs.*, 233 F.3d 31, 38 n.7 (1st Cir. 2000) (explaining that, "in order for there to be detrimental reliance, the aggrieved party must show that he has surrendered a right that he possessed" (citing *Heckler*, 467 U.S. at 61–62)); *Kennedy v. United States*, 965 F.2d 413, 418 n.2 (7th Cir. 1992) ("*Heckler* can be interpreted to require an estoppel claimant to

demonstrate he or she was statutorily entitled to a benefit before the claimant can argue detriment from loss of the benefit at the government's hands.").

Parrying, Restrepo urges us to follow other district courts that have come out the opposite way on this issue. *See United States v. Spurlock*, 782 F. Supp. 3d 987 (D. Nev. 2025), *appeal dismissed*, 2025 WL 2319947 (9th Cir. June 11, 2025); *United States v. Cole*, 799 F. Supp. 3d 438 (D.V.I. 2025); *United States v. Dangleben*, 2025 WL 2647195 (D.V.I. Sep. 15, 2025); *United States v. Suarez*, 801 F. Supp. 3d 872 (N.D. Cal. 2025); *United States v. Meehan*, 2026 WL 447431 (S.D. Ind. Feb. 17, 2026); *United States v Costanza-Goldomez*, 787 F. Supp. 3d 131 (D. Md. 2025); *United States v. Merrell*, 2025 WL 2911170 (N.D. W. Va. Oct. 7, 2025). But our facts are different from most (if not all) of these cases. For one thing, unlike what happened in *Spurlock*, *Cole*, *Dangleben*, and *Suarez*, we never set a deadline for the Government to file its death notice. *Contra Spurlock*, 782 F. Supp. 3d at 994–96, 999 ("[T]he Court set a deadline for the government to give notice by August 16, 2024, as to whether it would seek the death penalty against [the] Defendant. . . . On July 31, 2024, before the Court's August 16, 2024, deadline, the government timely filed a formal notice of intent not to seek the death penalty. . . . [On April 11, 2025,] the government filed a notice of its intent to seek the death penalty, reversing its July 2024 decision[.]"); *Cole*, 799 F. Supp. 3d at 441–43 (setting a March 5, 2024, deadline for a death notice, while the government filed the death notice on July 18, 2025); *Dangleben*, 2025 WL 2647195, at *3 ("The Government's Death Notice, filed well over a year after the Court-extended deadline of February 12, 2024, clearly violates that deadline."); *Suarez*, 801 F. Supp. 3d at 879 ("[T]he Government can no longer file any notice to seek the death penalty because such a notice would violate the Court's August 14, 2025, deadline."). Had the Government in our case violated our scheduling order the way

the government had in those other cases, we may well have joined those other judges in prohibiting the government from doing so. But that's just not our case.[14]

For another, the Government in our case told Restrepo that his case was under re-review just *five months* after he was indicted. It then served its Death Notice just five months after that (just ten months after the indictment was filed)—well before any substantive briefing had occurred. That, again, makes our case very different from most of the cases Restrepo relies on, where the government only filed its death notice *either* on the eve of trial *or else* years after the indictment came down. *See Spurlock*, 782 F. Supp. 3d at 1004 ("The August 2024 deadline was roughly 15 months after the case was indicted, more than two years after the government began investigating the case, and more than three years after Spurlock came into California custody related to two of the alleged murders."); *Cole*, 799 F. Supp. 3d at 460 (noting that the indictment was filed in January 2024, but the death notice wasn't served until July 18, 2025, "52 days before trial"); *Constanza-Galdomez*, 787 F. Supp. 3d at 139 ("On April 2, 2025, just five days before [the] Defendants were due to file their substantive motions pursuant to the scheduling order, the government informed this Court that the prosecution team was advised by a member of the Department of Justice's Capital Case Section (CCS) that The Attorney General's Capital Review Committee has selected defendants Wilson Costanza-Galdomez [sic], Edis Valenzuela-Rodriguez, and Jonathan Pesquera-Puerto for further evaluation." (cleaned up)); *Merrell*,

---

[14] One could—though the Defendant never does—blame the Government for the lack of a death-notice deadline. After all, one might say, had the Government not told us that it *wasn't* going to pursue the death penalty, we likely would have set such a deadline. And it's at least plausible to suppose—though we can't say for sure—that, had we set that deadline, the Government's later Death Notice might have come, as it did in so many of the cases Restrepo cites, too late. In this way, one could argue, our decision today rather encourages the government to play games—to lie about its intent to seek the death penalty as a means of preventing courts from setting deadlines it then cannot be blamed for missing. If that were the case, however, the Government's gamesmanship would fail at least the first *Wilk* factor (and likely several others besides). In any event, the Defendant never advances this argument. *See generally* Mot.; Reply. And that's probably because there's no evidence of any such gamesmanship on our facts.

2025 WL 2911170, at *1 ("On July 1, 2025, the Government filed a Notice of Intent to Seek the Death Penalty—seven months prior to trial—and over five years after the case began."); *Dangleben*, 2025 WL 2647195, at *2 (noting that the defendant was "put on notice that the United States was reviewing its 'no-seek' decision, nearly 16 months after being indicted"); *Meehan*, 2026 WL 447431, at *4 ("The Court also accepted the government's decision not to seek the death penalty at the July 28, 2022 status conference, more than three years before the government's reversal."). In fact, unlike *all* the cases Restrepo cites, the Government here told Restrepo's lawyer it may be reversing course *just two months* after it announced its no-seek. *Cf. Spurlock*, 782 F. Supp. 3d at 995–96 (serving a no-seek on July 31, 2024, and notifying the defendant of the CRC's re-review seven months later, on February 13, 2025); *Constanza-Galdomez*, 787 F. Supp. 3d at 135 (serving a no-seek on April 22, 2024, and notifying the defendant of the CRC's re-review a year later, on April 2, 2025); *Cole*, 799 F. Supp. 3d at 442 (serving a no-seek on March 1, 2024, and notifying the defendant of the CRC's re-review a year later, on March 26, 2025); *Dangleben*, 2025 WL 2647195, at *3 (serving a no-seek on February 7, 2024, and notifying the defendant of the CRC's re-review a year later, on February 12, 2025); *Suarez*, 801 F. Supp. 3d at 875 (serving a no-seek on May 2, 2024, and notifying the defendant of the CRC's re-review over a year later, on June 16, 2025); *Meehan*, 2026 WL 447431, at *4 (serving a no-seek on July 28, 2022, and notifying the defendant of the CRC's re-review three years later, in April 2025); *Merrel*, 2025 WL 2911170, at *1 (serving a no-seek on January 25, 2024, and discussing the CRC's possible re-review a year later, on January 27, 2025).

For all these reasons, we're not persuaded by the Defendant's judicial-estoppel arguments.

### b. Promissory Estoppel

Restrepo's reliance on the doctrine of promissory estoppel fares no better. Restrepo contends that "[t]he government's formal announcement qualified as a 'promise' because it was a clear manifestation of an intention to refrain from acting in a specified manner, conveyed in such a way

that Mr. Castano Restrepo and his defense team were entirely justified in understanding that an irrevocable commitment not to seek the death penalty had been made." Mot. at 16. "This is particularly true," he says, "in view of the Justice Manual provisions and the fact that the Department of Justice previously had treated its no-seek notices as permanent." *Ibid.* We don't think that's quite right.

As an initial matter, the Eleventh Circuit has only ever considered applying the doctrine of promissory estoppel against the government in a criminal case in the context of an immunity agreement. *See United States v. Weaver*, 905 F.2d 1466, 1474 (11th Cir. 1990) (considering whether the government promised to extend the immunity period for the defendant's continued cooperation and finding that, "since the government made no promises that Sikes would not be prosecuted for any offenses committed in 1986, the doctrine of promissory estoppel is of no aid herein to Sikes"); *cf. United States v. Washington*, 887 F. Supp. 2d 1077, 1100 (D. Mont. 2012) ("The doctrine of promissory estoppel does not preclude the federal government from enforcing its laws[.]"). And Restrepo identifies no authority for his contention that the doctrine of promissory estoppel can be invoked against the government for *following the law* in its charging decisions. We could reject his argument on this basis alone. *See Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed waived.").

But *even if* Restrepo had properly supported this argument, we would reject it. "To prevail on a promissory estoppel claim, a plaintiff must prove that (1) the defendant made certain promises, (2) the defendant should have expected that the plaintiff would rely on such promises, and (3) the plaintiff did in fact rely on such promises to her detriment." *Funderburk v. Fannie Mae*, 654 F. App'x 476, 478 (11th Cir. 2016) (cleaned up). "Only detrimental reliance which causes a substantial change in position will constitute sufficient consideration to support promissory estoppel." *Robinson v. SunTrust Mortg., Inc.*, 785 F. App'x 671, 678 (11th Cir. 2019).

Restrepo fails this third prong for the same reason he failed the third prong of the judicial-estoppel test—because he cannot show detrimental reliance. Restrepo says that "[t]he prosecution has obtained a distinct advantage" in two ways. Mot. 18. *First*, he claims that "[t]he defense had to make a presentation to the DOJ without an adequate time period to investigate mitigation[.]" *Ibid.* Restrepo was on notice of the CRC's review on March 24, 2025, and he had 71 days, until June 3, 2025, to prepare his mitigation defense. *See* Email Between Prosecutor and Defense Counsel; Resp. at 19 ("[O]n June 3, 2025, Mr. Reizenstein met with the Committee and presented his power point slides as mitigation."). But Restrepo hasn't shown that, if the Government had proceeded with the death penalty earlier, it would have given him *more* time than this to prepare for the CRC's review. In other words, once the Government submitted its Death Notice, it set him for the CRC review 71 days later. There's no evidence that, had the government submitted its Death Notice back when it told us it *wasn't* seeking the death penalty, it would have given Restrepo *more* than 71 days to prepare for the CRC review. In any event, as we've explained, Restrepo had no right to participate in the Government's decision-making in the first place—much less to have adequate time to conduct and prepare his mitigation package to the CRC. In other words, we see no "detrimental reliance which cause[d] a substantial change in position[.]" *Robinson*, 785 F. App'x at 678.

*Second*, Restrepo insists that "the late filing of the notice of intent to seek death has placed the defense in the position of being forced to object to the delay of the September 8, 2025 trial date, lest any delay allow the prosecution to get through the back door a timely filed notice that they cannot get through the front door." Mot. at 18. But this argument became moot when we continued Restrepo's trial to September 2026—a remedy that, as we've explained, the Eleventh Circuit has *expressly* endorsed. *See Wilk*, 452 F.3d at 1223–24 ("That a district court continues an earlier scheduled trial date for a murder case after a Death Notice is filed in order to make sure defense counsel has adequate preparation time for a now-required death defense is to be commended even if in the process it cures

36

what might have otherwise been an untimely Death Notice."). We therefore reject Restrepo's promissory-estoppel contentions.

### c.   Equitable Estoppel

Restrepo also advances a cursory equitable-estoppel argument. "When the government announced its no-seek decision," he explains, "Mr. Castano Restrepo and his defense team were misled into believing that the death penalty was off the table and thereby relied to their detriment." Mot. at 14. Again, however, "[t]he Supreme Court has never established that the doctrine of equitable estoppel can be applied against the government and, in fact, has implied that it cannot be." *Tovar-Alvarez v. U.S. Att'y Gen.*, 427 F.3d 1350, 1353 (11th Cir. 2005). We won't go against that implication.

In any event, Restrepo's equitable-estoppel claim ails on its merits. To prevail on a claim of equitable estoppel, Restrepo "must prove four elements: (1) words, conduct, or acquiescence that induced reliance; (2) willfulness or negligence with regard to the acts, conduct, or acquiescence; (3) detrimental reliance; and (4) affirmative misconduct by the government." *Travieso*, 217 F. App'x at 936 (citations omitted). "Affirmative misconduct requires more than governmental negligence or inaction." *Ibid.* Here, again, Restrepo fails the third and fourth prongs. For all the reasons we've already described, Restrepo hasn't shown "detrimental reliance." And he never even tries to identify any "affirmative misconduct by the government."[15] *See generally* Mot.; Reply. He's thus forfeited any such argument. *See Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only]

---

[15] Restrepo gets closest to alleging "affirmative misconduct" when he characterizes the Government's reversal as a "political decision to seek the death penalty and fulfill the vagaries emanating from Washington, D.C." Mot. at 3. But the Government acted well within its discretion in seeking the death penalty. It, after all, was merely doing what the law has always allowed it to do— and, indeed, what the law may have *required* it to do all along. *See supra* I.b–c; *see also United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case[.]"). We'd be hard-pressed to characterize the Government's efforts to follow the law as "affirmative misconduct."

in extraordinary circumstances."); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *Egidi*, 571 F.3d at 1163 ("Arguments not properly presented...are deemed waived.").

*    *    *

After careful review, in short, we **ORDER and ADJUDGE** that the Defendant's Motion to Strike [ECF No. 53] is **DENIED**.

**DONE AND ORDERED** in the Southern District of Florida on May 21, 2026.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record